1  MEHRDAD PORGHAVAMI, Defendant
   Appearing in Propria Persona
2  11140 Fair Oaks Blvd, Suite 300
   Fair oaks, CA 95628
3  Tel # (916) 747 1205
   Fax # (916) 966 2268
4  Email: mpagroup@aol.com

**FILED**

JUL 14 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

5                  UNITED STATES DISTRICT COURT

6                  EASTERN DISTRICT OF CALIFORNIA

7

8  BEN & JERRY'S FRANCHISING, INC.,          CASE NO. 2:07-CV-02599-JAM-KJM
   et al.,
9                                            *[Assigned to Hon. John A. Mendez]*

10              Plaintiffs,

11       v.

12  MEHRDAD PORGHAVAMI, et al.,

                                             **NOTICE OF MOTION AND MOTION TO
13              Defendants.                  EXCLUDE THE EXPERT WITNESS
                                             TESTIMONEY AND REPORT OF MR.
14                                           ROBERT H. WALLACE**

15  MEHRDAD PORGHAVAMI, et al.,

16              Cross-Complainants,

17       v.                                  HEARING:

18  BEN & JERRY'S FRANCHISING INC.,          Date: July 29, 2009
    BEN & JERRY'S HOMEMADE INC.,             Time: 9:00 am
19  BEN & JERRY'S OF CALIFORNIA, INC.        Courtroom: 6
    and WONDER ICE CREAM, LLC,
20

21              Cross-Defendants.            TRIAL DATE: DECEMBER 7, 2009

22

23

24

25       TO PLAINTIFFS' AND CROSS-DEFENDANTS' BEN & JERRY'S

26  FRANCHISING, INC. AND BEN & JERRY'S HOMEMADE, INC:

27       PLEASE TAKE NOTICE; that on July 29, 2009, at 9 a.m. in courtroom 6 of
28

                                         1

the above captioned court, located at 501 I Street, Suite 4-200 Sacramento, California, or as soon as thereafter as this matter could be heard, Defendants' and Cross-Complainants Mehrdad Porghavami and MPA GROUP, INC., will, and hereby do move this Court for an order excluding Plaintiffs' and Cross-Defendants Ben & Jerry's Franchising, Inc., and Ben & Jerry's Homemade, Inc. Mr. Robert H. Wallace the Expert Witness report and intended testimony.

This motion is based on this Notice of Motion and Motion, the pleadings, the attached Memorandum of point and Authorities, the attached Declaration of Mehrdad Porghavami, and such other materials as the Court, in its discretion, may consider. A proposed Order is also submitted herewith.

DATED: July 14, 2009

Respectfully Submitted,

By: _____

MEHRDAD PORGHAVAMI, ET AL
Defendants & Cross-Complainants
Appearing in Propria persona

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTERRODUCTION:

Plaintiffs and Cross-Defendants Ben & Jerry's Franchising, Inc. and Ben & Jerry's Homemade, Inc., (hereinafter collectively as "Ben & Jerry's") pursuant to Fed. R. Civ. P. 26(a)(2) Disclosures, have designated Mr. Robert H. Wallace as an Expert witness and submitted his Written Report which also included his resume, list of publications, list of prior testimony and statement of compensation (the Ben & Jerry's Report), is attached hereto as Defendants' Exhibit ``A``.    The Ben & Jerry's Report and is defective because; a) Mr. Wallace is not an industry expert and does not have any expertise in Scoop Shops and in particular sufficient knowledge in operations of small business such as Ben & Jerry's Scoop Shops and the retail business and the industry in general, b)  has insufficient experience in valuing the specific loses associated with the Scoop Shops. Accordingly Defendants' Mehrdad Porghavami and MPA GROUP, INC (hereinafter collectively as `Porghavami`) respectfully request that this Court's pursuant to Federal Rules of Evidence 702 for entry of an Order precluding the Ben & Jerry's Report and possible testimony of Mr. Wallace on this matter.

## II.    STATEMENT OF FACTS

On or about October 2002, Porghavami purchased his first Ben & Jerry's Scoop Shop in  Roseville California (Roseville Shop), then followed by Sacramento shop agreement (Sacramento Shop) in December 2003 and Concord shop agreement (Concord Shop) in August 2005. The shops where purchased on an assumption that shops required investment and were not up to Ben & Jerry's standard at the time of purchase, in fact for each shop Porghavami was given a list of improvement and the upgrades that Ben & Jerry's required before the franchisee agreements could be finalized.  Submitted herewith as Defendants Exhibit "B" true and correct copy of

3

"Store Upgrades Needed for transfer" for Concord Shop dated 4/20/2004. Porghavami upgraded and brought each shops up the then current Ben & Jerry`s standard. At the time of closing the Roseville and Sacramento shops meet and or exceeded Ben & Jerry`s requirements. Porghavami was also able to market the shops products and services effectively "outside of the four walls" and he had put together a list of customers and contact list that covered Placer, Sacramento and Contra Costa counties and had exceeded any other shops marketing efforts in the region. His Catering business had increased by 100 percent between 2003 to 2005. Attached herein as Exhibit ``C`` a true and correct copy of Roseville shop transfer package, ``Sales Mix & Sales History`` Off premise sales in 2003 total sum of $2,388.35 had increased to $16, 178.62 by the 2005. In fact by the September of 2006 after two years of negotiations, Porghavami`s Scoop Shops in Roseville and Concord were elected for the School Smoothies program in two School Districts in Roseville and in Contra Costa counties in which case it would have quadrupled his catering business, by generating additional sales of 300-500 per day of smoothies to each school district. With the new businesses in Roseville and the Kiser`s hospital complex just opened across the street from his Roseville shop, he was expecting to increase his catering and special deliveries to the hospital staff by 25% in the 2006 and at the rate of 10-15% thereafter. Porghavami had set up special take outs and delivery menu that was based on the requirements of his new clients in the hospital and the neighboring businesses.

Issues that effected his business in Roseville in addition to Ben & Jerry`s deteriorating quality of products and lighted tubs and constant increase of his supply and costs, also included; a) how to compete with the discounted pints of Ben & Jerry`s sold by shops such Wall Marts that for most part was even lower than his cost from his own distributor (the Cross-Defendants Wonder Ice Cream). Shortages by Ben & Jerry`s and Wonder Ice Cream starting the last quarter of 2004 throughout 2005 (numbered about 181 items that also included new and featured flavors).

4

Denial of products during January-February 2006 and again in from August 25, 2006 through closing of Roseville and Sacramento shops on November 1, 2006 and continued for Concord shop through July 2007. Ben & Jerry`s and Wonder have shorted and declined deliveries of 673 items from September 2004 through September 2006. Attached herein as Defendants` Exhibit ``D`` true and correct copy of Porghavami`s Second Supplemental Answer to Ben 7 Jerry`s 1st set of Interrogatory (page 14 line 8).

Starting September and during October 2006 Porghavami due to the ongoing problems with Ben & Jerry`s and their Distributor Wonder Ice Cream had initiated efforts for the sale his shops and as the result of his efforts he was able to reach an agreement in principal for the sale of the Roseville and Sacramento shops. The negotiated terms included a Letter of Intent (LOI) and the deposits subject to acceptance of the application by Ben & Jerry's and the terms that he could have sold his shops at the price and terms that had been agreed, and in fact one of his interested parties filed Ben & Jerry`s application and one was in the process of filing one, when Porghavami learned from Ben & Jerry's that his potential investor (buyer) would not be acceptable and was only turned down by Ben & Jerry`s as the result of ever changing requirements for the possible purchase of his shops, that Porghavami gave up any hope to ever selling his shops under the conditions Ben & Jerry`s required and higher set of standards that they had required. Attached herewith as Defendants` Exhibit ``E`` the application form and the LOI reached in regards to Sacramento Scoop Shop. Attached herewith as Defendants` Exhibit ``F`` the LOI reached in regards to Roseville Scoop Shop.

Mr. Wallace report is silent of these and other issues that had major effect on Porghavami`s business and lead to closing down his shops in Roseville and Sacramento, in fact Mr. Wallace report states that there was no fair market value associated with the Roseville or Sacramento Shop, beyond the value of its fixed assets. Here, Mr. Wallace is ignorance of the very term of what the ``Fair Market

5

Value`` means. Porghavami, through years of marketing and brokerage in Aviation and aircraft sales had learned that the definition of ``Fair Market Value`` is a price or terms that is negotiated between a willing and informed buyer and willing and inform Seller. So if Porghavami had offered the Roseville shop for $130,000., and Sacramento shop for $220,000., and there were parties that had accepted the terms and the price after their due diligent, then that price would represent the "Fair Market Values`` for each shop despite of Mr. Wallace opinion three years down the road. Mr. Wallace opinion also states that Porghavami ceased to place order, he is again ignorance that Wonder was the party that repeatedly shorted and or denied deliveries to Porghavami`s shops, despite the regular payments that they had received.

Mr. Wallace is pointing out two factors that drives sales-supply of products and demand for that product (Exhibit A, Ben & Jerry`s report page 8, item 2). Amazingly then he concludes that: MPA (Porghavami) has not presented evidence to support its contention that had if received a greater supply of products, it would have been able to generate higher sales level in 2005. This is the degree of Mr. Wallace lack of unfamiliarity with the retail sales and in particular Scoop Shops business! Why would you place for additional orders if you have products on hand (?), in that case why would you want more products? You only order additional products when you are running out and require the products for the continuance of your business. If you don`t get the products, then you cannot continue with your services and your sales will suffer. Obviously these two elements have direct relation and one complement and support the other one, study supply would only complement and support increase sales. Mr. Wallace is ignorance of Porghavami evidence, his continued demand and orders for more products and reordering the same shorted and denied items this is business 101(!) Mr. Wallace also concludes that ``Lost profits are calculated by deducting from lost sales the costs and expenses that would have been incurred had the additional sales been made". This is an

6

indicative of how off the chart this conclusion is, when you run a small business such as scoop shop, and you have to operate the shop, and staff and man the shop, your day to day operation costs are almost fixed. You would have, items such as your rents, insurance, utilities, marketing fees and your staff. The two staff that could serve 50 customer during 5-6 hours period of their shift, could also serve 100 customers with additional products, and with marketing and featured flavors, you could perhaps serve 150. The additional 50-100 customers would also be visiting back more often, if you don`t disappoint them, so actually your lost would decrease and your profit would increase in short term, and in long term would only improve your profits and bottom line, while the costs of the extra products would be nominal and limited to the costs of extra goods and paper products that you serve.

In the case of shortages and lack of featured and popular flavors, you can only conclude that your services will suffer, customer are not satisfied, your losses increases and the long term effect will be less customer frequencies, loss of sale and decrease profitability. In short Mr. Wallace report lacks the relevant and the understanding on the following:

1) Loss of sales due to unfair discounted pints sales to other local businesses that was not available to franchisees, including Porghavamis' shops and created an unfair competition against its own brand.

2) Loss of sales due to the lighted tubs and deteriorating quality of the products that increase customer dissatisfaction and increase costs and loss of sale and future businesses for franchisees, including Porghavami's shops.

3) Loss of sales due to the Shortages of popular and featured flavors,

4) High Costs of equipments including Micro`s and after sale support and services. Increasing your costs.

5) Operation of Small business and in particular Ben & Jerry`s Scoop Shops.

6) The understanding of the Fair Market Value

7) The continued declining sales prior to Porghavami's purchase was mainly due to shops not meeting very code that Ben & Jerry's had required for the normal operation of the Scoop Shops, including the broken down equipments, lack of updated equipments and machinery and local marketing and proper supervisions. Porghavami's had remedied all the related issues and at the time of closing each of his shops in Roseville and Sacramento had met or exceeded then Ben & Jerry's requirement and standards and in fact Porghavami despite of his ongoing struggle with Ben & Jerry's and their distributor Wonder had increased customer frequencies, sales of high ticket items, the Catering business and ice cream cake sales through out of his operations,

## III. ARGUMENT:

Rule 702 of the Federal Rules of Evidence provides for the admissibility of expert testimony in the Federal courts, setting the following parameters:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case.

The Court has discretion to exclude expert testimony on damages which, although thorough and scientific, is based upon speculative assumptions and not sufficiently connected to the theory of liability, Group Health Plan, inc. v. Philip Morris, USA, Inc., 344 F.3d 753, 761 (8th Cir. 2003). The owner or operator of a business with substantial experience in the industry may be allowed to provide opinion testimony on lost profit resulting from defendant's conduct. BBSerCO,

INC. v. Metrix Co., 324 F3d 955, 963 (8th Cir. 2003). However, openion testimony will be excluded from evidence where the witness lacks sufficient knowledge of the operations or experience in the industry. Dijo, Inc., v. Hilton Hotels Corp., 351 F3d 679, 686-87 (5th Cir. 2003). The court may bar expert opinion relating to purported damages when the testimony demonstrates that the witness has insufficient experience in valuing the specific losses in the particular industry. State Contracting & Engineering Corp v. Conditte AM, Inc., 346 F3d 1057, 1073 (Fed. Cir 2003)

Fed. R. Evid. 702; See Reiffen v. Microsoft corp., 270 F. Supp. 2d 1132, 1145 (N.D. Cal 2003) (Walker, J.). Although Rule 702 affords a court wide latitude to admit expert testimony, such testimony is inadmissible if it does not meet two related requirements: (1) it must be based on the special knowledge of the expert; and (2) it must be helpful to the finder of fact. See Daubert v. Merrel Dow Pharmaceuticals, Inc., 508 U.S. 579, 589-91 (1993); Andrew v. Metro North Commuter R. Co., 882 F. 2d 705, 708 (2d Cir. 1989)(stating for an expert's testimony to be admissible, it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a Jury is capable of understanding and deciding without the expert's help.); United States v. Jackson, 425 F. 2d 574, 576 (D.C. Cir 1970)("To warrant the use of expert testimony, two elements are require. First, the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman, and second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth")(quoting McCormick, evidence Section 13). The burden is on the party offering the proposed expert opinion testimony to prove by a preponderance of the evidence that the testimony satisfies the requirements for admissibility. See Daubert, 509 U.S. at 592n. 10. An expert for one purpose is not an expert for all purposes. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires

9

that the area of the witness's competence matches the subject matter of the witness's testimony". See 29 Charles A. Wright, et al., Federal practice & procedure section 6265 at P.255 & nn. 34 & 35 (1977). Accordingly, not all opinions that happen to be held by an expert are "expert opinions". See United States v. Benson, 941 F2d 598, 604 (7th Cir. 1991). Opinion falling outside the expert's area of expertise are inadmissible. See eg., Watkins v. Schriver, 52F.3d 769, 771 (8th Cir. 1995) affirming exclusion of neurologist's testimony "that the (Plaintiff's neck) injury was more consistent with being thrown into a wall than with stubmle into the corner. Mid-State Fertilizer Co. v. Exchange national bank, 877 F. 2d 1333, 1339-40 (7th Cir. 1989) rejecting economist's opinion that defendant's conduct "was contrary to good faith and fair dealing.

## IV. MR. WALLACE IS NOT QUALIFIED OR CAPABLE OF OPINE ON ECONOMIC ISSUES.

Mr. Wallace report ignoring very issues that had effected Porghavami's Scoop Shops business including: 1) Loss of sales due to unfair discounted pints to other local businesses that was not available to franchisees, including Porghavami, that has created an unfair competition against its own brand. 2) Loss of sales due to the lighted tubs and deteriorating quality of the products that increase customer dissatisfaction and increase costs and loss of sales and future business for franchisees, including Porghavami, 3) Loss of sales due to the Shortages of popular and featured flavors, 4) High Costs of equipments including Micro`s and after sale support and services, 5) Operation of Small business and in particular Ben & Jerry`s Scoop Shops. 6) The understanding of the Fair Market Value. 6) The continued declining sales prior to Porghavami`s purchase was due to shops not meeting very codes and standards that Ben & Jerry`s had required, including the broken down equipments, lack of equipments and machineries, local marketing and proper local supervisions, Porghavami`s had remedied all the related issues and at the time of

closing each of his shops in Roseville and Sacramento had met or exceeded then Ben & Jerry's requirement and standards) in fact Porghavami despite of his ongoing struggle with Ben & Jerry's and their distributor Wonder had increased customer frequencies, sales of high ticket items, Catering business and cake and sales through out of his operations.

## V. MR. WALLACE HAS NOT APPLIED RELATED INDISTRYS STANDARDS TO CONCLUDE HIS OPINION. (Report items VI. 2, 3, 4, 5 VII., 2, 3, 4,5, VIII., 1, 2, 3, 4)

Ben & Jerry's Report Items VI. 2, VII 2, and VIII 1 and Items VI 3, VII 3 and VIII 2- Ben & Jerry's and Wonder had shorted and or denied at least 673 tubs (Exhibit D) of ice cream and other products to Porghavami shops during September 2004 through September 2006. Assuming 98% were 2.5 gallons tubs then the shorted items would represents about 660 tubs, and according to Ben & Jerry's own instructions; How to Claim expenses, and the 2006 Free Cone day Reimbursement Form, attached herein as Defendants ``Exhibit G`` stating that each tub of product would yield an average of about 60 small scoop of ice cream. At the Ben & Jerry's own figure would have represented lost of 39,600 serving of single scoops at retail value $3.00 each according to the price survey attached herein as Defendants Exhibit ``H``, at the time represents loss sales of $118,800 between September 2004 through September 2006 at the costs of .50 per scoop (Ben & Jerry's own cost estimate $0.44 of 4 oz portion and $0.06 cost of cone or cup and paper goods, Ex. H) would represent sum of $19,800., which would have represented a profit of $99,000 on the shorted and denied tubs alone that were not delivered between September 2004 and September 2006. The above sum does not include losses on additional Sales, high ticket items sales such as Smoothies, Shakes and or Sundaes since typically these items have the higher return and profit margin. The above sum also does not include satisfied customers and their higher and more frequency shop visits resulting in additional sales. The above figure also does not include the losses

11

porghavami sustained as the result of lack of deliveries during months of January and February 2006 and August, September and October 2006. Mr. Wallace report is ignorance of the above issues and does not recognize the damages and losses of sales and loss of customers as the result of continued denied shipments and lack of deliveries for a small business and Scoop Shop such as Ben & Jerry's operations.

Ben & Jerry's Report Item VIII 3- Concord shop was denied delivery of products from July of 2006 through July of 2007, and yet as Mr. Wallace noted the shop sales increased by 22.8 percent to sum of 96,775, and that all without receiving the required shipments of the products, frequently out of the most popular flavors, decreased caterings due to lack of products and inconsistency of the shipments availability, other than what Porghavami was able to obtain from other franchisees, with lack of planning and marketing, which would have enable Porghavami to at least increase its sales by additional 33 percent as he had projected.

Ben & Jerry's report Items VI. 4 and VII. 4- Expenses related to early closure of the shops in Roseville and Sacramento- At the time of closing Roseville shop had a 9.5 year lease remaining and Sacramento shop had a balance of about 7 years remaining on the lease with the landlord. Porghavami had disputed the landlord claim and the extended of the damages, however the landlords for Roseville and Sacramento (Rocky Ridge Venture and FM Partnership) have obtained judgment against Porghavami in excess of 309,787.032 and on February 12, 2009 the parties have filed a notice of lien in the present action.4 in this court Mr. Wallace in his report is ignorance of the lack of delivers and ongoing issues with Ben & Jerry's and their Distributor Wonder Ice cream that lead to the closure of the shops On November 1, 2006 and denies the existence of the very same notice lien in the present action.

Ben & Jerry's report Items VI. 5, VII. 5, and VIII. 4- The loss of future sales as projected for each shops, were the minimum sales that each shop would

12

have been generated, assuming that the distribution would have not been disturbed and shortages were minimized, the figures does not include the rents for each shops and where based on Porghavami's personal experience of operating each shop and taking into consideration of then planned marketing and the business developments including sales related to Caterings, School Programs and additional customers as were outlined above. Educated projections that could only be achieved, by years of experience in the same filed, dealing and developing customer service, marketing strategy and persistence.

## VI. MR. WALLACE OPINION ON THE SHOPS "FAIR MARKET VALUE" AND HIS ANALYSES SHOULD BE EXCLUDED. (Report items VI. 1 and VII. 1)

The conclusion of Mr. Wallace in his report is that Roseville and Sacramento shops had no Fair Market Value other than value of their fixed assets is contrary to the normal business practices and a fact that widely has been recognized.     Both Roseville and Sacramento shops had customers Ready Willing and Able to purchase the shops (Refer to Ex. E and F) and in fact the party interested to Sacramento shops had already filed an application with Ben & Jerry's and party interested to Roseville shop was in the process of filling an application when Ben & Jerry's altered their required investment terms and denied the application submitted, as the result Porghavami also informed the interested party to the Roseville shop with the new financial requirement from Ben & Jerry's and he therefore withdrew his offer. The Wikipedia encyclopedia defines "Fair Market Value" (FMV) as "an estimate of the market Value of a Property, based on what a knowledgeable, willing, and unpressured buyer would probably pay to a knowledgeable, willing, and unpressured seller in the real estate market." On line Business Dictionary, defines Fair market Value as "Probable price at which a willing buyer will buy from a willing seller when (1) both are unrelated, (2) know the relevant facts, (3) neither is under any compulsion to buy or sell, and (4) all rights and benefit inherent in (or

13

attributable to) the item must have been included in the transfer. IRS Publication 561 defines Fair Market Value, 'is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. The Fair Market value in the cases of Roseville and Sacramento were not just estimated but also was agreed upon and contracts were drafted and one (Sacramento) application was submitted. So no longer was just an estimate(s) but that of the binding sales and fair market value that could be reliably referred to. Based on the above Mr. Wallace report on the Fair Market value should be denied.

## CONCLUSION

Mr. Wallace does not have the qualifications to offer an expert opinion related to economic and financial issues relevant to the claims of the underlying case. Mr. Wallace should not be permitted to offer opinion relating to the economic and financial issued on this case. For the reason stated above, Defendants' respectfully request the Court to enter an order to exclude Mr. Wallace report and possible testimony.

DATE: July 14, 2009                     Respectfully Submitted,


By:

MEHRDAD PORGHAVAMI, ET AL
Defendants & Cross-Complainants
Appearing in Propria persona

DEFENDANTS'

# Exhibit - "A"

**Report of**
**Robert H. Wallace**
**Expert Witness**
**For**
**Ben & Jerry's Franchising, Inc., and**
**Ben & Jerry's Homemade, Inc.**

**In the Matter of**
**Mehrdad Porghavami, et al**
**(Cross-Complainant)**

**v.**

**Ben & Jerry's Franchising, Inc.,**
**Ben & Jerry's Homemade, Inc.,**
**Ben & Jerry's of California, Inc. and**
**Wonder Ice Cream, LLC**
**(Cross-Defendants)**

**Case No. CV-02599-JAM-KJM**
**United States District Court**
**For the Eastern District of California**

**May 15, 2009**

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Table of Contents

I      The Nature and Scope of My Work...................................................................................1

II     Qualifications, Prior Case Testimony and Compensation..............................................1

III    Data or Other Information Considered in Forming the Opinions Stated Herein...............2

IV    Ben & Jerry's...............................................................................................................2

V     MPA's Ownership and Operation of Ben & Jerry's Scoop Shops.......................................4

VI    The Roseville Scoop Shop – Operating History and Damages Claimed by MPA..................6

VII.   The Sacramento Scoop Shop – Operating History and Damages Claimed by MPA ...........11

VIII   The Concord Scoop Shop - Operating History and Damages Claimed by MPA ................16

## Appendices:

A     Resume of Robert H. Wallace

B     Listing of Cases in Which Robert H. Wallace Has Provided Testimony During the
Preceding Four Year Period

C     Listing of Data or Other Information Provided in Forming the Opinions Stated Herein

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Listing of Exhibits

Exhibit 1    Summary of MPA's Ownership/Period of Operation of Ben & Jerry's Scoop Shops

Exhibit 2    Summary of the Profit and Loss Statements of MPA Per the Corporate Income
             Tax Returns

Exhibit 3    Summary of the Balance Sheets of MPA Per the Corporate Income Tax Returns

Exhibit 4    Ben & Jerry's Scoop Shop Roseville, California  -  Monthly Sales History

Exhibit 5    Actual Profit and Loss Statements and Estimated Break-Even Point for Ben &
             Jerry's Scoop Shop - Roseville, California

Exhibit 6    Ben & Jerry's Scoop Shop Sacramento, California  - Monthly Sales History

Exhibit 7    Actual Profit and Loss Statements and Estimated Break-Even Point for Ben &
             Jerry's Scoop Shop  - Sacramento, California

Exhibit 8    Ben & Jerry's Scoop Shop Concord, California  - Monthly Sales History

Exhibit 9    Actual Profit and Loss Statements and Estimated Break-Even Point for Ben &
             Jerry's Scoop Shop - Concord, California

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# I    The Nature and Scope of My Work

I, Robert H. Wallace, have been retained in connection with the matter ensuing from the second amended cross-complaint filed in the United States District Court for the Eastern District of California by Mr. Mehrdad Porghavami, et al as the cross-complainants against Ben & Jerry's Franchising, Inc., Ben & Jerry's Homemade, Inc., Ben & Jerry's of California, Inc. and Wonder Ice Cream, LLC as the cross-defendants. The allegations made by Mr. Porghavami in the second amended cross-complaint arise from his ownership and operation of three Ben & Jerry's franchise ice cream shops known as "*scoop shops*" located in Northern California at various times commencing in November 2002 and continuing through August 2008. Mr. Porghavami owned and operated these shops under the corporate entity, MPA Group, Inc. Herein my report, I refer to Mr. Porghavami and the MPA Group, Inc. collectively as "*MPA*".

I have been retained on behalf of Ben & Jerry's Franchising, Inc. and Ben & Jerry's Homemade, Inc. (herein collectively referred to as "*Ben & Jerry's*") to provide expert witness testimony with respect to economic and financial issues relevant to the claims made by MPA in its second amended cross-complaint, and to render an opinion on the amount of damages, if any, incurred by MPA if it prevails in its claims in this matter. To summarize my opinions and the related bases, I have prepared this report, which has been written to comply with Rule 26 of the Federal Rules of Civil Procedure governing disclosure of expert testimony.

I understand that, at this time, MPA has not designated an expert witness to opine on its damages; however, MPA has identified and quantified certain categories of damages in a verified letter to counsel for Ben & Jerry's dated April 10, 2009 supplementing prior discovery responses and in its second amended cross-complaint. The damages put forth by MPA are generally not based on sound financial and economic theory and are not supported by causal linkage to the allegations of wrongdoing by Ben & Jerry's in the second amended cross-complaint. In addition, certain categories of damages are duplicative of other categories. In this report, I have provided my initial assessment of the damages claims of MPA based on sound financial and economic theory and the relevant facts and circumstances currently known to me. I may issue a second report on June 15, 2009 for the purposes of: (1) providing any additional opinions regarding the damages of MPA I may have formulated by that date; (2) providing specific rebuttal opinions to the damage claims of MPA if revised or new damage claims are put forth by MPA; and (3) considering all relevant information that becomes available to me during the intervening time period.

# II    Qualifications, Prior Case Testimony and Compensation

I am a Certified Public Accountant in the State of California, and hold a Masters of Science Degree in Accounting from the Wharton Graduate School and a Bachelor of Science Degree in Economics from the University of Pennsylvania. I have qualified as an expert witness with regard to economic damages related to business matters on many occasions in the State

1

Courts and in Federal Court. My resume, which is at Appendix A to this report, more fully describes my professional qualifications and includes a listing of all publications authored by me within the preceding ten years. A listing of the cases in which I have given trial or deposition testimony within the preceding four years is at Appendix B to this report. My billing rate is currently $400 per hour for all work I perform including trial and deposition testimony.

## III    Data or Other Information Considered in Forming the Opinions Stated Herein

I have considered several sources of data and other information in forming my opinions, including financial records, contractual agreements and other records produced by MPA and Ben & Jerry's, legal documents filed in connection with this matter, correspondence between the parties, and sources of public information. I have provided a listing of the specific data and other information I have considered, including production numbers, if applicable, at Appendix C to this report.

## IV    Ben & Jerry's

Ben & Jerry's is headquartered in Vermont and was founded in 1978 when Ben Cohen and Jerry Greenfield started a local business to make and sell ice cream, which has become known as *"Vermont's Finest"* ice cream.[1]  Today, Ben & Jerry's produces a wide variety of super-premium ice cream and ice cream novelties and distributes these products nationwide and in selected foreign countries in supermarkets, grocery stores, convenience stores, franchise Ben & Jerry's scoop shops, restaurants and other venues[2] and operates its business *"on a three-part mission statement emphasizing product quality, economic reward and a commitment to the community."*[3]  In the years between the founding of the company in 1978 and 1985, Ben & Jerry's expanded to twelve scoop shops operating through a franchise system. By 2007, Ben & Jerry's franchise system grew to 600 scoop shops located in sixteen countries.[4]

Under its franchise system, qualified individuals can start-up, build and own and operate a Ben & Jerry's franchise scoop shop. Estimated expenditures to start-up a Ben & Jerry's franchise scoop shop range from a low of $144,000 to a high of $384,000 based on the size and location of the shop.[5]  Of this amount, the most substantial portions relate to the acquisition/building of leasehold improvements and the acquisition of furniture, fixtures, smallwares and equipment, which are payable to third party contractors and vendors.[6]

---

[1] Ben & Jerry's company profile found at www.unilever.com
[2] Company Profile for Ben & Jerry's issued in a press release by Ben & Jerry's dated March 30, 2007 obtained at www.businesswire.com
[3] Ben & Jerry's company profile found at www.unilever.com
[4] *"Ben & Jerry's Franchisees Build a Better Future at Annual Conference in New Orleans"* – a press release issued by Ben & Jerry's dated February 2, 2007 obtained at www.businesswire.com
[5] Franchise Opportunities at www.benjerry.com
[6] Franchise Opportunities at www.benjerry.com

2

Approximately $35,000 is payable to Ben & Jerry's consisting of a $32,000 initial franchise fee and $1,000 to $3,000 for initial training in the operation of a scoop shop.[7] If a franchisee develops more than one shop, the first shop requires a $32,000 franchise fee, the second shop, a $20,000 franchise fee and the third shop, an $18,000 franchise fee.[8] Franchisees are required to expend 4 percent of gross sales from their scoop shop on marketing and promotion, of which 2 percent is expended locally and 2 percent is contributed to a Ben & Jerry's corporate marketing fund to pay for corporate marketing and promotion initiatives.[9] Under certain . franchise agreements, the franchisee pays Ben & Jerry's royalties of 3 percent of sales;[10] however, certain agreements, such as those assumed by MPA, require no royalty payments.

Franchise agreements generally have a term of 10 years commencing with the date of the lease for the premises of the scoop shop.[11] If certain conditions are met, the franchisee may apply for one additional consecutive term of ten years for a renewal fee of $15,000. Conditions for renewal include, among other things, renovation and modernization of the premises and equipment as reasonably required by Ben & Jerry's.[12] Pursuant to its franchise agreements, Ben & Jerry's agrees to *"use reasonable efforts to make available for purchase by Operator* [i.e. franchise owner], *either directly or indirectly from Ben & Jerry's, the Ben & Jerry's Products currently being offered for sale in Scoop Shops; provided however, that Ben & Jerry's reserves the rights"*, among other things, *"to discontinue, in its sole discretion, the availability of particular Ben & Jerry's products from time to time"* and *"to designate particular Ben & Jerry's Products for sale at retail in limited geographic regions, demographic markets, or types of facilities and venues, or to otherwise limit the offer and sale at retail of any Ben & Jerry's Product in such manner and for such periods of time as Ben & Jerry's may reasonably deem appropriate, including without limitation, to reflect varying customer preferences, to conduct seasonal or regional promotions, and to determine the marketability of a Ben & Jerry's Product or the feasibility and desirability of offering a Ben & Jerry's Product for sale under the System."*[13] The franchise agreement states that the Operator [i.e. franchise owner] *"acknowledges and agrees that any duty or obligation imposed on Ben & Jerry's by this agreement may be performed by any distributor, designee, employee, or agent of Ben & Jerry's, as Ben & Jerry's may direct."*[14]

---

[7] Franchise Opportunities at www.benjerry.com

[8] Franchise Opportunities at www.benjerry.com

[9] Franchise Opportunities at www.benjerry.com

[10] Franchise Opportunities at www.benjerry.com

[11] Franchise agreement dated October 31, 2002 between Ben & Jerry's and MPA, Section 2. Term and Renewal (BJ-000089)

[12] Franchise agreement dated October 31, 2002 between Ben & Jerry's and MPA, Section 2. (BJ-000089 to BJ-000090)

[13] Franchise agreement dated October 31, 2002 between Ben & Jerry's and MPA , Section 3.8 1 (BJ-000091)

[14] Franchise agreement dated October 31, 2002 between Ben & Jerry's and MPA, Section 3.8 1 (BJ-000091)

3

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

## V    MPA's Ownership and Operation of Ben & Jerry's Scoop Shops

MPA became an owner/operator of Ben & Jerry's scoop shops by the acquisition of three existing Ben & Jerry's scoop shops located in Northern California from the owners/franchisees of those shops rather than by opening a new shop as described above. The first acquisition by MPA was of the Roseville shop on October 31, 2002 for $50,000, followed by the acquisition of the Sacramento shop on December 18, 2003 for $120,000, and the Concord shop on April 14, 2004 for $22,000. I have summarized certain significant dates and other information, and the sources of that information, for the three scoop shops at Exhibit 1. Because existing shops were purchased by MPA which were being operated pursuant to existing franchise agreements with Ben & Jerry's, it appears that the only amounts paid to Ben & Jerry's by MPA in connection with the acquisitions were training fees of $3,600.[15] Transfer fees, which are typically paid by the seller, were waived for the Concord shop in lieu of MPA's purchase of the Micros cash register system for that location,[16] which likely had a cost of approximately $7,250.[17] In addition, I understand that MPA claims to have purchased Micros cash registers for the Roseville and Sacramento shops at a cost of $14,503.[18] In connection with the transfer of ownership of the three scoop shops to MPA, Ben & Jerry's and MPA entered into franchise agreements pursuant to which MPA obtained the rights and assumed the obligations for the remaining respective terms of the existing Ben & Jerry's franchise agreements for these three scoop shops. The total acquisition costs paid by MPA were substantially lower than the costs that would have been incurred to start up new shops. The cost of three new shops, at current prices, would be in the range of a low of approximately $432,000 ($144,000 each) to a high of $1.152 million ($384,000 each) as compared to the total purchase and training fees cost to MPA of approximately $217,000 including the cost of three Micros systems. The purchase prices paid by MPA were likely substantially lower than would have been incurred for a new shop for a number of reasons including the age and condition of the fixed assets, the remaining terms of the premises leases and franchise agreements, and the historical performance of the shops.

---

[15] Per the Roseville Transfer, Consent and Release Agreement, the seller paid transfer fees of $3,000 and MPA paid $1,800 of training fees. (BJ-000064 to BJ-000065) Per the Sacramento Transfer, Consent and Release Agreement, the seller paid transfer fees of $3,000 and MPA paid training fees of $1,800. (BJ-008303 to BJ-008308) I understand from counsel for Ben & Jerry's that the training fees per the Sacramento agreement may have been waived and that MPA may have paid some or all of the transfer fees. If training fees paid totaled $1,800 instead of $3,600 and MPA paid all of the transfer fees, MPA's total purchase and training costs would be approximately $222,000 instead of $217,000.

[16] BJ-007028

[17] Paragraph 45 of the Second Amended Complaint filed by MPA states that $14,503 was the cost of the Micros system for both the Sacramento and Roseville locations. The average cost per location of $7,250 has been used above for the Concord location.

[18] Second Amended Complaint filed by MPA, Paragraph 45

4

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

MPA owned and operated the three scoop shops as a corporate entity. I have summarized the profit and loss statements and the balance sheets of the corporate entity based on its Federal or state income tax returns at Exhibits 2 and 3. Federal and state income tax returns were produced by MPA for 2002, 2003, 2004 and 2006 and only a state tax return for 2007. Counsel for Ben & Jerry's has requested the Federal tax returns for 2005 and 2007 from MPA and I will include this information on Exhibits 1 and 2 if it is produced.

Under the terms of the franchise agreements for the three shops, no royalties were payable to Ben & Jerry's; however, MPA was required to expend 2 percent of sales for local marketing and promotion and contribute 2 percent of sales to Ben & Jerry's for corporate administered marketing and promotional efforts.[19]

In this matter, MPA has claimed damages related to lost sales allegedly caused by lack of deliveries and/or deliveries of Ben & Jerry's products in quantities that were less than ordered. During the time of the alleged supply issues, Wonder Ice Cream, LLC (herein referred to as "*Wonder*") was the distributor designated by Ben & Jerry's to supply the three shops owned by MPA. I understand from counsel for Ben & Jerry's that during certain months in early 2006 and again in mid 2006 to mid 2007, MPA ceased placing orders with Wonder and Wonder ceased making deliveries to MPA because MPA was not in compliance with the agreed-upon terms of payment. In correspondence from Wonder to MPA dated February 13, 2006, Wonder wrote "*Your account has been outside of terms as far back as January 2005. You have not paid any invoices within terms of Net 21 days extended to all Northern California franchises.*"[20] During the periods in which MPA was not ordering from Wonder or receiving product from Wonder, I understand from counsel for Ben & Jerry's that MPA supplied its three shops by purchasing Ben & Jerry's products from other franchisees at the same prices that MPA would have paid to Wonder. Any lost sales related to lack of deliveries by Wonder attributable to MPA's failure to comply with the payment terms of its account with Wonder are not relevant to damages recoverable from the defendants in this matter.

Below, under the discussion of MPA's claims for lost sales for each shop, I have included a calculation of maximum potential lost sales of MPA that are attributable to shortages in order fulfillment by Wonder based on the actual quantities of products delivered to MPA as compared to the quantities of continuing products ordered by MPA. These calculations represent maximum potential lost sales because they assume that all continuing products ordered by MPA would have been sold by MPA and there is no evidence to indicate that this would have occurred. In addition, under the terms of the franchise agreements for the three shops, Ben & Jerry's and/or its designee had the duty to "*use reasonable efforts to make available* [to MPA] *for purchase*" Ben & Jerry's products. The Court may find that the order

[19] See monthly sales reports filed by MPA
[20] BJ-002054 to BJ-002058

5

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

fulfillment rates of 97 percent to 99 percent for the three shops of MPA during the periods of lost sales claimed by MPA meet the standard of *"reasonable efforts"* and thus MPA has no damages recoverable from lost sales attributable to supply issues.

Based on the summary of MPA's orders and Wonder's deliveries prepared by Wonder for 2005, MPA ordered certain products that had been discontinued, and consequently, were not available for delivery. Quantities of discontinued products have been excluded in the calculation of the fulfillment rate of the orders. As discussed above, under the terms of the franchise agreements, Ben & Jerry's reserves the right to discontinue, in its sole discretion, the availability of particular products.

## VI    The Roseville Scoop Shop - Operating History and Damages Claimed by MPA

The Roseville scoop shop was originally opened on July 1, 1996,[21] and had been in operation over six years when it was acquired by MPA. MPA paid $50,000 cash to the franchisee/owner of the Roseville shop for the purchase of the assets of the business consisting of $10,000 for furniture, fixtures, equipment and smallwares and $40,000 for the lease and leasehold improvements.[22] MPA operated the Roseville shop for four years and closed it on approximately November 1, 2006.[23] Sales at the Roseville shop prior to MPA's ownership (i.e. the period from opening in July 1996 to the transfer of ownership on October 31, 2002) reached an annual peak in 1999 at approximately $267,000. Each year subsequent to 1999 through 2004, annual sales declined, dropping 17.56 percent from 2000 to 2001 and 21 percent in the ten month period of 2002 prior to the transfer of ownership to MPA. The trend of declining sales continued after the transfer of ownership to MPA; however, declines lessened in significance from prior years, to 10.14 percent in 2003 and 10.44 percent in 2004. In 2005, sales increased by 1.39 percent over the prior year. I have presented the monthly sales history for the Roseville shop for its entire operating history from the shop opening in July 1996 to its closure on November 1, 2006 at Exhibit 4.

In a verified letter to counsel for Ben & Jerry's dated April 10, 2009 supplementing prior discovery responses, MPA has indicated that it has damages related to the Roseville shop in five categories. I have provided my initial comments with regard to each category of damages below.

### 1.  Roseville shop fair market value at closure of $130,000

As described above, MPA purchased the Roseville shop for $50,000 on October 31, 2002. MPA's claim of fair market value of the shop at closure of $130,000 indicates that MPA

---

[21] BJ-002346 and BJ-006800
[22] BJ-006820 and BJ-006834
[23] BJ-002346

6

claims the value of the shop increased by $80,000 during the period from October 31, 2002 to November 1, 2006, the date of closure. At the time of MPA's purchase of the Roseville shop, the last twelve months sales (i.e. the twelve months ended October 31, 2002) of the shop were $168,434. (See Exhibit 4) For the year ended December 31, 2001, the prior owner of the Roseville shop prepared a profit and loss statement that indicated the shop generated profits of approximately $10,400 on sales of approximately $208,000.[24] I have prepared a break-even analysis for the Roseville shop to estimate the sales level that must be generated to cover all fixed and variable operating costs of the shop. Break-even sales simply cover costs and are not sufficient to provide compensation to the owner/manager of the shop for management services rendered or to provide any profit for a return on investment in the shop. I have concluded that annual break-even sales are approximately $185,000 given cost of goods sold of 33 percent. (See Exhibit 5) The annual sales generated by the Roseville shop of $168,434 in its last twelve months of operation prior to the purchase by MPA was not sufficient to cover the operating costs of the shop, and thus was not sufficient to generate profits to provide the owner/operator with any compensation for services rendered in connection with management of the shop or the payment of any profits to the owner/operator as a return on investment. This determination is consistent with the allocation of the $50,000 purchase price paid by MPA to fixed assets and not to goodwill -- an intangible associated with the expectation of future profits.

In this matter, MPA has made no damage claims for lost sales of the Roseville shop prior to 2005. Thus, sales levels from November 2002 to December 2004 are indicative of the sales levels that MPA could theoretically achieve for the Roseville shop absent any alleged wrongful actions. In 2003, MPA generated only $151,352 of sales from the Roseville shop and, in 2004, only $135,548. These sales levels indicate that the Roseville shop was unable to attain profitability under the management of MPA and thus the shop had no reasonable expectation of future profits without a significant change in operations, which may have been accomplished by a new owner/manager or an infusion of capital used for shop improvements or additional promotional expenses. Consequently, at the time of closure, there was no fair market value associated with the Roseville shop beyond the value of its fixed assets. MPA had the ability to realize the value of those fixed assets by selling the fixed assets separately or by selling the shop, including all fixed assets, to a new owner/operator (one who was willing to undertake the necessary remedial actions to increase annual sales levels) at an amount that would be expected to reflect the value of the fixed assets giving consideration to the facts that MPA paid $50,000 for those fixed assets plus $7,500 for the Micros system on October 31, 2002 and the value of the fixed assets was reduced from the use of those assets by MPA over its four years of ownership of the shop. Given the facts and circumstances that (1) MPA did not pay for any intangible value for the Roseville shop when it purchased the shop in 2002 and there was no

[24] MP-002753

7

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

intangible value of the shop as of November 2006 when it was closed; (2) closure of the shop was indicated by its lack of profitability absent any alleged wrongful actions by Ben & Jerry's; (3) MPA could have sold the shop to an approved, qualified purchaser for the value of its fixed assets in 2006 instead of closing the shop; and (4) MPA could have sold the fixed assets separately, it is my opinion that MPA has no damages in this matter related to the lost fair market value of the Roseville shop.

## 2. Loss of revenues during 2005 from lack of products of $49,500

MPA claims that it lost revenues in 2005 because it did not receive all of the products it ordered from Wonder, the distributor designated by Ben & Jerry's to supply the Roseville shop with Ben & Jerry's products. Actual sales levels in 2005 for the Roseville shop were $137,426. (See Exhibit 4) If MPA had made additional sales of $49,500 in 2005, total sales would have been $186,926. In 2004, the prior year in which MPA has made no damage claims, the shop had sales of $135,548. Thus, sales actually increased by 1.39 percent in 2005 – the year in which MPA claims to have lost sales due to supply issues. It is not reasonable that the Roseville shop would have generated additional sales of $49,500 in 2005 bringing total sales to $186,926, but for the wrongful actions alleged in the cross-complaint. Two factors drive sales – supply of product and demand for that product. MPA has not presented evidence to support its contention that had it received a greater supply of product, it would have been able to generate higher sales levels in 2005. Sales for the last twelve months (which ended October 2002) under the prior owner totaled $168,434. (See Exhibit 4) The highest annual sales level ever attained by MPA at the Roseville shop was $151,352 in 2003 – only approximately $14,000 higher than sales actually generated in 2005. Sales at the Roseville shop declined each year from 2000 to 2004. A sales level of $186,926 for 2005, as claimed by MPA, is not supportable given the historical trend of declining sales at the shop from 2000 to 2004 and the actual sales levels in 2003 and 2004.

Additionally, I understand that Wonder. delivered product in quantities representing 98.2 percent of the product quantities ordered by MPA for the Roseville shop during January to December 2005.[25] I have estimated MPA's actual cost of goods sold for the Roseville shop for 2005 at 33 percent of actual sales of $137,426, which indicates estimated cost of goods sold of $45,351. If this cost represents 98.2 percent of the cost of the product requested by MPA, the cost of goods sold associated with all requested product would be $46,182 ($45,351 divided by 98.2 percent). A cost of goods sold level of $46,182 would be expected to generate sales of $139,946 ($46,182 divided by 33 percent). A sales level of $139,946 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $2,520 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $49,500 claimed by MPA.

---

[25] Letter dated February 13, 2006 from Wonder to MPA (BJ-002054 to BJ-002058)

8

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

In addition, lost revenues are not a proper measure of damages in this matter. Lost profits is the proper measure of damages arising from lost revenues directly attributable to the alleged wrongful actions. Lost profits are calculated by deducting from lost sales the costs and expenses that would have been incurred had the additional sales been made. Such additional costs and expenses include cost of goods sold, marketing expenses, and other variable costs, such as labor and supplies, which I have estimated to be 62 percent of sales. (See Exhibit 5) Any lost sales claims of MPA must be reduced by 62 percent to determine lost profits.

### 3. Losses during 2006 from lack of deliveries and products of $79,000

The Roseville shop was open for ten months of operation in 2006 and closed on November 1, 2006. During that ten months, the shop generated sales of $107,072, as compared to sales of $136,132 for the same ten month period in 2003 and $122,572 for the same ten month period in 2004. (See Exhibit 4) MPA has claimed that it would have made additional sales of $79,000 in 2006, which would bring total sales for the ten months to $186,072. As described above in number 2, MPA's claim for lost sales is not reasonable given prior sales levels of the Roseville shop and its trend of declining sales.

Additionally, I understand that counsel for Ben & Jerry's has performed an analysis of the fulfillment rate of orders placed by MPA for Ben & Jerry's products with Wonder for its Roseville shop during 2006 based on a summary of quantities ordered and delivered, which was prepared by MPA.[26] This analysis indicates that approximately 99 percent of the quantities of Ben & Jerry's products ordered by MPA from Wonder for its Roseville shop during 2006 were delivered. MPA's actual cost of goods sold for the Roseville shop for 2006 were $36,636, which was 33 percent of actual sales of $111,654.[27] If this cost represents 99 percent of the cost of the products ordered from Wonder by MPA, the cost of goods sold associated with all ordered product would be $37,006 ($36,636 divided by 99 percent). A cost of goods sold level of $37,006 would be expected to generate sales of $112,139 ($37,006 divided by 33 percent). A sales level of $112,139 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $485 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $79,000 claimed by MPA.

Again, as described above, lost sales are not a proper measure of damage and must be reduced to lost profits by the deduction of variable expenses estimated to be 62 percent of sales for the Roseville shop.

---

[26] MP004210 to MP004218

[27] Sales and costs of goods sold for 2006 were totaled from the monthly sales reports submitted by MPA to Ben & Jerry's (See Exhibit 5)

9

## 4. *Expenses related to early closure, including landlord claims, totaling $143,599*

MPA has not provided the amounts of the costs that comprise the claim of $143,599 nor any supporting documentation; however, it appears that this claim may be substantially related to landlord claims against MPA under the lease for the Roseville premises, which ultimately may not be paid by MPA. In order to claim damages for expenses related to closure of the Roseville shop, MPA must prove that the wrongful actions of the defendants caused MPA to close the Roseville shop. Based on the facts and circumstances I have described above, the Roseville shop had not proven to be a financially viable entity under management/ownership of MPA and would not have been a financially viable entity as operated by MPA even if the alleged wrongful acts had not occurred. Based on the sales levels of the Roseville shop through 2004 and the downward trend in sales, continued operation of the shop by MPA would have resulted in additional losses, and thus closure of the shop was inevitable to prevent future losses that would have reasonably been expected to occur under the ownership and management of MPA. The shop had failed to generate sales above the break-even level annually in 2002 through closure on November 1, 2006. As described above, the lack of the ability to attain annual break-even level sales of $185,000 in 2005 and 2006 is not reasonably attributable to shortages in order fulfillment, which had a minimal impact on sales, if any. *(See Exhibit 5)* Based on these facts and circumstances, MPA's closure of the Roseville shop is not attributable to the wrongful acts alleged by MPA in this matter.

## 5. Loss of future sales - $120,000 annually for ten years to April 30, 2016 of $1.2 million

MPA has made a claim for the loss of future sales it would have made had it been able to operate the Roseville shop for an additional ten years through the expiration of the lease agreement it signed in November 2005. As discussed above, lost sales are not a proper measure of damages in this matter. To determine damages arising from future lost sales, fixed and incremental costs and expenses that would have been incurred in connection with generating those sales must be deducted to determine lost profits and those lost profits must be discounted to present value at a rate of return commensurate with the risk associated with those lost profits. Such a calculation of the present value of future anticipated profits would indicate a value of the business and thus this claim is subsumed in MPA's claim for the lost fair market value of the Roseville shop at the date of closure, and is therefore, duplicative.

Additionally, at an annual level of sales of $120,000, the Roseville shop would not have generated any profits, and therefore, there are no future lost profits. *(See Exhibit 5 for the break-even analysis)* The financial results of the operation of the Roseville shop in 2003 and 2004, years for which no damage claims have been made by MPA in this matter, also indicate that the shop was not profitable.

10

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

## VII The Sacramento Scoop Shop - Operating History and Damages Claimed by MPA

The Sacramento scoop shop was originally opened on June 24, 1993,[28] and had been in operation for over ten years when it was acquired by MPA. Pursuant to an asset purchase agreement dated December 18, 2003, MPA purchased the assets of the Sacramento scoop shop consisting of the furniture, fixtures, equipment and smallwares, the lease and leasehold improvements and the franchise agreement from the franchisee/owner of the Sacramento shop for a total of $120,000 consisting of a cash payment of $35,000 and an $85,000 note carried by the seller, which was payable over 36 months.[29]  Based on the recording of this acquisition for tax purposes, MPA allocated $110,000 to goodwill and the remainder to fixed assets.[30] The franchise agreement for the Sacramento shop was renewed by the prior owner upon the expiration of its original ten year term in June 2003, and thus, at the time of MPA's purchase, had a scheduled expiration date in June 2013.[31] The asset purchase agreement specified a closing date of December 18, 2003; however, MPA began filing the monthly sales reports for the Sacramento shop as the franchisee in August 2003.[32]  MPA operated the Sacramento shop for over three years and closed it on approximately November 1, 2006. Sales at the Sacramento shop prior to MPA's ownership/management (i.e. the period from opening in 1993 to July 2003) reached an annual peak in 1995 at $350,952. Each year subsequent to 1995, annual sales declined, and totaled $242,679 in the last twelve months the shop was operated by the prior owner. Annual sales declined by 5.59 percent in 2001 and 8.08 percent in 2002. The trend of declining sales continued after the transfer of management/ownership to MPA at similar annual rates of decline of 8.05 percent in 2004 and 9.64 percent in 2005. I have presented the monthly sales history for the Sacramento shop for its entire operating history from the first reported sales in July 1993 to its closure on November 1, 2006 at Exhibit 6.

In a verified letter to counsel for Ben & Jerry's dated April 10, 2009 supplementing prior discovery responses, MPA has indicated that it has damages related to the Sacramento shop in five categories. I have provided my initial comments with regard to each category of damages below.

### 1. *Sacramento shop fair market value at closure of $220,000*

As described above, MPA purchased the Sacramento shop for $120,000 in December 2003. MPA's claim of fair market value of the shop at closure of $220,000 indicates that MPA claims that the value of the shop increased by $100,000 during the period from December 2003 to November 1, 2006, the date of closure. At the time of MPA's purchase of the Sacramento

---

[28] BJ-002347

[29] BJ-006981 to BJ-006982

[30] Form 4562 of the 2003 Federal income tax return of MPA (MP004075 to MP004076)

[31] BJ-001564

[32] Monthly sales report for Sacramento for August 2003 (BJ-007741)

11

. shop, the last twelve months sales (i.e. the twelve months ended November 30, 2003) of the
shop were $234,981. (*See Exhibit 6*) For the year ended December 31, 2002, the prior owner of
the Sacramento shop prepared a profit and loss statement that indicated the shop generated
profits of $52,623 on sales of $253,058.[33]  I have prepared a break-even analysis for the
Sacramento shop to estimate the sales level that must be generated to cover all fixed and
variable operating costs of the shop. Break-even sales simply cover the costs and are not
sufficient to provide compensation to the owner/manager for management services rendered
or to provide any profit for a return on investment in the shop. I have concluded that annual
break-even sales are approximately $190,000 given cost of goods sold of 33 percent.   (*See
Exhibit 7*) While the shop was generating sales sufficient to cover all fixed and variable costs
and to generate profit prior to purchase by MPA, under MPA's management the shop's annual
sales declined to approximately $214,000 in 2004 and to approximately $193,000 in 2005
(which is very close to the break-even point of $190,000). MPA has made no claims for
damages in this matter in 2004; and, as discussed below, the lost sales of MPA during 2005
related to shortages in order fulfillment, which are the subject of allegations in this matter,
were minimal, if any.

Given the trend of declining sales for the Sacramento shop that commenced in 1996 and
continued to 2004 and thereafter with annual declines of 5.59 percent in 2001, 8.08 percent in
2002, 7.68 percent in 2003 and 8.05 percent in 2004, the decline in sales in 2005 to $193,454 (a
decline of 9.64 percent to the approximate break-even point) was reasonable and consistent
with the established trend. (*See Exhibit 6*) Thus, as of November 2006, the fair market value of
the Sacramento shop had significantly declined from the $120,000 paid by MPA in December
2003, which directly contradicts MPA's claim that the value had increased to $220,000 as of
November 2006. Annual sales of the Sacramento shop in 2005 and 2006 and the established
negative trend in sales indicate that under the management of MPA, the shop had no
reasonable expectation of generating future profits without a significant change in operations,
which may have been accomplished by a new owner/manager or an infusion of capital used for
shop improvements or additional promotional expenses. Consequently, at the time of closure
in November 2006, there was no fair market value associated with the Sacramento shop
beyond the value of its fixed assets. MPA had the ability to realize the value of those fixed
assets by selling the fixed assets separately or by selling the shop, including all fixed assets, to a
new approved, qualified owner/operator (one who was willing to undertake the necessary
remedial actions to increase annual sales levels) at an amount that would be expected to reflect
the value of the fixed assets giving consideration to the facts that MPA allocated $10,000 of the
price it paid for the Sacramento shop in December 2003 to fixed assets plus $7,500 for the
Micros system; and the value of the fixed assets was reduced from the use of those assets by
MPA over its approximately three years of ownership of the shop.  Given the facts and

---

[33] MP-002750

12

circumstances that (1) the Sacramento shop had no intangible value as of November 2006 when it was closed; (2) closure of the shop, as operated by MPA, was indicated by its negative sales trend, unrelated to any alleged wrongful actions by Ben & Jerry's; (3) MPA could have sold the shop in 2006 instead of closing the shop had a qualified buyer been found; and (4) MPA could have sold the fixed assets separately, it is my opinion that MPA has no damages in this matter related to the lost fair market value of the Sacramento shop.

## 2. Lost revenue in 2005 of $78,000 from lack of products

MPA claims that it lost revenues in 2005 of $78,000 because it did not receive all of the products it ordered from Wonder, the distributor designated by Ben & Jerry's to supply the Sacramento shop with Ben & Jerry's products. Actual sales levels in 2005 for the Sacramento shop were $193,454. (See Exhibit 6) If MPA had made additional sales of $78,000 in 2005, total sales would have been $271,454. In 2004, the prior year in which MPA has made no damages claims for lost sales, the shop had sales of $214,097. Thus, the decline in sales at the Sacramento shop in 2005 as compared to 2004 was $20,643 (a consistent decline compared to prior years). It is not reasonable that the Sacramento shop would have generated additional sales of $78,000 in 2005 bringing total sales to $271,454, but for the wrongful actions alleged in the cross-complaint. Two factors drive sales – supply of product and demand for that product. MPA has not presented evidence to support its contention that had it received a greater supply of product, it would have been able to generate higher sales levels in 2005. Sales for the last twelve months (which ended July 2003) under the management of the prior owner totaled $242,679. (See Exhibit 6). Sales at the Sacramento shop declined each year from 1996 to 2004. A sales level of $271,454 for 2005 (which represents a 27 percent increase from 2004), as claimed by MPA, is not supportable given the historical trend of declining sales at the shop from 1996 to 2004 and the actual sales levels in 2003 and 2004.

Additionally, I understand that Wonder delivered product in quantities representing 98.9 percent of the product quantities ordered by MPA for the Sacramento shop during January to December 2005.[34] I have estimated MPA's actual cost of goods sold for the Sacramento shop for 2005 at 33 percent of actual sales of $193,454, which indicates an actual cost of goods sold of $63,840. If this cost represents 98.9 percent of the cost of the product ordered by MPA, the cost of goods sold associated with all ordered product would be $64,550 ($63,840 divided by 98.9 percent). A cost of goods sold level of $64,550 would be expected to generate sales of $195,606 ($64,550 divided by 33 percent). A sales level of $195,606 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $2,152 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $78,000 claimed by MPA.

---

[34] Letter dated February 13, 2006 from Wonder to MPA (BJ-002054 to BJ-002058)

13

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

In addition, lost revenues are not a proper measure of damages in this matter. Lost profits is the proper measure of damages arising from lost revenues directly attributable to the alleged wrongful actions. Lost profits are calculated by deducting from lost sales the costs and expenses that would have been incurred had the additional sales been made. Such additional costs and expenses include cost of goods sold, marketing expenses, and other variable costs, such as labor and supplies, which I have estimated to be 60 percent of sales for the Sacramento shop. (See Exhibit 7) Any lost sales claims of MPA must be reduced by 60 percent to determine lost profits.

### 3. Lost revenues in 2006 of $98,000 from lack of products and deliveries

The Sacramento shop was open for ten months of operation in 2006 and closed on November 1, 2006. MPA has claimed that it would have made additional sales of $98,000 in 2006, which would bring total sales for the ten months to $254,742. During the ten months ended October 31, 2006, the Sacramento shop generated sales of $156,742, as compared to sales of $204,371 for the same ten month period in 2003 and $186,772 for the same ten month period in 2004, which were prior to any damage claims for lost sales by MPA. (See Exhibit 6) As described above in number 2, the claim for lost sales is not reasonable given prior sales levels of the Sacramento shop and its trend of declining sales. In fact, the sales level in 2006 of $156,742 is consistent with the decline in sales from 2003 to 2004 and the declines prior to the acquisition by MPA.

Additionally, I understand that counsel for Ben & Jerry's has performed an analysis based on MPA's orders and Wonder's invoices for 2006 and has determined that Wonder delivered approximately 99 percent of the quantities of Ben & Jerry's products ordered by MPA for its Sacramento shop during 2006. I understand that a summary prepared by MPA of its orders and invoices from Wonder for products received for the Sacramento shop in 2006 corroborates the 99 percent fulfillment rate.[35] MPA's actual cost of goods sold for the Sacramento shop for 2006 was $63,182, which was 40.3 percent of actual sales of $156,742.[36] If this cost represents 99 percent of the cost of the products ordered by MPA, the cost of goods sold associated with all ordered products would be $63,820 ($63,182 divided by 99 percent). A cost of goods sold level of $63,820 would be expected to generate sales of $158,362 ($63,820 divided by 40.3 percent). A sales level of $158,362 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $1,620 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $98,000 claimed by MPA.

---

[35] MP004210 to MP004218

[36] Sales and costs of goods sold for 2006 were totaled from the monthly sales reports submitted by MPA to Ben & Jerry's (See Exhibit 7)

14

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

Again, as described above, lost sales are not a proper measure of damage and must be reduced to lost profits by the deduction of variable expenses estimated to be 60 percent of sales for the Sacramento shop. (See Exhibit 7)

### 4. Expenses related to early closure of the shop of $169,717

MPA has not provided the amounts of the costs that comprise the claim of $169,717 nor any supporting documentation; however, it appears that this claim may be substantially related to landlord claims against MPA under the lease for the Sacramento premises, which ultimately may not be paid by MPA. In order to claim damages for expenses related to closure of the Sacramento shop, MPA must prove that the wrongful actions of the defendants caused MPA to close the Sacramento shop. Based on the facts and circumstances I have described above, declines in sales, if any, attributable to shortages in order fulfillment, in 2005 and 2006, were not of the significance to cause closure of the Sacramento shop. Shortages in order fulfillment had a minimal impact on sales, if any. Thus, MPA has not established a causal linkage of closure of the Sacramento shop to the alleged wrongful actions. Given the downward trend of sales of the Sacramento shop, there was no reasonable expectation that the Sacramento shop would be a financially viable entity in the future under the management of MPA. Based on the annual sales of the Sacramento shop in 2004 and the downward trend in sales, the continued operation of the shop by MPA would have resulted in losses, and thus closure of the shop, under MPA management, was inevitable to prevent such losses. (See discussion under claim number 1)

### 5. Lost future sales of $1.68 million ($280,000 per year for the remaining term of the agreement - 2006 through 2013)

MPA has made a claim for loss of future sales it would have made had it been able to operate the Sacramento shop for an additional six years through the expiration of its franchise agreement with Ben & Jerry's on June 24, 2013. As discussed above, lost sales are not a proper measure of damages in this matter. To determine damages arising from future lost sales, fixed and incremental costs and expenses that would have been incurred in connection with generating those sales must be deducted to determine lost profits and those lost profits must be discounted to present value at a rate of return commensurate with the risk associated with those lost profits. Such a calculation of the present value of future anticipated profits would indicate a value of the business and thus this claim is subsumed in MPA's claim for the lost fair market value of the Sacramento shop at the date of closure, and is therefore, duplicative. (See discussion of the fair value of the Sacramento shop in claim number 1 above.)

Given the trend in sales of the Sacramento shop, both prior to the acquisition by MPA and after, MPA's projection of sales of $280,000 per year, under MPA management, is unreasonable and unsupportable. As described in claim number 1 above, given the declining

15

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

sales trend of the Sacramento shop (sales in 2004 were approximately $214,000 and historical declines in sales were 5 to 10 percent per year), the shop's ability to generate sales in excess of the break-even level of $190,000 was doubtful under the management of MPA, and consequently, there was no reasonable expectation of future profits, and thus, MPA has no loss in this claim category.

## VIII    The Concord Scoop Shop - Operating History and Damages Claimed by MPA

The Concord scoop shop was originally opened on August 29, 1998[37] and had been in operation for over five years when it was acquired by MPA. MPA acquired the Concord shop for a cash purchase price of $22,000, of which $5,000 was for the furniture, fixtures, equipment and smallwares, and $17,000 was for the lease and leasehold improvements.[38]    However, based on the recording of this acquisition for tax purposes, MPA allocated $22,000 to goodwill and recorded $26,685 as fixed assets.[39]  A portion of the fixed asset additions appears to be related to the purchase of the Micros cash register system at a cost of approximately $7,250.[40] The franchise agreement for the Concord shop was scheduled to expire on August 29, 2008[41] and the lease agreement for the premises expired on or about the time of the shop closing.

MPA operated the Concord shop for over four years and closed it on or about August 30, 2008.[42]   Sales at the Concord shop prior to MPA's ownership/management (i.e. the period from opening in August 1998 to April 15, 2004) reached an annual peak in 1999 at $210,614. In each year during the period from 2000 to 2006, reported annual sales declined. The year ended December 31, 2002 was the last full year of sales reported to Ben & Jerry's by the prior owner and in that year, sales totaled $131,829, which was a decline of 25.39 percent from the prior year. In January and February 2003, sales declined 34.54 percent from that period in the prior year. I understand from counsel for Ben & Jerry's that during the period from March 2003 to April 15, 2004, the prior owner was an absentee owner, who left the management of the shop to others who failed to file monthly sales reports with Ben & Jerry's. Consequently, sales, if any, for the period from March 2003 to April 15, 2004 are unknown to Ben & Jerry's. Total sales for the last twelve months reported before the transfer of ownership (i.e. March 2002 to February 2003) were $124,634. The trend of declining sales continued after the transfer of management to MPA with a decline of 16.58 percent for the 8.5 months from April 15, 2004 to December 31, 2004 as compared to the last reported sales for that period in 2002. The period in 2005 comparable to the April 15, 2004 to December 31, 2004 time period showed a decline

[37] BJ-002345

[38] BJ-007074

[39] Form 4562 of the 2004 Federal income tax return of MPA (MP004110 to MP004111)

[40] Second Amended Cross-Complaint filed by MPA, Paragraph 45, states that $14,503 was the cost of the Micros system for both the Sacramento and Roseville locations, the average cost per location of $7,250 has been used above
[41] BJ-007028

[42] Second Amended Cross-Complaint filed by MPA

16

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

in sales of 15.98 percent. An additional 7.03 percent decline in annual sales occurred in 2006; however, in 2007, sales rebounded by 22.8 percent to an annual total of $96,755, an amount that was still far below the last twelve months reported sales under prior management of $124,634. I have presented the monthly sales history for the Concord shop for its entire operating history from the first reported sales in August 1998 to its closure in August 2008 at Exhibit 8.

In a verified letter to counsel for Ben & Jerry's dated April 10, 2009 supplementing prior discovery responses, MPA has indicated that it has damages related to the Concord shop in four categories. I have provided my initial comments with regard to each category of damages below.

### 1. Lost revenue in 2005 of $11,750 from lack of products

MPA claims that it lost revenues totaling $11,750 in 2005 because it did not receive all of the products it ordered from Wonder, the distributor designated by Ben & Jerry's to supply the Concord shop with Ben & Jerry's products. Actual sales levels in 2005 for the Concord shop were $84,750. (See Exhibit 8) If MPA had made additional sales of $11,750 in 2005, total annual sales would have been $96,500. MPA acquired the Concord shop on April 15, 2004 and operated it for the 8.5 month period ended December 31, 2004 generating total sales for that period of $78,281. MPA has not made any claims for damages during the 8.5 month period of operations in 2004. For the 8.5 month period from April 15, 2005 to December 31, 2005, sales at the Concord shop were $65,770, a decline of $12,511 from the comparable period in 2004, which is a decline of 15.98 percent. Based on information presented below, it appears likely that this decline is substantially related to factors which caused sales levels at the Concord shop to be in decline annually from 2000 to 2004, and not related to supply issues as alleged by MPA. Percentage declines in 2000 to 2004 ranged from 3.78 percent to 34.54 percent and the average decline in sales for the last 8.5 months of the year from 2000 to 2004 was almost 13 percent per year. MPA has not presented evidence to support its contention that had it received a greater supply of product, it would have been able to generate higher sales levels in 2005.

Additionally, I understand that Wonder delivered product representing 98 percent of the products ordered by MPA for its Concord shop in 2005.[43] I have estimated MPA's actual cost of goods sold for the Concord shop for 2005 at 33 percent of actual sales of $84,750, which indicates an actual cost of goods sold of $27,968. If this cost represents 98 percent of the cost of the product requested by MPA, the cost of goods sold associated with all requested product would be $28,539 ($27,968 divided by 98 percent). A cost of goods sold level of $28,539 would be expected to generate sales of $86,482 ($28,539 divided by 33 percent). A sales level of

---

[43] Letter dated February 13, 2006 from Wonder to MPA (BJ-002054 to BJ-002058)

17

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

$86,482 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $1,732 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $11,750 claimed by MPA.

In addition, lost sales are not a proper measure of damages in this matter. Lost profits is the proper measure of damages arising from lost revenues directly attributable to the alleged wrongful actions. Lost profits are calculated by deducting from lost sales the costs and expenses that would have been incurred had the additional sales been made. Such additional costs and expenses include cost of goods sold, marketing expenses, and other variable costs, such as labor and supplies, which I have estimated to be 62 percent of sales for the Concord shop. (See Exhibit 9) Any lost sales claims of MPA must be reduced by 62 percent to determine lost profits.

## 2. Lost revenues in 2006 of $24,000 from lack of products and deliveries

MPA claims that it lost revenues of $24,000 in 2006 because of lack of products and deliveries. If MPA had made additional sales of $24,000 in 2006, total sales would have been $102,791. Actual sales levels in 2006 for the Concord shop were $78,791, a decline of 7.03 percent from the prior year. Percentage declines in 2000 to 2004 ranged from 3.78 percent to 34.54 percent and the average decline in sales for the last 8.5 months of the year from 2000 to 2004 was almost 13 percent per year. (See Exhibit 8) Based on information presented below, it appears that it is likely that the decline from 2005 to 2006 is substantially related to factors which caused sales levels at the Concord shop to be in decline annually from 2000 to 2004, and not supply issues as alleged by MPA. MPA has not presented evidence to support its contention that had it received a greater supply of product, it would have been able to generate higher sales levels in 2006.

Additionally, I understand that counsel for Ben & Jerry's has performed an analysis based on MPA's orders and Wonder's invoices for 2006 and has determined that Wonder delivered approximately 97 percent of the quantities of Ben & Jerry's products ordered by MPA for its Concord shop during 2006. I understand that a summary prepared by MPA of its orders and invoices for products received for the Concord shop in 2006 corroborates the 97 percent fulfillment rate. MPA's actual cost of goods sold for the Concord shop for 2006 were $29,705, which was 37.7 percent of actual sales of $78,791.[44] If this cost represents 97 percent of the cost of the product ordered by MPA, the cost of goods sold associated with all ordered product would be $30,624 ($29,705 divided by 97 percent). A cost of goods sold level of $30,624 would be expected to generate sales of $81,231 ($30,624 divided by 37.7 percent). A sales level of $81,231 indicates that MPA may have, at most, lost revenues associated with shortages in

---

[44] Sales and costs of goods sold for 2006 were totaled from the monthly sales reports submitted by MPA to Ben & Jerry's (See Exhibit 9)

18

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

order fulfillment of $2,440 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $24,000 claimed by MPA.

Again, as described above, lost sales are not a proper measure of damage and must be reduced to lost profits by the deduction of variable expenses estimated to be 62 percent of sales for the Concord shop. (See Exhibit 9)

### 3. Lost revenues in 2007 of $40,000 from lack of deliveries

MPA has claimed that it lost revenues at the Concord shop in 2007 of $40,000 because of lack of deliveries. Actual sales at the Concord shop in 2007 were $96,755, a 22.8 percent increase over prior year sales of $78,791. Additional sales in 2007 of $40,000 would bring total sales to $136,755 as compared to MPA's unsupportable claims that total sales in 2006 would have been $102,791 and total sales in 2005 would have been $96,500, but for the delivery issues and lack of products claims alleged by MPA. Total claimed sales by MPA in 2007 of $136,755 are 33 percent higher than unsupportable claimed sales by MPA of $102,792 for 2006. This claimed sales increase of 33 percent in 2007, which is the increase over claimed sales for 2006, not actual sales for 2006, is not reasonable given both the trend of declining sales and the actual sales levels at the Concord shop in periods prior to MPA's ownership and in periods for which MPA is making no damage claims. As well, in the damages claim category 4 discussed below for the Concord shop, MPA has alleged the loss of annual future sales of $96,000, indicating a further inconsistency with a claim of annual sales of $136,755 in 2007.

Additionally, I understand that counsel for Ben & Jerry's has performed an analysis of the fulfillment rate of orders placed by MPA for Ben & Jerry's products with its supplier, Wonder, for its Concord shop during 2007 based on a summary of quantities ordered and delivered, which was prepared by MPA.[45] This analysis indicates that approximately 97 percent of the quantities of Ben & Jerry's products ordered by MPA for its Concord shop during 2007 were delivered. MPA's actual cost of goods sold for the Concord shop for 2007 was $33,876, which was 35 percent of actual sales of $96,755.[46] If this cost represents 97 percent of the cost of the products ordered by MPA, the cost of goods sold associated with all ordered products would be $34,924 ($33,876 divided by 97 percent). A cost of goods sold level of $34,924 would be expected to generate sales of $99,783 ($34,924 divided by 35 percent). A sales level of $99,783 indicates that MPA may have, at most, lost revenues associated with shortages in order fulfillment of $3,028 assuming MPA had been able to sell all product that it ordered (and there is no evidence to indicate this), not the $40,000 claimed by MPA.

---

[45] MP004210 to MP004218

[46] Sales and costs of goods sold for 2007 were totaled from the monthly sales reports submitted by MPA to Ben & Jerry's (See Exhibit 9)

19

Again, as described above, lost sales are not a proper measure of damage and must be reduced to lost profits by the deduction of variable expenses estimated to be 62 percent of sales for the Concord shop. (See Exhibit 9)

## 4. Lost future sales of $960,000 ($96,000 per year for the 10 year period under the option through August 30, 2018)

MPA has made a claim for loss of future sales it would have made had it been able to operate the Concord shop for an additional ten years presumably under a hypothetical renewal of its franchise agreement with Ben & Jerry's, which expired on August 29, 2008, and under a hypothetical renewal of the premises lease, which I understand expired on or about the time of closure of the shop. As discussed above, lost future sales are not a proper measure of damages in this matter. To determine damages arising from future lost sales, fixed and incremental costs and expenses that would have been incurred in connection with generating those sales must be deducted to determine lost profits and those lost profits must be discounted to present value at a rate of return commensurate with the risk associated with those lost profits. Such a calculation of the present value of future anticipated profits would indicate a value of the business.

I have prepared a break-even analysis for the Concord shop, which indicates that at a sales level of $88,000 the shop would break-even (i.e. will cover its fixed and variable costs, including cost of goods sold of 33 percent of sales, but will not generate any profit). (See Exhibit 9) At an annual sales level of $96,000, the Concord shop would generate profits of approximately $3,000 annually, which is calculated as the $96,000 of sales less variable costs of 62 percent, including cost of goods sold of 33 percent of sales, less fixed costs of approximately $33,000. Variable and fixed costs for the Concord shop have been estimated at Exhibit 9. $3,000 of profit per year for ten years is $30,000, not the $960,000 claimed by MPA, and when discounted to present value and reduced by the $15,000 franchise fee due upon renewal in August 2008 per the terms of the franchise agreement, would be approximately zero. In addition, MPA has not established that closure of the Concord shop was caused by the wrongful actions alleged in this matter, and, consequently, MPA is not entitled to a recovery of the present value of future profits, if any, for the Concord shop.

Robert H. Wallace CPA

20

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix A

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# ROBERT H. WALLACE, CPA/ABV

## PARTNER

| | |
|---|---|
| **EDUCATION AND CERTIFICATION:** | University of Pennsylvania - May 1975<br>Bachelor of Science in Economics - Accounting Major<br>Wharton Graduate School - May 1975<br>Masters of Science in Accounting<br>Certified Public Accountant - California |

**EXPERIENCE:**

Litigation:
Research, damage computations and valuations for cases involving business losses, business valuation, personal injury, marriage dissolution, audit and accounting deficiencies, court and deposition testimony, assistance in and analysis of settlement proposals.

Auditing, Accounting and Business Operations:
Manufacturing, retail, real estate and construction, financial institutions and service industries.
Specific experience in inventory and cost accounting and accumulation, operational audits and management recommendation letters, review of financial statements, business consulting, corporate tax accounting.

**MEMBERSHIP IN ASSOCIATIONS:**

California Society of Certified Public Accountants
American Institute of Certified Public Accountants
Institute of Business Appraisers

**TEACHING:**

Brodshatzer, Wallace, Spoon and Yip - local staff training
Steres, Alpert & Carne - local staff training
University of San Diego - Law School - School of Continuing Education
Cal Western Law School
Various attorney organizations
Various San Diego law firms

**ARTICLES**

"Calculation of Consumption in Wrongful Death Litigation," Trial Bar News"

**MEDIA INTERVIEWS**

Personal Injury Damage Calculations, New Accounting Pronouncements, San Diego Daily Transcript

**WORK EXPERIENCE:**

Brodshatzer, Wallace, Spoon and Yip - February 1988 to present
Steres, Alpert & Carne - September 1978 to February 1988
Columbia Pictures, Inc. - November 1977 to August 1978
(Internal Operational Auditor)
Peat, Marwick, Mitchell and Company - July 1975 to October 1977

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix B

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

ROBERT WALLACE
DEPOSITION LIST

| CASE NAME | DATE |
|---|---|
| | |
| DAVID DAVIES v. DAVID KIRKMAN, M.D. | 02/08/05 |
| THERESA KERNER v. SUMMIT HOMES | 02/09/05 |
| UNIPLASTE INT'L vs. EXTRUDING SOURCES INC. | 03/16/05 |
| HUAN YAO WU vs. CHIH SHUANG LIU | 03/29/05 |
| ABE INVESTMENTS vs. NARVEN ENTERPRISES | 04/08/05 |
| ABACUS AMERICA vs. ALABONZA CORPORATION | 05/13/05 |
| JACQUELINE HELLEIS vs. 350 WEST ASH | 05/19/05 |
| CHRISTOPHER LEE vs SDG&E, et al | 05/23/05 |
| GREG HARRIS vs. CHARLES POPE | 06/07/05 |
| STACY ESSIG vs. YONGHUN SUH, M.D. | 08/04/05 |
| EINSTEIN COMPUTER CORP. vs. GATEWAY INC. | 08/16/05 |
| PATRICIA HARVEY vs. S.C. VALLEY ENGINEERING | 08/18/05 |
| IMX, INC. vs. LENDING TREE, INC. | 08/23/05 |
| DAVID ZAMARRIPPA v. CHARLES KUIPERS DESIGN INC. | 09/13/05 |
| WESTERN HEALTHCARE v. PACIFIC COAST HEMATOLOGY | 11/08/05 |
| CHARLES E. HILL & ASSOC. vs. AMAZON.COM INC. | 12/21/05 |
| JOSE DORIA vs. KLEM MANZANO | 01/09/06 |
| GREGORY SAYLOR vs. INTEGRATED SUPPORT SVCS. | 01/27/06 |
| ROBERT WASKO vs. JOHN D. HILL, M.D. | 02/06/06 |
| LEON BRADLEY vs. S.D. CONVENTION CENTER CORP. | 02/21/06 |
| SOURCELINK NET vs. CARREFOUR S.A. | 02/22/06 |
| GERALD COOK vs. LOCKHEAD MARTIN | 02/24/06 |
| JIM SNIDER vs. WILLIAM VIZARD | 03/03/06 |
| NORMAN LEPKER vs. KEVIN DEITEL, M.D., et al | 03/16/06 |
| MARK COMBS vs. SKYRIDER COMMUNICATIONS | 04/06/06 |
| SANTOS SALAS v. HILLTOP FINANCIAL MORTGAGE INC. | 04/27/06 |
| LAWRENCE SHAW v. SARTEB RILEY SWYGERT | 04/28/06 |
| CROSSROADS SYSTEMS v. DOT HILL SYSTEMS | 05/12/06 |
| JUSTIN TACKETT v. COUNTY OF IMPERIAL | 06/29/06 |
| JULIE & MICHAEL RAMSBACKER v. KAISER | 06/30/06 |
| JAMIE ZEPPETELLA v. TOYOBO CO. LTD. | 07/11/06 |
| JAMES CRISTLER v. EXPRESS MESSENGERS | 08/04/06 |
| HOWARD ALLRED v. KAREN GENTRY | 08/25/06 |
| BROWN V HEWLETT PACKARD | 09/29/06 |
| MERIDIAN PROJECT SYSTEMS V HARDIN CONSTRUCTION | 10/03/06 |
| ANTHONY VELTRI V AT&T | 10/11/06 |
| JAMES CRISTLER v. EXPRESS MESSENGERS | 11/15/06 |
| MARIO DE MATTEO V BEST WESTERN | 11/28/06 |
| LINDA BUTTICE V SCRIPPS MEMORIAL HOSPITAL | 11/29/06 |
| BRUCE THOMPSON V FIRST PACIFIC CORP | 12/06/06 |
| VERONICA RISTER V ROMAN CATHOLIC BISHOP ET AL | 01/08/07 |
| DEBRA GAST V MONIQUE KING MD | 01/10/07 |
| RACKABLE SYSTEMS v. SUPERMICRO COMPUTER INC. | 02/09/07 |
| AARON LOUDER v. LUIS VASQUEZ | 04/05/07 |
| CLARENCE RIGALI v. ARS ALAMITOS CORP. | 04/13/07 |
| NANCY WOLFE v. GEORGE SHENAS | 05/17/07 |
| CHARLENE LEWIS v. KAISER PERMENENTE, et al. | 06/22/07 |
| NET RATINGS vs. VISUAL SCIENCES, et al. | 07/10/07 |
| GARY SMYSER vs. TAZ EXPRESS | 07/11/07 |
| FRISCO GEORGE vs. KAISER PERMENENTE, et al | 08/13/07 |
| ESTATE OF RICHARD METCALF vs. YAMAHO MOTOR CORP. | 08/29/07 |
| K. JOHNSON PARTNERS LP vs. L & M RESTAURANTS | 09/20/07 |
| JOSE ZERMENO vs. COOPER TIRE & RUBBER CO. | 09/21/07 |
| GJL SPORTS CAMPS INC. vs. THE REGENTS UCSD | 09/24/07 |
| MARIA S. FREITAS vs. MH LUXORY ALLOYS | 12/14/07 |
| KARL SHORT vs. LINDA BECK | 01/21/08 |
| US PHILIPS CORP vs. EASTMAN KODAK COMPANY | 02/15/08 |
| AMBER RUPP vs. UNITED STATES OF AMERICA | 02/28/08 |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

ROBERT WALLACE
DEPOSITION LIST

| CASE NAME | DATE |
|---|---|
| | |
| CHRISTINE BARROS vs. KAISER PERMENENTE | 03/11/08 |
| MARIA CASTRO vs. CASE BRENTLINGER | 04/01/08 |
| RICHARD DYER vs. DAMON CORPORATION, et al. | 04/08/08 |
| POLAROID, PANASONIC vs. HEWLETT PACKARD | 05/06/08 |
| PABLO GOMEZ vs. CITY OF SAN DIEGO | 05/15/08 |
| AERUS, LLC vs. PROTEAM, INC. | 06/03/08 |
| SAMICA vs. MORGATE, UPS, MBE | 11/13/08 |
| APPLIED PRECISION vs. INTEGRATED TECH CORP (ITC) | 01/16/09 |
| JACOB GLEZER vs. E. LAWRENCE SAKAS, M.D. | 02/02/09 |
| DUFF MALLORY vs. WILLIAM SAMUELS M.D. | 02/18/09 |
| MORGATE VS. UPS, MAILBOXES ETC. | 02/19/09 |
| INLAND EMPIRE FOODS vs. ZATECA FOODS | 02/23/09 |
| MORGATE VS. UPS, MAILBOXES ETC. | 02/24/09 |
| CGA PROPRETIES, et al. vs. SDG&E | 04/29/09 |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

## ROBERT WALLACE
## TRIAL OR ARBITRATION
## TESTIMONY

| CASE NAME | DATE |
|-----------|------|
| | |
| | |
| LEGACY RESORT RENTALS vs. DAIMLER CHRYSLER | 02/23/05 |
| HUAN YAO WU vs. CHIH SHUANG LIU | 04/05/05 |
| OTAY PROJECT vs. 350 WEST ASH | 06/20/05 |
| GREG HARRIS vs. CHARLES POPE | 08/03/05 |
| CHRISTOPHER LEE vs. SDG&E | 08/15/05 |
| CHARLES BATTAGLIA vs. HEALTH SOUTH CORP. | 08/24/05 |
| PATRICIA HARVEY vs. S.C. VALLEY ENGINEERING | 09/15/05 |
| STACY ESSIG vs. YONGHUN SUH, M.D. | 11/07/05 |
| UNIPLAST INT'L vs. EXTRUDING SOURCE INC. | 12/12/05 |
| IMX INC. vs. LENDING TREE INC. | 01/13/06 |
| DELTA UTILITIES SOLUTIONS vs. NEIL MEDLOCK | 02/01/06 |
| JOSE DORIA vs. KLEM MANZANO | 02/06/06 |
| GERALD COOK vs. LOCKHEED MARTIN, et al | 03/06/06 |
| LEON BRADY, III vs. SAN DIEGO CONVENTION CENTER | 03/21/06 |
| SOURCINGLINK NET vs. CARREFOUR SA | 04/17/06 |
| THERESA KEENER vs. SUMMIT HOMES | 05/03/06 |
| TERESA WORTH vs. CONTINENTAL AIRLINES | 05/22/06 |
| LAWRENCE SHAW vs. SARTEE RILEY SWYGERT | 05/30/06 |
| NORMAN LEPKER vs. KEVIN DEITEL, M.D. ET AL | 06/22/06 |
| JULIE & MICHAEL RAMSBACKER vs. KAISER | 07/12/06 |
| INFO +, LLC vs. ANACOMP | 12/14/06 |
| BEATRICE KESSLER v. FISHER INVESTMENTS INC. | 05/17/07 |
| DEBRA GAST v. MONIQUE KING, M.D.; SHARP HOSPITAL | 06/05/07 |
| AARON LOUDER v. MATHESON FAST FRIGHT, et al. | 06/21/07 |
| LINDA BUTTICE vs. SCRIPPS MEMORIAL HOSPITAL | 06/29/07 |
| GARY SMYSER vs. TAZ EXPRESS | 07/11/07 |
| FRISCO GEORGE vs. KAISER PERMENENTE | 08/28/07 |
| IAMCO vs. UPS/MBE | 11/01/07 |
| GJL SPORTS CAMP vs. UCSD | 11/06/07 |
| CAORL WOJCIECHOWICZ vs. UNITED STATES OF AMERICA | 03/04/08 |
| DAVID LEHMAN, M.D. vs. ROBERT NENAD | 03/12/08 |
| CORNELL RESEARCH FOUND. vs. HEWLETT PACKARD | 05/28/08 |
| PABLO GOMEZ vs. CITY OF SAN DIEGO | 09/02/08 |
| ESTATE OF RICHARD METCALF vs. YAMAHA MOTOR CORP. | 10/09/08 |
| SHIRLEY ROGOZIENSKI vs. FRANK ROGOZIENSKI | 03/03/09 |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix C

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix C

## List of Documents and Other Information Considered

**Legal Documents and Correspondence Between the Parties:**

Second Amended Cross-Complaint filed by Mehrdad Porghavami on 10/2/08

Letter from Mehrdad Porghavami dated April 10, 2009 to counsel for Ben & Jerry's

Mehrdad Porghavami's Responses to Wonder Ice Cream LLC Interrogatories dated 9/26/08

Mehrdad Porghavami and MPA Group's Supplemental Responses to Ben & Jerry's First Set of

    Interrogatory Numbers 3, 4, 5, 6, 7, 8, 9, 10, 12, 15, 16, 18 and 19

Mehrdad Porghavami's Responses to Ben & Jerry's Interrogatories dated 3/17/08

Mehrdad Porghavami's Responses to Ben & Jerry's Second Set of Interrogatories dated 2/6/09

**Public Information:**

Information obtained at Ben & Jerry's web site

Information obtained about Ben & Jerry's at Unilever's web site

Company Profile for Ben & Jerry's dated March 30, 2007 obtained at www.businesswire.com

"Ben & Jerry's Franchisees Build a Better Future at Annual Conference in New Orleans" dated

    dated February 2, 2007 obtained at www.businesswire.com

Ben & Jerry's Homemade, Inc. found at www.fundingniverse.com/company-histories

Ben & Jerry's franchise information at www.bizbuysell.com

Minimum wage information per the California Department of Industrial Relations

| Documents Produced by Mehrdad Porghavami and MPA: | Bates Numbers | | |
|---|---|---|---|
| Daily Sales Report | MP-000622 | | |
| Daily Sales Report | MP-000658 | to | MP-000659 |
| Payroll or sales and use tax returns | MP-000660 | to | MP-000692 |
| Payroll or sales and use tax returns | MP-000703 | to | MP-000712 |
| Daily Sales Report | MP-000751 | | |
| Daily Sales Report | MP-000762 | to | MP-000763 |
| Payroll or sales and use tax returns | MP-000764 | to | MP-000773 |
| Payroll or sales and use tax returns | MP-000776 | to | MP-000779 |
| Payroll or sales and use tax returns | MP-000816 | to | MP-000820 |
| Concord Daily Consolidated System Sales Detail | MP-001173 | | |
| Payroll or sales and use tax returns | MP-001174 | to | MP-001190 |
| Daily Sales Report | MP-001195 | to | MP-001198 |
| Payroll or sales and use tax returns | MP-001199 | to | MP-001210 |
| Concord April 2007 sales and email | MP-001220 | to | MP-001221 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-001252 | | |
| Concord Daily Consolidated System Sales Detail | MP-001256 | | |
| Concord P&L's - 2005 and 2006 and Transfer Package | MP-001284 | to | MP-001292 |
| Concord 2006 expense information | MP-001295 | | |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix C

## List of Documents and Other Information Considered

| | | | |
|---|---|---|---|
| MPA Group Corporation Income Tax Returns -2006 | MP001410 | to | MP001424 |
| Payroll or sales and use tax returns | MP-001425 | | . |
| Payroll or sales and use tax returns | MP-001474 | | |
| Roseville Quarterly Profit and Loss Statements and cover letter | MP-002480 | to | MP-002485 |
| Payroll or sales and use tax returns | MP-002499 | to | MP-002518 |
| Ben & Jerry's Monthly sales reports - Concord | MP-002519 | to | MP-002521 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-002528 | to | MP-002536 |
| MPA Financial statements and cover letter | MP-002546 | to | MP-002553 |
| Roseville Quarterly Profit and Loss Statements and cover letter | MP-002554 | to | MP-002560 |
| Roseville Daily Consolidated System Sales Detail | MP-002561 | to | MP-002563 |
| Daily Consolidated Systems sales reports | MP-002564 | to | MP-002567 |
| August 2005 notes | MP-002568 | | |
| Daily sales reports | MP-002569 | to | MP-002577 |
| Sacramento Sept 2005 notes | MP-002578 | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-002579 | to | MP-002618 |
| Daily Sales Report | MP-002622 | | |
| Roseville historical monthly sales - Jan 2003 to March 2005 | MP-002623 | | |
| Sacramento historical monthly sales - Jan 2003 to March 2005 | MP-002624 | | |
| Roseville monthly sales - Jan 2002 to June 2003 | MP-002741 | | |
| Davis sales history | MP-002742 | | |
| Lease information | MP-002743 | & | MP-002746 |
| Davis sales history and 2001 and 2002 P&Ls | MP-002744 | to | MP-002745 |
| 2001 Roseville P&L | MP-002747 | | |
| 2001 Sacramento P&L | MP-002749 | | |
| Ben & Jerry's Sacramento P&L's - 2000 to 2002 | MP002750 | to | MP002752 |
| Roseville 2001 Profit and Loss Statement | MP-002753 | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-002931 | to | MP-002995 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-002998 | to | MP-003015 |
| Concord 2004 - Free cone day | MP-003019 | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003591 | to | MP-003594 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003596 | to | MP-003598 |
| Summary of Monthly Sales - Concord | MP-003599 | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003600 | to | MP-003601 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003604 | to | MP-003611 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003613 | to | MP-003616 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003638 | to | MP-003641 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003668 | to | MP-003669 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003694 | to | MP-003695 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003713 | to | MP-003714 |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Appendix C

## List of Documents and Other Information Considered

| | | | |
|---|---|---|---|
| | | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003757 | to | MP-003758 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-003761 | to | MP-003766 |
| Ben & Jerry's Sacramento P&L 2005 | MP-003801 | | |
| Various tax returns | MP-003942 | to | MP-003971 |
| MPA Financial statements | MP-003972 | to | MP-003976 |
| Various tax returns | MP-003977 | to | MP-004045 |
| Mehrdad Porghavami personal 2005 income tax returns | MP-004046 | to | MP-004050 |
| 2002 to 2004 income tax returns | MP004051 | to | MP004120 |
| Payroll, unemployment or sales and use tax returns | MP-004140 | to | MP-004160 |
| Various tax returns | MP-004173 | to | MP-004174 |
| Schedule of Wonder orders and deliveries | MP-004210 | to | MP-004218 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007691 | to | MP-007700 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007703 | to | MP-007706 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007714 | to | MP-007720 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007724 | to | MP-007726 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007729 | to | MP-007731 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007734 | | |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007739 | to | MP-007740 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007743 | to | MP-007747 |
| Ben & Jerry's Monthly sales reports (may have attachments) | MP-007874 | to | MP-007879 |
| Daily Sales Report | MP-00940 | to | MP-00942 |
| | | | |
| **Documents Produced by Ben & Jerry's:** | | | |
| Ben & Jerry's Franchise Agreement with MPA dated 12/18/03 | BJ-000005 | to | BJ-000081 |
| Ben & Jerry's Franchise Agreement with MPA dated 10/31/02 | BJ-000082 | to | BJ-000140 |
| Ben & Jerry's Franchise Agreement and amendments - Concord | BJ-000143 | to | BJ-000210 |
| Assignment of Sacramento Lease and other transfer information | BJ-001563 | to | BJ-001564 |
| Ben & Jerry's 2006 Transfer Packages | BJ-002002 | to | BJ-002009 |
| Feb 13, 2006 letter from Wonder to MPA | BJ-002054 | to | BJ-002058 |
| Summary of monthly sales -Roseville, Concord and Sacramento | BJ-002345 | to | BJ-002347 |
| Ben & Jerry's Monthly sales reports | BJ-002996 | to | BJ-002997 |
| Ben & Jerry's Monthly sales reports | BJ-003016 | to | BJ-003018 |
| Asset Purchase Agreement - Roseville Ben & Jerry's and related correspondence | BJ-006800 | to | BJ-006838 |
| Asset Purchase Agreement - Sacramento Ben & Jerry's and related correspondence | BJ-006980 | to | BJ-007003 |
| Concord shop transfer documents | BJ-007028 | to | BJ-007030 |
| Concord shop transfer documents | BJ-007074 | to | BJ-007078 |
| Ben & Jerry's Monthly sales reports - Concord and attachments | BJ-007377 | to | BJ-007444 |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

| Appendix C | | | | |
|---|---|---|---|---|
| List of Documents and Other Information Considered | | | | |
| | | | | |
| | | | | |
| Ben & Jerry's Monthly sales reports - Concord and attachments | | BJ-007445 | to | BJ-007476 |
| Ben & Jerry's Monthly sales reports - Concord and attachments | | BJ-007457 | to | BJ-007464 |
| Ben & Jerry's Monthly sales reports - Concord and attachments | | BJ-007477 | to | BJ-007516 |
| Ben & Jerry's Monthly sales reports - Roseville and attachments | | BJ-007517 | to | BJ-007690 |
| Ben & Jerry's Monthly sales reports - Roseville | | BJ-007691 | to | BJ-007713 |
| Ben & Jerry's Monthly sales reports - Sacramento | | BJ-007721 | to | BJ-007723 |
| Ben & Jerry's Monthly sales reports - Sacramento | | BJ-007727 | to | BJ-007728 |
| Ben & Jerry's Monthly sales reports - Sacramento | | BJ-007732 | to | BJ-007733 |
| Ben & Jerry's Monthly sales reports - Sacramento | | BJ-007735 | to | BJ-007738 |
| Ben & Jerry's Monthly sales reports - Sacramento | | BJ-007741 | to | BJ-007742 |
| Ben & Jerry's Monthly sales reports - Sacramento and attachments | | BJ-007748 | to | BJ-007873 |
| Transfer, Consent and Release Agreement - Sacramento | | BJ-008303 | to | BJ-008308 |
| 10/22/06 letter re: Sacramento offer | | 2587 | | |
| Emails re: Sacramento offer | | 2594 | to | 2595 |

Page 4 of 4

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Exhibits

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

## Mehrdad Porghavami et al v. Ben & Jerry's et al

### Summary of MPA's Ownership/Period of Operation of Ben & Jerry's Scoop Shops

#### Exhibit 1

| | | Roseville | Sacramento | Concord |
|---|---|---|---|---|
| Store Location | | Roseville | Sacramento | Concord |
| | *Source:* | *BJ-002346 and BJ-006800* | *BJ-002347* | *BJ-002345* |
| Date Opened | | 07/01/96 | 06/24/93 | 08/29/98 |
| | *Source:* | *BJ-006819* | *BJ-006988* | *2nd Amended Cross Complaint* |
| Date Ownership Transferred to MPA | | 10/31/02 | 12/18/03 | 04/15/04 |
| | *Source:* | *BJ-002346* | *BJ-002347* | *2nd Amended Cross Complaint* |
| Date Closed | | 11/01/06 | 11/01/06 | 08/30/08 |
| | *Source:* | *BJ-006820 and BJ-006894* | *BJ-006983- BJ-006982* | *BJ-007074* |
| Purchase Cost to MPA | | $50,000 cash payment consisting of $10,000 for furniture, fixtures, equipment and smallwares and $40,000 for the lease and leasehold improvements | $35,000 cash and an $85,000 note carried by the seller amortized over 36 months for a total of $120,000 | $22,000 cash payment consisting of $5,000 for furniture, fixtures, equipment and smallwares and $17,000 for the lease and leasehold improvements |
| | *Source:* | *BJ-000080* | *BJ-001564* | *BJ-007028 and BJ-000144* |
| Expiration Date of the Franchise Agreement with Ben & Jerry's | | 07/01/06 | 06/24/13 | 08/29/08 |
| | *Source:* | *BJ-000092 to BJ-000093* | *BJ-001564* | *BJ-007029* |
| Royalty % of Sales to Ben & Jerry's | | none | none | none |
| | *Source:* | *Monthly sales reports for the shops, BJ-000108, BJ-000029 and BJ-007030* | | |
| Marketing and Promotion Fees | | 4% of gross sales; 2% expended locally and 2% to Ben & Jerry's Corporate | 4% of gross sales; 2% expended locally and 2% to Ben & Jerry's Corporate | 4% of gross sales: 2% expended locally and 2% to Ben & Jerry's Corporate |

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

| | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MPDO4057 & MPDO4068 | | MPDO4071 & MPDO4077 | | MPDO5206 & MPDO4412 | | Not produced by MPA | | MPDO5413 & MPDO5417 | | MPDO5897 *** | |
| Source: Corporate Income Tax Returns | | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % |
| Sales | | $19,770 | 100.00% | $233,184 | 100.00% | $427,989 | 100.00% | | | $347,933 | 132.78% | $92,581 | 132.75% |
| Less returns and allowances | | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | | | (85,741) | -32.78% | (22,840) | -32.75% |
| Net sales | | 19,770 | 100.00% | 233,184 | 100.00% | 427,989 | 100.00% | | | 261,592 | 100.00% | 69,741 | 100.00% |
| Cost of goods sold | | 6,410 | 32.42% | 72,959 | 31.29% | 100,152 | 23.40% | | | 201,657 | 77.09% | 36,688 | 52.61% |
| Gross Profit | | 13,360 | 67.58% | 160,225 | 68.71% | 327,787 | 76.60% | | | 59,935 | 22.91% | 33,053 | 47.39% |
| | | | | | | | | | | | | | |
| Expenses: | | | | | | | | | | | | | |
| Salary - Mehrdad Porghavami | | | | | | 17,500 | 4.09% | | | | | | |
| Salaries and wages | | 760 | 3.84% | 43,753 | 18.76% | 69,850 | 16.32% | | | 93,991 | 35.93% | | |
| Repairs and maintenance | | 211 | 1.07% | 1,124 | 0.48% | 4,203 | 0.98% | | | 2,666 | 1.02% | 545 | 0.78% |
| Rents | | 9,189 | 46.48% | 72,160 | 30.95% | 114,083 | 26.66% | | | | | | |
| Taxes and licenses | | 1,159 | 5.86% | 7,580 | 3.25% | 13,245 | 3.10% | | | 5,591 | 2.11% | 7,071 | 10.14% |
| Interest | | | | | | | | | | 25,181 | 9.63% | 12,046 | 17.27% |
| Depreciation | | 1,885 | 9.53% | 6,197 | 2.66% * | 27,551 | 6.44% | | | 8,731 | 3.34% | 2,910 | 4.17% |
| Advertising | | 20 | 0.10% | 3,641 | 1.56% | 15,453 | 3.61% | | | | | | |
| Accounting | | | 0.00% | 1,750 | 0.75% | 2,414 | 0.56% | | | 1,500 | 0.57% | | |
| Amortization | | | | 6,148 | 2.64% | 8,435 | 1.97% | | | 8,800 | 3.36% | | |
| Auto and truck | | 21 | 0.11% | 1,248 | 0.53% | 590 | 0.14% | | | | | | |
| Bank charges | | | | 891 | 0.38% | 641 | 0.15% | | | | | | |
| Dues and subscriptions | | 30 | 0.15% | 115 | 0.05% | 561 | 0.13% | | | | | | |
| Equipment rent | | | | | | 464 | 0.11% | | | 9,973 | 3.81% | | |
| Insurance | | 1,040 | 5.26% | 4,288 | 1.84% | 7,925 | 1.85% | | | 4,011 | 1.53% | | |
| Miscellaneous | | 200 | 1.01% | 507 | 0.22% | 538 | 0.13% | | | | | | |
| Office | | 478 | 2.42% | 781 | 0.33% | 1,416 | 0.33% | | | | | | |
| Postage | | 15 | 0.08% | 112 | 0.05% | 262 | 0.06% | | | | | | |
| Security | | | | 349 | 0.15% | 555 | 0.13% | | | | | | |
| Legal and professional | | | | | | | | | | 1,766 | 0.68% | | |
| Supplies | | 88 | 0.45% | 1,514 | 0.65% | 572 | 0.13% | | | 40,347 | 15.42% | | |
| Telephone | | 270 | 1.37% | 2,520 | 1.08% | 4,474 | 1.05% | | | | | | |
| Travel | | 717 | 3.63% | 220 | 0.09% | 142 | 0.03% | | | | | | |
| Utilities | | 436 | 2.21% | 7,032 | 3.02% | 16,872 | 3.94% | | | 25,234 | 9.65% | | |
| Franchise fees | | 4,167 | 21.08% | 3,312 | 1.42% | 19,104 | 4.46% | | | | | | |
| Credit card fees & discount | | | | 1,215 | 0.52% | 953 | 0.22% | | | | | | |
| Marketing | | | | | | | | | | 1,889 | 0.72% | | |
| Other deductions | | | | | | | | | | | | 59,689 | 85.59% |
| Total Expenses | | 20,686 | 104.63% | 166,452 | 71.38% | 327,787 | 76.60% | | | 229,620 | 87.78% | 82,261 | 117.95% |
| | | | | | | | | | | | | | |
| Net Profit/(Loss) | | ($7,326) | -37.06% | ($6,227) | -2.67% | $0 | 0.00% | | | ($169,685) | -64.87% | ($49,208) | -70.56% |

\* Depreciation in 2004 includes $19,561 from an election to expense fixed assets purchased at the Concord shop. (MPDO4110)

\*\* The Federal income tax return for MPA was not produced for 2007. The California state tax return is the source of the 2007 amounts shown here.

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

**Mehrdad Porghavami et al v. Ben & Jerry's et al**

**Summary of the Balance Sheets of MPA**

**Per the Corporate Income Tax Returns**

**Exhibit 3**

| | | 2002 | 2003 | 2004 | December 31, 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Source: Corporate Income Tax Returns | | MPC004060 | MPC004074 | MPC004109 | | MPC003414 | |
| **Current Assets:** | | | | | | | |
| Cash in bank | | $5,920 | $8,539 | $16,733 | Not produced | $0 | Not produced |
| Inventory | | 1,000 | 3,000 | 3,000 | · by MPA | 1,000 | by MPA |
| **Total Current Assets** | | $6,920 | $11,539 | $19,733 | | $1,000 | |
| | | | | | | | |
| Fixed Assets - Roseville Shop | [1] | 50,500 | 50,500 | 50,500 | | 50,500 | |
| Fixed Assets - Sacramento Shop | [1] | | 10,000 | 10,000 | | 10,000 | |
| Fixed Assets - Concord Shop | [1] | | | 26,685 | | 26,685 | |
| Fixed Assets (location not determined) | [1] | | 8,203 | 8,203 | | 22,815 | |
| | | | 68,703 | 95,388 | | 110,000 | |
| Less accumulated depreciation | | (1,885) | (8,082) | (27,551) | | (38,425) | |
| Net Fixed Assets | | 48,615 | 60,621 | 67,837 | | 71,575 | |
| | | | | | | | |
| Goodwill - Sacramento Shop | | | 110,000 | 110,000 | | 110,000 | |
| Goodwill - Concord Shop | | | | 22,000 | | 22,000 | |
| Accumulated amortization of intangibles | | | (6,148) | (8,435) | | (26,095) | |
| Net Intangible Assets | | 0 | 103,852 | 123,565 | | 105,965 | |
| | | | | | | | |
| **Total Assets** | | $55,535 | $176,012 | $211,135 | | $178,540 | |
| | | | | | | | |
| **Current Liabilities:** | | | | | | | |
| Notes payable | | | $115,000 | $115,000 | | $0 | |
| Loans from shareholders | | | | | | 247,766 | |
| Sales/Payroll Taxes Payable | | 476 | | | | 25,044 | |
| **Total Current Liabilities** | | $476 | $115,000 | $115,000 | | $272,810 | |
| | | | | | | | |
| Capital stock and additional paid-in capital | | 60,500 | 60,500 | 60,500 | | 20,000 | |
| Retained earnings | | (5,443) | 512 | 35,635 | | (114,270) | |
| **Total Equity** | | 55,059 | 61,012 | 96,135 | | (94,270) | |
| | | | | | | | |
| **Total Liabilities and Equity** | | $55,535 | $176,012 | $211,135 | | $178,540 | |

[1] Fixed assets by location has been determined by information provided in the asset purchase agreements and Schedules 4562 to the tax returns.

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

**Mehrdad Porghavami et al v. Ben & Jerry's et al**

**Ben & Jerry's Scoop Shop in Roseville, California**

**Monthly Sales History**

**Exhibit 4**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Roseville Store Opened | | | | 07/01/96 * | | | |
| Ownership Transferred to MPA | | | | 10/31/02 * | | | |
| Roseville Store Closed | | | | 11/01/06 * | | | |

| | Sales Prior to MPA's Ownership | | | | | | | Sales under MPA's Ownership | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2002 | 2003 | 2004 | 2005 | 2006 |
| January | not open | $12,861 | $15,284 | $15,228 | $16,514 | $13,364 | $10,043 | | $10,210 | $7,736 | $7,564 | $5,836 |
| February | not open | 15,495 | 14,506 | 15,371 | 16,032 | 12,245 | 10,341 | | 10,168 | 8,276 | 7,489 | 6,475 |
| March | not open | 21,320 | 18,577 | 19,046 | 21,388 | 18,307 | 13,999 | | 14,596 | 12,650 | 10,284 | 7,288 |
| April | not open | 21,993 | 21,858 | 21,826 | 23,821 | 17,981 | 14,850 | | 11,052 | 11,582 | 13,861 | 8,989 |
| May | not open | 28,841 | 24,973 | 27,138 | 26,281 | 24,865 | 16,546 | | 15,796 | 14,538 | 17,264 | 13,102 |
| June | not open | 30,182 | 30,289 | 32,850 | 30,756 | 25,806 | 19,499 | | 18,327 | 16,612 | 17,388 | 17,003 |
| July | $35,546 | 31,405 | 33,933 | 35,864 | 31,149 | 24,293 | 18,903 | | 17,887 | 17,839 | 17,106 | 15,168 |
| August | 30,656 | 29,962 | 32,780 | 28,970 | 27,162 | 21,560 | 18,382 | | 15,896 | 14,794 | 15,034 | 15,560 |
| September | 22,255 | 21,978 | 24,128 | 23,066 | 20,473 | 17,396 | 13,256 | | 12,209 | 10,658 | 11,568 | 11,262 |
| October | 16,931 | 18,171 | 19,709 | 19,577 | 15,112 | 13,303 | 13,537 | | 9,991 | 7,887 | 9,023 | 6,389 |
| November | 13,099 | 15,165 | 15,013 | 13,447 | 10,680 | 10,536 | | $9,138 | 7,896 | 6,169 | 5,704 | *closed* |
| December | 11,744 | 12,384 | 13,013 | 13,324 | 13,174 | 8,542 | | 8,484 | 7,324 | 6,807 | 5,141 | *closed* |
| | $130,331 | $259,757 | $264,063 | $266,707 | $252,542 | $208,198 | $249,356 | $17,622 | $151,352 | $135,548 | $137,426 | $107,072 |
| % Change in Sales From Comparable Prior Period | | 1.66% | | 1.00% | -5.33% | -17.56% | -21.03% | -7.63% | -10.14% | -10.44% | 1.39% | -15.41% |
| Last 12 Months Sales Under Prior Owner | | | | | | | | $168,434 | | | | |
| Jan to Oct 2001 Sales Under Prior Owner | | | | | | | | $189,120 | | | | |
| Jan to Oct 2003 Sales Under MPA | | | | | | | | $136,132 | | | | |
| Jan to Oct 2004 Sales Under MPA | | | | | | | | $122,572 | | | | |

Annual sales peaked in 1999 and declined in each subsequent year to 2004.

*Source: Monthly sales amounts for the period from July 1996 to May 2002 are per the schedule of sales history attached to the asset purchase agreement dated Oct 31, 2002 (BJ-006837). Monthly sales for June 2002 to Oct 2002 are per BJ-002346. Monthly sales amounts for Nov 2002 to Oct 2006 are per the monthly sales reports filed by MPA.*

*\* Opening and closing dates were obtained from BJ-002346. The date of transfer to MPA is per the Roseville Store Asset Purchase agreement at BJ-006819.*

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

**Mehrdad Porghavami et al v. Ben & Jerry's et al**

**Actual Profit and Loss Statements and Estimated Break-Even Point**

**For Ben & Jerry's Scoop Shop - Roseville, California**

**Exhibit 5**

| | Annual | (2 months) | 1st Qtr | 2nd Qtr | Jan to Oct | Total Actual | | Projected Break-Even Point by Robert Wallace | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2003 | 2006 (10 months) | | | | | |
| | MP-002758 | MP-002559 & MP-002560 | MP-002557 & MP-002558 | MP-002661 & MP-002562 | | $ | % | $ | % | |
| Sales | $206,198 | $17,523 | $34,973 | $45,176 | $111,654 | $417,624 | 100.00% | $185,000 | 100% | |
| Cost of Goods Sold (1) | 67,015 | 13,554 | 6,726 | 16,485 | 36,636 | 140,426 | 33.62% | 61,050 | 33% | (5) |
| Gross Margin | 141,183 | 4,059 | 28,247 | 28,691 | 75,018 | 277,198 | 66.38% | 123,950 | 67% | |
| Gross Margin % (1) | 67.81% | 23.03% | 80.77% | 63.51% | 67.19% | | | | | |
| **Expenses:** | | | | | | | | | | |
| Labor | 47,987 | 3,784 | 7,099 | 11,014 | 24,025 | 93,889 | 22.48% | 42,550 | 23% | (5) |
| Telephone | 1,351 | 270 | 640 | 450 | not provided | 2,711 | | see other below | | |
| Electric and water | 5,880 | 436 | 1,346 | 1,247 | not provided | 8,909 | | 5,500 | 3% | (6) |
| Gas/oil | | 150 | 214 | 367 | not provided | 731 | | see other below | | |
| Supplies | 2,082 | 2,810 | 2,201 | 3,219 | not provided | 10,312 | | 3,700 | 2% | (5) |
| Travel and entertainment | | 989 | 162 | 319 | not provided | 1,470 | | see other below | | |
| Repairs and maintenance | 1,206 | 1,370 | 105 | 59 | not provided | 2,780 | | see other below | | |
| Bank charges/interest | | 75 | 197 | 252 | not provided | 524 | | see other below | | |
| Cash over/short | | 59 | 96 | | not provided | 155 | | see other below | | |
| Legal/accounting fees | | 250 | 375 | 750 | not provided | 1,375 | | see other below | | |
| Fees and licenses | 1,884 | 3,956 | 1,342 | 40 | not provided | 7,232 | | see other below | | |
| Other | | 20 | 56 | 222 | not provided | 238 | | 9,804 | | (6) |
| Insurance | 3,000 | | | | not provided | 3,000 | | see other above | | |
| Payroll taxes | 6,296 | | | | not provided | 6,296 | | see payroll above | | |
| Marketing expenses | 8,328 | 705 | 1,861 | 1,149 | 9,590 | 21,133 | 5.06% | 7,400 | 4% | (5) |
| Rent | 52,858 | 9,189 | 13,783 | 13,834 | 45,830 | 135,494 | 32.44% | 54,996 | | (4) & (6) |
| Total Expenses | 130,802 | 24,063 | 28,977 | 32,562 | 79,445 | 295,249 | 70.94% | 123,950 | | |
| | | | | | | | | | | |
| Net Profit/(Loss) (2) | $10,381 | ($20,004) | ($3,730) | ($4,271) | ($4,427) | ($19,051) | -4.56% | $0 | 0% | |

(1) Cost of goods sold appear to be overstated (and gross margin understated) in the 4th quarter of 2002 and understated in the first quarter of 2003. However, the 34% cost of good sold for the 20 month period are in line with cost of goods sold percentages reported per the tax returns of 32.43% in 2002 and 31.25% in 2003.

(2) The tax return for MPA for 2002, which includes only the last two months of operations for the Roseville store and no other store operations, reported a loss of $7,326. This loss may include the non-recurring franchise transfer fee of $4,800 and if so would indicate a loss of $2,526 from on-going operations.

(3) Amounts have been totalled from information per the monthly sales reports prepared by MPA and filed with Ben & Jerry's.

(4) Rent expense in 2006 is reported on the monthly sales reports at $4,583 per month. This amount has been multiplied by 12 to determine annual rent for the break-even calculation. Rent may be higher than this amount by additional charges related to percentages of sales above certain levels.

(5) These expenses are variable in nature and have been calculated as a percentage of sales in the break-even analysis.

(6) These expenses are more fixed or incremental in nature and have been determined as a fixed amount, not a percentage of sales, in the break-even analysis.

Note: Total variable expenses in the break-even analysis are 62% of sales. Total fixed expenses in the break-even analysis are $70,300.
Breakeven sales are calculated as $185,000 which is equal to $70,300 divided by (100% - 62%)

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

## Mehrdad Porghavami et al v. Ben & Jerry's et al
## Ben & Jerry's Scoop Shop In Sacramento California
## Monthly Sales History
### Exhibit 6

| | | |
|---|---|---|
| Sacramento Store Opened | 06/24/93 | ** |
| Ownership Transferred to MPA | 12/18/03 | ** (MPA began managing the shop in August 2003 per the monthly sales reports) |
| Sacramento Store Closed | 11/01/06 | ** |

| Month | \*\*\* Sales prior to MPA's Ownership and prior to MPA's Management \*\*\* | | | | | | | | | | | Sales Under MPA's Management/Ownership | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 | 2004 | 2005 | 2006 |
| January | not open | $17,860 | $23,437 | * | * | $20,586 | $20,584 | $21,307 | $20,357 | $16,366 | $17,718 | | $14,300 | $14,686 | $14,922 |
| February | not open | 23,080 | 25,892 | 26,398 | * | 18,595 | 21,897 | 23,020 | 18,628 | 20,493 | 18,549 | | 15,428 | 15,684 | 13,522 |
| March | not open | 25,867 | 27,647 | 30,625 | * | 23,164 | 23,270 | 23,934 | 23,715 | 24,013 | 18,763 | | 18,902 | 18,180 | 15,038 |
| April | not open | 27,578 | 29,027 | 29,241 | * | 24,174 | 25,951 | 26,585 | 21,385 | 21,218 | 19,269 | | 19,793 | 18,017 | 15,403 |
| May | not open | 28,687 | 32,486 | 32,564 | * | 27,645 | 28,795 | 27,335 | 22,893 | 20,462 | 22,815 | | 19,575 | 17,102 | 16,820 |
| June | not open | 35,330 | 33,871 | 35,783 | * | 28,717 | 29,736 | 32,028 | 27,727 | 28,203 | 24,956 | | 22,242 | 16,478 | 20,846 |
| July | net open | 36,995 | 37,200 | 34,794 | * | 38,141 | 31,333 | 33,730 | 30,168 | 29,251 | 28,387 | | 24,046 | 22,850 | 19,810 |
| August | 43,418 | 34,238 | 35,127 | 31,484 | * | 32,007 | 27,496 | 27,262 | 30,986 | 24,122 | | $22,770 | 20,460 | 17,078 | 15,710 |
| September | 36,634 | 25,712 | 28,324 | 23,099 | * | 24,513 | 22,542 | 21,869 | 23,408 | 19,497 | | 16,595 | 16,710 | 14,862 | 12,639 |
| October | 26,855 | 24,137 | 25,938 | 22,270 | * | 21,188 | 22,416 | 16,785 | 19,321 | 17,019 | | 14,549 | 15,316 | 14,226 | 12,032 |
| November | 25,506 | 21,603 | 25,352 | 21,383 | * | 19,374 | 20,395 | 16,534 | 19,803 | 16,025 | | 15,051 | 14,215 | 12,741 | closed |
| December | 18,714 | 23,420 | 26,651 | 19,570 | * | 19,442 | 19,221 | 20,254 | 15,999 | 15,559 | | 13,428 | 13,110 | 11,550 | closed |
| | $170,621 | $324,507 | $350,952 | $307,212 | | $297,546 | $293,666 | $290,643 | $274,390 | $252,228 | $150,457 | $82,393 | $214,097 | $193,454 | $156,742 |

Annual sales peaked in 1995 and declined in each subsequent year.

| % Change in Sales From Comparable Prior Period | | | | | | | -1.30% | -1.03% | -5.59% | -8.08% | -5.97% | -10.66% | -8.05% | -9.64% | -7.34% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | (Five Months) | (Annual) | (Annual) | (Ten Months) |

| | |
|---|---|
| Total of Aug 2002 to Dec 2002 sales | $92,222 |
| Last 12 Months Sales Under Prior Owner | $242,679 |
| Last Jan to Oct Sales Under Prior Owner/Management | $211,095 (Jan to July 2003 plus Aug to Oct 2002) |

The source of sales amounts shown above for 1993 to July 2003 is BJ-002347. Sales for Aug 2003 to Oct 2006 are per the monthly sales reports filed by MPA.

\* Sales data was not provided for this period.

\*\* Opening and closing dates were obtained from BJ-002347. The date of transfer to MPA is per the Sacramento Store Asset Purchase agreement at BJ-006988.

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

Mehrdad Porghavami et al v. Ben & Jerry's et al

Actual Profit and Loss Statements and Estimated Break-Even Point

For Ben & Jerry's Scoop Shop - Sacramento, California

Exhibit 7

| Sources: | MP-002752 | | MP-002751 | | | | MP-003861 | | (1) | | Projected Annual Break-EvenPoint by Robert Wallace | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | | 2001 | | 2002 | | 2005 | | 10 months Jan to Oct 2006 | | | | |
| | $ | % | $ | % | $ | % | $ | % | $ | % | $ | % | |
| | | | | | | | | | | | | | |
| Sales | $290,460 | 100.0% | $272,596 | 100.0% | $259,058 | 100.0% | $193,455 | 100.0% | $156,742 | 100.0% | $190,000 | 100% | |
| Cost of Goods Sold | 83,433 | 28.7% | 88,470 | 32.5% | 78,448 | 31.0% | 50,268 | (5) | 63,182 | 40.31% | 62,700 | 33% | (3) |
| Gross Margin | 207,027 | 71.3% | 184,126 | 67.5% | 174,610 | 69.0% | 143,187 | | 93,560 | 59.69% | 127,300 | 67% | |
| | | | | | | | | | | | | | |
| Expenses: | | | | | | | | | | | | | |
| Labor and Payroll Taxes | 63,798 | 22.0% | 56,099 | 20.6% | 57,664 | 22.8% | 36,312 | 18.8% | 31,803 | 20.29% | 38,000 | 20% | (3) |
| Local marketing | 11,618 | 4.0% | 10,903 | 4.0% | 10,122 | 4.0% | 3,900 | (7) | 10,490 | 6.69% | 7,600 | 4% | (3) |
| Ben & Jerry's Marketing | Included above | | Included above | | Included above | | | (7) | 3,052 | 1.95% | 3,800 | 2% | (3) |
| Rent | 39,095 | 13.5% | 39,274 | 14.4% | 39,746 | 15.7% | 52,806 | 27.3% | 50,299 | 32.09% | 60,360 | 32% | (2) & (4) |
| Supplies | 2,905 | 1.0% | 2,726 | 1.0% | 2,530 | 1.0% | | | not provided | | 1,900 | 1% | (3) |
| Utilities | 5,594 | 1.9% | 5,371 | 2.0% | 6,260 | 2.5% | 8,016 | 4.1% | not provided | | 8,000 | 4% | (4) |
| Insurance, Fees, Licenses, Telephone, and other | 5,832 | 2.0% | 6,197 | 2.3% | 5,665 | 2.2% | 15,349 | (6) | not provided | | 7,640 | 4% | (4) |
| Total Expenses | 128,842 | 44.4% | 120,570 | 44.2% | 121,987 | 48.2% | 116,383 | | not provided | | 127,300 | | |
| | | | | | | | | | | | | | |
| Net Profit/(Loss) | $78,185 | 26.9% | $63,556 | 23.3% | $52,623 | 20.8% | $26,804 | | not provided | | $0 | 0% | |

(1) Amounts have been totalled from information per the monthly sales reports prepared by MPA.

(2) Rent expense in 2006 is reported on the monthly sales reports at $5,030 per month. This amount was multiplied by 12 to determine the rent for the break-even calculation.

(3) These expenses are variable in nature and have been calculated as a percentage of sales in the break-even analysis.

(4) These expenses are more fixed or incremental in nature and have been determined as a fixed amount, not a percentage of sales, in the break-even analysis.

(5) The 2005 P&L did not provide cost of goods sold. There was a line item of expense for supply/gas/repairs that has been used here as cost of goods sold, but it appears too low.

(6) This amount includes taxes expense of $18,081 (which appears to include sales taxes) net of taxes collected of $4,596, plus $1,864 of insurance. Sales tax should not be included.

(7) Per the monthly sales reports submitted to Ben & Jerry's for 2005, $10,237 was spent on local marketing in addition to $3,900 for the marketing contribution. This expense is not shown in the 2005 P&L and represents 5.3% of sales.

Note: Total variable expenses in the break-even analysis are 60% of sales. Total fixed expenses in the break-even analysis are $76,000.
Breakeven sales are calculated as $190,000 which is equal to $76,000 divided by (100% - 60%)

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

**Mehrdad Porghavami et al v. Ben & Jerry's et al**

**Ben & Jerry's Scoop Shop in Concord, California**

**Monthly Sales History**

**Exhibit 8**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Concord Store Opened | | | 08/29/98 | ** | | | | | | | | | |
| Ownership Transferred to MP | | | 04/15/04 | ** | | | | | | | | | |
| Concord Store Closed | | | 08/30/08 | ** | | | | | | | | | |

| Month | Sales prior to MPA's Ownership | | | | | | | | Sales Under MPA's Ownership | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | | 2004 | 2005 | 2006 | 2007 | 2008 |
| January | not open | $15,727 | $14,907 | $12,945 | $10,303 | $6,961 | * | | | $4,773 | $4,414 | $6,070 | $4,591 |
| February | not open | 13,776 | 13,411 | 13,667 | 10,525 | 6,672 | * | | | 5,251 | 4,991 | 7,530 | 5,295 |
| March | not open | 12,756 | 13,481 | 14,567 | 11,540 | * | * | | | 5,975 | 4,018 | 8,910 | 6,280 |
| April | not open | 14,482 | 15,137 | 13,749 | 11,238 | * | | | $2,636 | 5,961 | 6,368 | 7,910 | 6,760 |
| May | not open | 21,971 | 19,159 | 17,544 | 15,133 | * | | | 12,861 | 8,717 | 8,640 | 9,080 | 8,992 |
| June | not open | 21,971 | 19,002 | 18,854 | 15,688 | * | | | 15,169 | 10,111 | 10,408 | 9,085 | 13,726 |
| July | not open | 27,872 | 22,862 | 21,454 | 16,398 | * | | | 13,866 | 13,765 | 13,273 | 11,868 | 14,162 |
| August | 6,436 | 23,772 | 16,804 | 19,329 | 12,838 | * | | | 10,425 | 8,929 | 8,444 | 8,833 | 5,949 |
| September | 19,232 | 16,850 | 13,334 | 13,301 | 8,325 | * | | | 7,288 | 6,513 | 4,759 | 5,250 | closed |
| October | 16,636 | 14,296 | 11,389 | 10,235 | 6,467 | * | | | 6,843 | 5,902 | 3,557 | 11,780 | closed |
| November | 16,257 | 13,315 | 11,508 | 11,209 | 7,241 | * | | | 5,568 | 5,353 | 4,378 | 5,623 | closed |
| December | 16,325 | 13,826 | 12,639 | 9,839 | 6,133 | * | | | 3,625 | 3,500 | 5,541 | 4,816 | closed |
| | $74,886 | $210,614 | $183,693 | $176,698 | $131,829 | $13,633 | | | $78,281 | $84,750 | $78,791 | $96,755 | $66,755 |
| | | | | | | | | | 8.5 months | *** annual | annual | annual | 8 months |
| % Change In Sales From Comparable Reported Prior Period | | | -12.81% | -3.78% | -25.39% | -34.54% | | | -16.58% | -18.08% | -7.03% | 22.80% | -3.65% |
| | | | | | | | | | | -15.98% - percentage change 8.5 mos a/ 2005 vs 2004 | | | |

| | | | | | |
|---|---|---|---|---|---|
| Last 12 Months Reported Sales Under Prior Owner | | | | $124,634 | |
| Sales - April 15, 2002 to Dec 31, 2002 | | | | $93,842 | |

Annual sales peaked in 1999 and declined in each subsequent year through 2006.

\* The Concord shop come under new ownership in March 2003. Sales for these periods were not reported to Ben & Jerry's, and thus are unknown, if any.

\*\* The opening date was obtained from BJ-002345. The closing date and the date of transfer to MPA are per the 2nd amended cross complaint.

\*\*\* Because of seasonal fluctuations in sales, the annual rate of decline for 2005 has been calculated by comparing 2005 annual sales to the last reported sales for each of the months of the year, which includes April 2004 to Dec 2004 plus Jan and Feb 2003 plus March 2002.

Source: Monthly sales amounts for Aug 1998 to Feb 2003 are per BJ-002345. Monthly sales for April 2004 to Aug 2008 are per the monthly sales reports filed by MPA.

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

# Mehrdad Porghavami et al v. Ben & Jerry's et al

## Actual Profit and Loss Statements and Estimated Break-Even Point
### For Ben & Jerry's Scoop Shop - Concord, California

**Exhibit 9**

| | MP-001283 2005 $ | % | Actual P&L Information produced for Concord by MPA — Annual 2006 $ | % | Annual 2007 $ | % | 8 Months - Jan to Aug 2008 $ | % | Projected Annual Break-Even Point by Robert Wallace $ | % | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 83,989 | 100.00% | 78,792 | 100.00% | 96,795 | 100.00% | 96,755 | 100.00% | 98,000 | 100% | [1] |
| Cost of Goods Sold | 20,839 | | 29,705 | 37.70% | 33,876 | 35.01% | 27,211 | 40.76% | 29,040 | 33% | [3][8] |
| Gross Margin | 63,150 | | 49,087 | 62.30% | 62,879 | 64.99% | 69,544 | 59.24% | 58,960 | 67% | |
| **Expenses:** | | | | | | | | | | | |
| Labor | 19,023 | 22.65% | 15,814 | 20.07% | 480 | 0.50% | 1,660 | 2.49% | 20,240 | 23% | [2][6] |
| Local Marketing | | | 5,185 | 6.59% | 10,516 | 10.87% | 4,632 | 6.94% | 1,760 | 2% | [6] |
| Ben & Jerry's Marketing | 1,697 | 2.02% | 1,517 | 1.93% | 1,814 | 1.87% | 1,557 | 1.73% | 1,760 | 2% | [6] |
| Rent | 18,009 | 21.44% | 16,620 | 21.09% | 18,742 | 19.37% | 11,185 | 16.76% | 17,000 | 19% | [7] |
| Supplies | | | | | | | | | 1,760 | 2% | [6][9] |
| Utilities | 12,047 | 14.34% | 11,570 | 14.68% | | | | | 11,000 | 13% | [7] |
| Insurance, Fees, Licenses, Telephone, and other | 9,395 | 11.19% | (5,485) | | | | | | 5,440 | 6% | [7] |
| Total expenses | 60,171 | | 45,221 | | | | | | 58,960 | | |
| Profit/(Loss) | 2,979 | 3.55% | 3,866 | 4.91% | | | | | 50 | 0% | |

[1] Amounts have been totalled from the amounts reported on the monthly sales reports filed by MPA for that year.

[2] Labor amounts in 2007 and 2008 per the monthly reports can not have been fully reported. Based on labor as a % of sales: for Concord at 22.65% in 2005 and 20% in 2006, for Roseville at 23% of sales; and for Sacramento at 20% of sales; 23% has been used in the break-even analysis. Minimum wage in California was $6.75 per hour in 2004 to 2005, $7.50 per hour in 2007 and $8 per hour commencing 1/1/08, including mandatory benefits of social security, medicare and worker's comp. hourly pay would be approx. $8.80 in 2008. Labor expense in the break-even analysis of $23,240 provides 2,300 hours of annual labor, which is 1.11 workers at 40 hours per week and may be too low.

[3] The 2005 P&L did not provide cost of goods sold. There was a line item of expense for supply/purchase/repairs that has been used here as cost of goods sold, but it appears too low.

[4] This expense line item for 2005 includes taxes expense of $9,619 (which appears to include sales taxes) net of taxes collected of $2,088, plus $1,864 of insurance. Sales taxes should not be included.

[5] All amounts except utilities, other expense and profit, were totalled from the monthly sales reports. Utilities, Other and Profit are per MP-001285. Other includes the net of differences in other categories between the monthly sales reports and MP-001285 to arrive at the profit per MP-001285.

[6] These expenses are variable in nature and have been calculated as a percentage of sales in the break-even analysis.

[7] These expenses are more fixed or incremental in nature and have been determined as a fixed amount, not a percentage of sales, in the break-even analysis.

[8] Cost of goods sold has been provided at 33% of sales in the break-even analysis based on Roseville and Sacramento costs. Higher costs of 35% to 41% could be used.

[9] Supplies have been provided at 2% of sales in the break-even analysis based on supplies expense as a percentage of sales for the Roseville store.

Note: Total variable expenses in the break-even analysis are 62% of sales. Total fixed expenses in the break-even analysis are $33,440.
Breakeven sales are calculated at $88,000 which is equal to $33,440 divided by (100% - 62%)

CONFIDENTIAL
PURSUANT TO
STIPULATED PROTECTION ORDER

DEFENDANTS'

# Exhibit - "B"

Subj:    **Store Upgrades needed for Transfer**
Date:    4/20/2004 1:04:38 PM Pacific Daylight Time
From:    stevec@benjerry.com
To:      rosevillebestic@aol.com, jh1985a@yahoo.com

John & Mehrdad,
Here is the list of physical store upgrades needed to be done for the transfer to be approved

<<Checklist For Renewal Concord.doc>>

Steve Chertoff
Ben & Jerry's
Regional Franchise Mgr
(702) 896-9461
stevec@benjerry.com

MP004276

## Checklist For Renewal/Transfer
## Concord, CA
## April 2004

1. Upgrade Register to Micros System

2. Upgrade Blenders to Blend Tec

3. Repaint Store to approved color scheme.

4. Purchase approved Zeroll scoops and spades

5. Purchase and install new menu board system

6. Repair/Replace broken cove tiles beneath front counter

7. Remove/Replace broken chairs and tables

8. Replace missing bottom drawer on the back counter.

9. Repair or replace broken cake case.

10. Repair neon on main sign.

11. Repair/Replace broken tiles beneath walk-in freezer

12. Correct all issues on attached inspection report

DEFENDANTS'
# Exhibit - "C"

# Sale of



## Located @

## 2030 Douglas Blvd, # 18
## Roseville, CA 95661

2861

## The Ben & Jerry's 2006 Transfer Package

*Note to proposed Seller: Please complete this package & submit to Ben & Jerry's, attn: Franchise Sales Coordinator (franchise.info@benjerry.com) at 30 Community Drive, S. Burlington VT 05403.*

*We also ask that you provide a copy of this package to any potential candidates. Any candidates that are presented to Ben & Jerry's for consideration will enter into our complete interview process & will at some point be asked specific questions with regards to the specific materials in this package. Please note, Ben & Jerry's Franchising Inc will not comment on the contents of this package. The questions directed at potential candidates will be asked to ensure that the candidates understand key aspects of the business they could potentially be purchasing.*

*We look forward to working with you on the potential sale of your Ben & Jerry's scoop shop; please contact your Division Manager or Franchise Sales Specialist if you have any questions about this process.*

## Background and Location Information

Ben & Jerry's at Roseville, California officially opened for business on April 1, 1996

The mailing address for the shop is: 2030 Douglas Blvd, Suite 18 Roseville, CA 95661

Description of location: out door center

The phone number for the shop is: 916 781 7879

We considered many different elements prior to opening this scoop shop and felt the there were significant advantages with this location. These advantages are:

- High Traffic
- Desirable neighborhood
- Varius Businee opprtunities, Room for expansion

## Staff Overview

We currently have 5 employees. We consider the key staff members to be:

1. Position/Title Manager Employee Name Parvaneh Givsan Hire Date03/16/2005
2. Position/Title Sn Scooper/Ass Manager Employee Name Gina Martin Hire Date09/01/2005
3. Position/Title Sn Scooper Employee Name Walter Wright Hire Date04/08/2006
4. Position/Title Scooper Employee Name Kayla Stevens Hire Date06/05/2006
5. Position/Title          Employee Name          Hire Date

Key points about the staff: Dependable, Trustworthy, Hardworker

2862

## Sales Mix & Sales History

| Cups & Cones | 2003: 80,354.23 | 2004: 87,473.65 | 2005: 75,616.38 |
| Frozen Beverages | 2003: 18,491.78 | 2004: 16,734.22 | 2005: 14,220.20 |
| Cakes | 2003: 14,674.11 | 2004: 7,201.85 | 2005: 8,684.14 |
| Off Premise | 2003: 2,388.35 | 2004: 2000.56 | 2005: 16,178.62 |
| Sundaes | 2003: 13,259.88 | 2004: 7,947.46 | 2005: 10,697.18 |
| Average Customer Transaction | 2003: 6.13 | 2004: 5.40 | 2005: 3.56 |
| Total Sales | 2003: 150,555.26 | 2004: 135,546.22 | 2005: 137,426.70 |

Year to date 2006, the sales trends for this store are (please enter positive or negative & the applicable %): Mix

## Sales Price & Terms

For the purpose of opening discussions, the following price and terms are the basis for any transfer discussions. Modifications will be considered based on individual circumstances.

Deposit: $50,000.00
Payment to seller at closing: $80,000.00
**Total Selling Price: $130,000.00**

The selling price includes the following:
- The remainder of the term of the franchise agreement (subject to franchisor approval), which is
- All equipment, furniture, and fixtures
- Any customer lists available

Inventory will be completed the morning of closing date and buyer will be responsible to pay seller the costs of all food items and paper goods in store at time of closing.

In addition, the buyer will:
- Assume premise lease, subject to landlord approval. If lease will not be assumed, please advise potential buyer that all leases must include the Ben & Jerry's lease riders & all leases must be approved by Ben & Jerry's. Lease terms must meet the term of the Franchise Agreement.
- Assume operating leases and rental contracts as applicable
- Assume costs of prorated items going forward as of closing date (insurance, advertising fees, rent, utilities, etc.).

2863

- Any deposits seller has with landlord, state agencies (i.e. electric company) or other business parties will be returned to seller and new owner (buyer) will provide deposits as required.
- Acquire any items required by Ben & Jerry's Franchising Inc., the store is being sold under "as is" conditions. Buyer & seller should review the transfer checklist, which will be completed by the Regional Franchise Manager to see what (if any) specific upgrades will be required prior to transfer by Ben & Jerry's Franchising Inc.

The seller will be responsible for accounts receivable and accounts payable as of transfer date. The seller is also responsible to meet all reporting and financial requirements with Ben & Jerry's Franchising Inc prior to closing. **If there are any outstanding reports or fees, Ben & Jerry's will not recognize the transfer of the business.**

NOTE: A transfer fee is due to Ben & Jerry's as outlined in your agreement (recent agreements have a \$10,000 transfer fee).

## Property Information

Property Owner: Rocky Ridge Venture
Address: 1530 J Street, Suite 200
Address: Sacramento, CA 95814
Phone #: 916 383 3333

Property Manager: Fulcrum Management Group
Address: 1530 J Street, Suite 200
Address: Sacramento, CA 95814
Phone #: 916 383 3333

Lease Information
Lease term: 5 Years with 5 years options
Lease start date: May 1, 2005
Lease end date: April 30, 2011

Monthly rent schedule: 3,843.00

Current Monthly Cam Payments: \$668.72

Rent & CAM check should be made out to: Rocky Ridge Venture
Rent & CAM check should be sent to Fulcrum Management by the 10 th of each month .

**Please attach an equipment list, age of each piece of equipment & photos of the scoop shop.**

## Roseville Shop Equipment List

- ➤ Micros Point of Sale Computer/Register (new)
- ➤ BJ signage system (new)
- ➤ 42" Plasma TV (new)
- ➤ Samsung DVD Player (new)
- ➤ Remmington B/W monitor Surveillance System (4 years old)
- ➤ Centry Safe Box (original)
- ➤ Freezer (original)
- ➤ 2 dip boxes (original)
- ➤ 1 cake display (original)
- ➤ 1 double tank hot fudge warmer (original)
- ➤ 1 caramel warmer (new)
- ➤ 1 Vita Mix blenders, 3 tubs (new)
- ➤ Ice maker (original)
- ➤ Stereo (new)
- ➤ Leather Sofa (2 years old) booths, chairs and tables (original)
- ➤ Juicer (original)
- ➤ 5 large heavy duty storage shelves (original)
- ➤ Fetco Coffee brewer (new)
- ➤ Cecilware Steam Machine (new)
- ➤ Microwave oven
- ➤ Waffle maker (original/refurbished)
- ➤ Heavy Duty KitchenAid Mixer (original)

2865

- Cookies/Brownie display box (new)
- Double doors under counter refrigerator (original)
- Heavy Duty steel prep-table
- NU-VU baking oven (original)
- 7 topping jars
- 1 Commercial child high chair
- 4 Zeroll Ice Cream Scoop
- Fax Machine (original)
- Cordless Phone (2 hand sets)
- Tec scale

2866





2867

DEFENDANTS'
# Exhibit - "D"

MEHRDAD PORGHAVAMI, Defendant
Appearing in Propria Persona
11140 Fair Oaks Blvd, Suite 300
Fair oaks, CA 95628
Tel # (916) 747 1205
Fax # (916) 966 2268
Email: mpagroup@aol.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DITRICT OF CALIFORNIA

| | |
|---|---|
| BEN & JERRY'S FRANCHISE, INC., a ) Vermont Corporation, and BEN & JERRY'S ) HOMEMADE, INC., a Vermont Corporation, ) | Case No. 2:07-CV-02599-JAM-KJM |
| | **[Assigned to Hon. John A. Mendez]** |
| Plaintiff, ) | |
| Vs. ) | |
| MEHRDAD PORGHAVAMI, et al. ) | |
| Defendant, ) | **DEFENDANTS' MEHRDAD PORGHAVAMI AND MPA GROUP, INC'S SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORY NUMBER S: 3, 5, 6, 8, 9, 10, 15, 16 and 19.** |
| MEHRDAD PORGHAVAMI, et al. ) | |
| Cross-Complainants ) | |
| Vs. ) | |
| BEN & JERRY'S FRANCHISE INC., a ) Vermont Corporation, and BEN & JERRY'S ) HOMEMADE INC., a Vermont Corporation, ) And BEN & JERRY'S OF CALIFORNIA, ) INC., a California Corporation and WONDER) ICE CREAM LLC., a California Company. ) | **Trial Date: December 7, 2009** |
| Cross-Defendants ) | |

| | | |
|---|---|---|
| PROPOUNDING PARTY | : | Plaintiffs' BEN & JERRY'S FRANCHISING INC |
| | | and BEN & JERRY'S HOMEMADE, INC. |
| RESPONDING PARTY | : | Defendants' Mehrdad Porghavami, ET AL. |
| SET NUMBER | : | TWO (2) |

-1-

1              Pursuant to the FRCP 33, Defendants and Cross-Complainant MEHRDAD

2  PORGHAVAMI and MPA GROUP, INC., (hereinafter "Porghavami") provide these 2nd

3  supplemental to Plaintiffs' and Cross-Defendants' BEN & JERRY'S FRANCHISING INC and

4  BEN & JERRY'S HOMEMADE, INC (hereinafter "Ben & Jerry's) First Set of Interrogatories

5  numbers 3, 5, 6, 8, 9, 10, 15, 16 and 19, and request as their further submitted on April 22, 2009 as

6  follows:

7                         **GENERAL OBJECTIONS**

8              Porghavami incorporate in each of its supplemental responses the following

9  objections:

10             1- These responses are made without prejudice Porghavamis' right to supplement

11 or amend these responses in the event that any documents or information previously available to

12 Porghavami may have been omitted by oversight, inadvertence, or good faith error or mistake.

13             2- Porghavami further objects to each and every interrogatory to the extend that

14 they call for information to which Ben & Jerry's has equal and or greater access than Porghavami.

15             3- Porghavami objects to Ben & Jerry's definition of "You" and "Your" to the

16 extend the Ben & Jerry's seeks to obtain information outside Porghavami's personal knowledge

17 and/or seek information protected by the work product doctrine.

18             4- Porghavamis' discovery and preparations for trial are ongoing in this matter

19 and these responses made based on the information and facts presently known and is without

20 prejudice to Porghavamis' right to introduce facts, documents witnesses or other evidence that

21 may be subsequently discovered.

22             5- Porghavami further objects to these interrogatories to the extend they purported

23 to impose duties and obligations which exceed or are different than those imposed by the Federal

24 rules of Civil procedure.

25 **INTERROGATORY NO.3:**

26 Identify all financial information, including, but not limited to, all gross revenue/gross sales

27 information, that you were provided by BJCA or Ben & Jerry's that form the basis, in whole or in

28 part , of Your claim in this case that You were misled and, as to each, state:

                                               -2-

1    a.  the specific information provided, including, but not limited to , an identification of
2        any documents containing that information that you were provided;

3    b.  who specifically provided it to You (and, if provided by BJCA, state all facts that
4        support Your contention that Ben & Jerry's is responsible for that information);

5    c.  the date(s) you were provided it;

6    d.  the details of any oral or written communications between You and the provider with
7        respect to the information;

8    e.  what, if anything, You did to verify the information;

9    f.  Your basis for contending that the information was false or misleading and the date
10       when You first learn that;

11   g.  Whether You contend that Ben & Jerry's knew the information was false or misleading
12       at the time it was provided, and Your basis for contending that;

13   h.  Whether (and, if so, how) You relied on the information;

14   i.  How, if at all, You were damaged by the receipt of, and reliance on, the information;
15       and

16   j.  all documents related to Your responses to this interrogatory.

17   ## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

18   Subject to and without waiving its general and specific objections it has made Porghavami
19   supplements his responses as follows:

20   a.  Sales history, 2001 Statement of Income & Expenses bates-numbered MP004121 through
21       MP004123, 2881 through 2885

22   b.  Mary Down, the BJCA's sales agent provided the information on or about July 23, 2002,
23       claiming to be the sales history of the Roseville and Sacramento shops that were provided
24       to her by BJCA for the prospective buyers review. Later on Jay Bar of BJCA also confirm
25       the same sales records. Plaintiffs' approved the BJCA's sales and all documents were also
26       submitted to Plaintiffss for their approval of transfer of the shops to Defendants. Plaintiffs'
27       was the party that in fact it had the custody and all information on the BJCA's shops and
28       their poor performance in some cases.

                                             -3-

c. July 23, 2002 for Roseville shop and April 8, 2003 for Sacramento shop.

d. The discussions followed with Jay Bar of BJCA and then meeting on the August 2, 2002 with Michael Gale and Max Gitnick, reaching the agreement to purchase the Roseville shop subject to the Plaintiffs' approval. I was also told that the actual sales numbers that were filed with Ben & Jerry's were higher than the same sales reports that BJCA had submitted for my review and considerations. That BJCA did not file monthly report per shop but that of all their shops were filed jointly, therefore their monthly average is higher than average of a single shop!

e. During our meetings, I requested additional information from representative of Plaintiffs' initially Will Patten and discussion followed up with Steve Chertoff, I was told then that whatever BJCA provided me are what I have to go with and that they have no additional information.

f. The sales reported by BJCA were 30-50 % higher than the actual sales for each shop. I was also let to believe that with hands on owner and operator generally the sales should go up considerably about 30% in average. BJCA was considered to be an absentee owner (being based in the Southern California) and I was local in Roseville and Sacramento (Northern California). Therefore, I was actually expecting a 30-50% higher sale with a hand on operation and owner operator on the promises. By the late 2006 I was certain that the numbers provided were in fact false and unreliable at the best.

g. Yes, since this was not the first time that BJCA had provided false and misleading sales records and there were other investors and franchisees that also had experienced the same falsified records, and there was at least one law suit pending against BJCA that Plaintiff's had reported. Plaintiffs' had an obligation to come forward with additional information and put BJCA sales records under scrutiny.

h. Based on the information and the Sales history provided by BJCA and later on the appearance of the Item 19 of the Uniform Franchise Circular – Franchise Agreement provided by Plaintiffs', I decided to purchase the shops. Other than BJCA and Plaintiffs, I

-4-

| 1 | had no other source of information. It is also my understanding the it was Plaintiffs and |
| 2 | the BJCA responsibility to provide accurate and proper information, |
| 3 | i. As stated, knowing what I know now, I would have not gotten involved and would had not |
| 4 | purchased the shops which in the process I have lost my investments and so far with large |
| 5 | financial losses. |
| 6 | j. MP004121 through MP004129, MP004175 through MP004177, 2881 through 2885, MP- |
| 7 | 002780, MP-002781, MP-002782, MP-003022, MP003023, MP003094 through MP- |
| 8 | 003098, MP-003052 through MP-003057, MP-003105 through MP-003116, MP002758 |
| 9 | through MP-002778, MP-002748, MP-002747, MP-002753, MP-002749 through |
| 10 | MP002752, MP003033, MP-001327, MP-001328. |

## INTERROGATORY NO.5:

Identify each instance in which You contend that You received Ben & Jerry's Product that was underweight and, as to each instance, state;

a. The products involved (and invoice number, if available);

b. From whom You purchased it;

c. The date;

d. What the weight should have been;

e. What the weight actually was;

f. What action, if any You took as a result;

g. Whom, if any one, You communicated with at Wonder or Plaintiffs concerning this; and

h. Any documents relating to this instance.

## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving its general and specific objections it has made Porghavami supplements his responses as follows:

a. Shipments received from 2004 through 2008, including, Order/invoice numbers:

565656, 564897, 568252, 568252, 567197, 573274, 573785, 573785, 572583, 571798,

569252, 24500, 24714, 569301, 569905, 568938, 569252, 569301, 569300, 569905,

570379, 26089, 25799, 25800, 570545, 570805, 570969, 26219, 570972, 575023, 575533,

-5-

575963, 574475, 575963, 576486, 577679, 577897, 578234, 580861, 578767, 581219,

581870, 581871, 579932, 579931, 578006, 578767, 000027803,

b. Wonder Ice Cream and Ben & Jerry's

c. 2004 through 2008

d. 17.5 to 18,5 lbs.

e. 12.5 to 15.5 lbs.

f. Spoke with the other franchises, monitor extranet, reported and complaint to Steve Chertoff, the Plaintiffs Regional Franchise Manager.

g. Steve Chertoff, the West Coast RFM for Plaintiffs'

h. Bates-numbered: 2567 through 2582, MP-003268, MP-003272, MP-003267, MP-003266, MP-003265, MP-003309, MP-003295, MP-003318, MP-003319, MP-003500, MP-003502, MP-003315, MP-003491, MP-003492, MP-003493, MP-003485, MP-003486, MP-003480, MP-003481, MP-003474, MP-003475, MP-003301, MP-003302, MP-003297, MP-003298, MP-001508, MP-001507, MP-003454, MP-003455, MP-003543, MP-003544, MP-003558, MP-003539, MP-003449, MP-003450, MP-003444, MP-003445, MP-003436, MP-003437, MP-00344, MP003845 through MP003928, MPW-000102 through MPW-000166

## INTERROGATORY NO.6:

Identify each instance in which you contend that You received Ben & Jerry's Product that was improperly packed and/or marked and, as to each instance, state:

a. The Product involved (and invoice number, if available);

b. From whom you purchased it;

c. the date;

d. In what way it was improperly packed and/or marked;

e. What action, if any, you took as a result;

f. Whom, if anyone, You communicated with at Wonder or Plaintiffs concerning this; and

g. Any documents relating to this instance.

////

-6-

## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

Subject to and without waiving its general and specific objections it has made Porghavami
supplements his responses as follows:

    a.  Flavors: Phish Food, Butter Pecan, Vanilla Heat bar, Peanut Butter Cup, delivered in June
2006 with expiry date in August 16, 2006 MPW-0001711, and assorted repacked of Ben &
Jerry's pints

    b.  Wonder Ice Cream

    c.  Often, started from mid to late 2005

    d.  Some were expired, some were broken boxes,

    e.  Reported to Wonder Ice Cream and Plaintiffs RFM Steve Chertoff,

    f.  Mike Johnston, Wonder General Manager at the time and Steve Chertoff Plaintiffs RFM

    g.  2848, MP-003267, MP-002820, MP-003277, MPW-0001711

## INTERROGATORY NO.8:

Identify each instance in which You contend that You ordered Ben & Jerry's Product but did not
receive it either at all or in a timely manner and, as to each instance, state:

    a.  The Products involved (and invoice number, if available);

    b.  From whom You purchased it;

    c.  The date You ordered it;

    d.  The date You should have received it per the order;

    e.  The amount You ordered;

    f.  What reason(s) were given to You as to why You did not receive the full order;

    g.  whether you eventually received the Product (and, if less than the full order, state the
amount You received and when);

    h.  what action, if any, You took as a result;

    i.  whom if anyone, You communicated with Wonder or Plaintiffs concerning this; and

    j.  any documents relating to this instance.

////

////

-7-

**SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Subject to and without waiving its general and specific objections it has made Porghavami supplements his responses as follows:

a. Dates and Invoice (order) numbers- (Date: Order Numbers of shorted and non deliveries) 9/28/2004: 565656, 9/06/2004: 564897, 3/2/05: 568252, 1/5/05: 567197, 8/3/05: 573274, 8/17/05: 573785, 7/13/05: 572583, 6/22/05: 571798, 4/04/05: 569252, 4/13/05: 569301, 4/25/05: 569905, 3/30/05: 568938, 4/6/05: 569252, 4/6/05: 569300, 4/25/05: 569905, 5/11/05: 570379, 5/25/05: 570805, 5/25/05; 570805, 5/30/05: 570969, 6/1/05: 570972, 5/26/05: 570972, 9/27/05: 575023, 10/19/05: 575533, 11/09/05: 575963, 9/7/05: 574475, 12/14/05: 576486, 1/10/06: No delivery, 3/3/06: 577897, 3/28/06: 578234, 6/20/06: 580861, 4/24/06; 578767, 6/27/06: 581219, 7/18/06: 581870, 7/18/06: 58187, 08/20/06: No delivery, 9/18/2006: No delivery. Bated documents MP003845 through MP003928, MP-003209 through MP-003211

b. Wonder Ice Cream LLC

c. The deliveries were requested including for: 09/28/04 (565656), 9/06/04 (564897), 3/02/05 (568252), 1/05/05 (567197), 8/03/05 (573274), 8/17/05 (573785), 7/13/05 (572583), 6/22/05 (571798), 04/13/05 (569252), 04/13/05 (569301), 04/25/05 (569905), 3/30/05 (568938), 4/06/05 (569252), 04/18/05 (569300), 04/25/05 (569905), 05/11/05 (570379) delayed and shorted, 5/16/05 (570545), 05/23/05 (570805), 5/26/05 (570969), 5/26/05 (570972), 5/26/05 (570972), 09/27/05 (575023), 10/18/05 (575533), 11/08/05 (575963), 09/06/05 (574475), 11/08/06 (575963), 12/12/05 (576486) delayed and shorted, 03/03/06 (577897), 03/21/06 (578234), 06/15/06 (580861) delayed and shorted, 04/14/06 (578767) delayed and shorted, 06/26/06 (581219), 07/14/06 (581870), 07/14/06 (581871), 5/18/06 (579932) delayed, 5/18/06 (579931) delayed. 01/10/06 was not delivered, 08/20/06 was not delivered, 05/25/06 (MP-002823) was not delivered.

d. The schedules that were expected to be delivered by Wonder Ice Cream including: 09/24/04 (565656), 8/31/04 (564897), 02/28/05 (568252), 1/04/05 (567197), 8/01/05 (573274), 8/16/05 (573785), 7/12/05 (572583), 6/20/05 (571798), 04/04/05 (569252),

-8-

04/06/05 (569301), 04/27/05 (569905), 5/12/05 (570379), 5/18/05 (570545), 3/23/05

(568938), 4/04/05 (569252), 04/06/05 (569300), 04/25/05 (569905), 05/18/05 (570379)

delayed and shorted, 5/18/05 (570545), 05/25/05 (570805), 5/30/05 (570969), 6/1/05

(570972), 6/01/05 (570972), 09/28/05 (575023), 10/19/05 (575533), 11/09/05 (575963),

09/07/05 (574475), 11/09/06 (575963), 12/13/05 (576486) , 03/03/06 (577897), 03/28/06

(578234), 06/16/06 (580861), 04/18/06 (578767), 06/27/06 (581219), 07/14/06 (581870),

07/14/06 (581871), 5/19/06 (579932), 5/19/06 (579931), 01/10/06 was not delivered,

08/20/06 was not delivered, 05/25/06 (MP-002823) was not delivered

e. Orders to Wonder Ice cream LLC, including: 186 items on 09/28/04 (565656), 153 items on 9/06/04 (564897), 119 items on 01/04/05 (567197), 159 items on 08/01/05 (573274), 222 items on 08/16/05 (573785), 104 items on 07/12/05 (572583), 143 items on 06/22/05 (571798), 116 items on 04/04/05, 127 items on 04/06/05 (569301), 120 items on 04/25/05 (569905), 168 items on 03/23/05 (568938), 116 items on 04/04/06 (569252), 127 items on 04/06/05 (569301), 126 items on 04/06/05 (569300), 120 items on 04/25/05 (569905), 141 items on 05/11/05 (570379), 15 items on 05/16/05 (570545), 139 items on 05/23/05 (570805), 136 items on 05/26/05 (570969), 131 items on 05/26/05 (570972), 129 items ordered on 09/27/05 (575023), 188 items ordered on 10/18/05 (575533), 163 ordered on 11/08/05 (575963), 179 items ordered on 09/06/05 (574475), 163 ordered on 11/08/05 (575963), 246 items ordered on 12/12/05 (576486), 121 items ordered on 02/21/06 (577679), 136 items ordered 03/02/06 (577897), 102 items on 03/21/06 (578234), 217 items ordered on 6/20/06 (580861), 20 items ordered on 04/14/06 (578767), 0192 items ordered on 06/26/06 (581219), 184 items ordered on 07/14/06 (581870), 166 items ordered on 07/14/06 (581871), 141 Items ordered on 05/18/06, 169 items ordered on 05/18/06, 198 items on 01/10/06 that was never delivered, 210 items on 08/20/06 that was never delivered. 10 seasonal items that was ordered on 05/25/06 that was never delivered, 60 items ordered on 07/04/2007, 61 items ordered on 07/10/07, 61 items ordered on 07/24/07, 58 items ordered on 08/15/07, 59 items ordered on 09/05/07, 53 items ordered on 10/12/07, 50 items on 12/11/07, 30 items on 01/31/08, 63 items on 02/29/08, 66 items on 04/02/08,

-9-

| 1 | 77 items on 04/08/08, 53 items on 04/30/08, 54 items on 05/28/08, 4 items on 5/30/08, 54 |
| 2 | items on 06/10/08. |

f. That Wonder Ice Cream was out of stock, or Wonder did not get their shipment, or the delivery truck had not arrived yet, or that the warehouse was out of stock and etc.

g. Often the missing items were incorporated in to a new order and new shipment, including the bates-numbered MP003845 through MP003927

h. Called Order desk at Wonder Ice Cream and called Plaintiffs RFM Steve Chertoff and inquired on the status of the products.

i. Jaime Miller at Wonder Ice Cream and Steve Chertoff RFM with Plaintiffs'

j. Bates-numbered: MP003845 through MP003928, MP-003432, MP-003354, MP-003355, MP-003403, MP-003368, MP-003369, MP-003372, MP-003373, MP-003364, MP-003365, MP-003218, MP-000800, MP-002823, MP-003207 through MP-003217

## INTERROGATORY NO.9:

Identify each instance in which You contend that You were shorted on Ben & jerry's Product, and, as to each instance, state:

a. the Product involved (and invoice number, if available);

b. from whom You purchased it;

c. the date;

d. how much You were shorted;

e. the reason(s) given to You for the shorting;

f. what action, if any, You took as a result;

g. whom, if anyone, You communicated with at Wonder or Plaintiffs concerning this; and

h. any documents relating to this instance.

## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

Subject to and without waiving its general and specific objections it has made Porghavami supplements his responses as follows:

a. The shorted product including:

Order Number: products-

-10-

565656: 10 tubs of BJ Half Bake Carb Karma, 4 pints of BJ Coffee Heat Bar Crunch, 2 pints of BJ Phish Food FY, 2 pints of Half Bake FY, 2 pints BJ Phish Food (Total Shortages: 20),

564897: 1 pints of BJ Pistachio, 4 tubs of BJ Dublin Mudslide (Total Shortages: 5),

567197: 5 tubs of BJ Triple Caramel Chunk, 573274: 2 tubs of BJ Primary Berry Graham (Total Shortages: 2),

573785: 2 pints of BJ Brownie Batter, 2 pints of BJ Pistachio, 2 pints of BJ Phish Food, 6 tubs of BJ Strawberry Kiwi, 6 tubs of BJ Giant Chocolate Chip (Total Shortages: 18),

572583: 8 tubs of BJ Chocolate Therapy (Total Shortages: 8),

571798: 1 pint of BJ Phish Food, 2 tubs of BJ Triple Caramel Chunk, 3 tubs of BJ Chocolate Therapy, 2 tubs of BJ Mango Lime Sorbets, 6 tubs of BJ Chunky Monkey (Total Shortages: 14),

569252: 2 tubs of BJ Lemon Lime Sorbet (Total Shortages: 2),

569301: 2 tubs of BJ Apply Ever After, 3 tubs of BJ Chocolate Therapy, 2 tubs of BJ's Lemon Lime Sorbet, 3 tubs of BJ's Choc-Fudge Brownie (Total Shortages: 10),

569905: 6 tubs of BJ's Lemon Lime Sorbet, 4 tubs of BJ's Butter Pecan, 2 boxes of BJ's Brownie Batter (Total Shortages: 12),

568938: 4 tubs of BJ's In a Crunch, 2 tubs of BJ's Lemon Lime Sorbet (Total Shortages: 6),

569252: 2 tubs of BJ's Lemon Lime Sorbet, 1 tub of BJ's Choc-Fudge Brownie (Total Shortages: 3),

569300: 4 tubs of BJ's Chocolate Therapy, 2 tubs of BJ's Lemon Lime Sorbet, 2 boxes of BJ's Brownie Batter (Total Shortages: 8),

569905: 6 tubs of BJ's Lemon Lime Sorbet, 1 tub of BJ's Butter Pecan, 2 Boxes of BJ's Brownie Batter (Total Shortages: 9),

570379: 8 tubs of BJ Half Bake Carb Karma, 1 box of BJ's Cherry Garcia Bars, 6 tubs of BJ's Lemon Lime Sorbet, 4 boxes of BJ's Brownie Batters (Total Shortages: 19),

-11-

| | |
|---|---|
| 1 | 570805: 1 pints of BJ's Pistachio, 6 tubs of BJ's Lemon Lime Sorbet, 2 tubs of BJ's NSA |
| 2 | Blueberry, 2 boxes of BJ's Brownie Batters (Total Shortages: 11), |
| 3 | 570969: 1 pints of BJ's Pistachio, 4 tubs of Chocolate Therapy, 1 tubs of BJ's Berry Berry |
| 4 | Sorbet, 5 tubs of BJ's Lemon Lime Sorbets (Total shortages: 11), |
| 5 | 570972: 1 pints of BJ's Pistachio, 4 tubs of BJ's Lemon Lime Sorbets (Total Shortages: |
| 6 | 5), |
| 7 | 575023: 2 tubs of BJ's Cherry Vanilla (Total Shortages: 2) |
| 8 | 575533: 2 pints BJ's Brownie Batter, 2 pints of BJ's Pistachio, 7 tubs of BJ's Wavy Gravy |
| 9 | (Total Shortages: 11) |
| 10 | 575963: 4 tubs of BJ's Half Bake FY, 10 tubs of BJ's Wavy Gravy (Total Shortages: 14). |
| 11 | 574475: 3 pints of BJ's Pistachio, 12 tubs of Strawberry Kiwi Sorbets (Total Shortages: |
| 12 | 15). |
| 13 | 576486: 3 pints of BJ's Brownie Batter, 5 pints of BJ's Pistachio (Total Shortages: 8). |
| 14 | 577897: 4 tubs of BJ's Baklava (Total Shortages: 4). |
| 15 | 578234: 2 tubs of BJ's NSA Vanilla Choc Swirl (Total Shortages: 2), |
| 16 | 580861: 2 tubs of BJ's NSA Vanilla Choc Swirl (Total Shortages: 2), |
| 17 | 578767: 10 tubs of BJ's Wavy Gravy Total Shortages; 10), |
| 18 | 581219: 4 tubs of BJ's NSA Vanilla Choc Swirl (Total Shortages: 4), |
| 19 | 581870: 1 tub of BJ's NSA Vanilla Choc Swirl (Total Shortages: 1), |
| 20 | 581871: 1 tub of BJ's NSA Vanilla Choc Swirl (Total Shortages: 1). |
| 21 | Shipment Dates: Products Shortages- |
| 22 | 01/11/06: Shipment (MP-003573) was not delivered: 6 tubs Butter Pecan, 10 tubs Cherry |
| 23 | Garcia, 14 tubs Choc-Chip Cookie Dough, 10 tubs Choc-Fudge Brownie, 14 |
| 24 | tubs of Chocolate, 6 tubs Chunky Monkey, 8 tubs of Coconut Almond Fudge |
| 25 | Chip, 6 tubs of Coffee, 4 tubs of Coffee Coffee Buz Buz, 4 tubs of Dublin |
| 26 | Mudslide, 14 tubs of    Mint Choc-Chunk, 4 tubs of N.Y. Super Fudge Chunk, 4 |
| 27 | tubs of Oatmeal Cookie Chunk, 4 tubs of Peanut Butter, 6 tubs of Phish Food, 5 |
| 28 | tubs of Strawberry, 5 tubs of Strawberry Cheese Cake, 8 tubs of Sweet Cream & |

-12-

| 1 | Cookies, 6 tubs of Triple Caramel Chunk, 10 Vanilla for a Change, 4 tubs of |
|---|---|
| 2 | Vanilla, 4 tubs of NSA Vanilla Choc-Swirl, 4 Half Baked FY, 4 tubs Black |
| 3 | Raspberry FY, 4 tubs of Vanilla, 6 tubs of Lemonade Stand, 8 tubs of |
| 4 | Strawberry Kiwi, 2 boxes of Cookie Dough Batter, 4 boxes of Brownie Batter, 3 |
| 5 | pints of Cherry Garcia, 3 pints of Choc-Chip Cookie Dough, 4 pints of Mint |
| 6 | Choc-Chunk (Total Shortages: 198), |

08/22/06: Shipment (MP-003928) was not delivered: 10 tubs Cherry Garcia, 14 tubs Choc-Chip Cookie Dough, 14 tubs Choc-Fudge Brownie, 12 tubs of chocolate, 8 tubs of Chocolate Therapy, 6 tubs Chunky Monkey, 6 tubs of Coconut Almond Fudge Chip, 6 tubs of Coffee, 6 tubs of Coffee Coffee Buz Buz, 6 tubs Of Dublin Mudslide, 5 tubs of Key Lime Pie, 14 tubs of Mint Choc-Chunk, 5 tubs of N.Y. Super Fudge Chunk, 4 tubs of Peanut Butter, 8 tubs of Phish Food, 8 tubs of Strawberry, 10 tubs of Sweet Cream & Cookies, 6 tubs of Triple Caramel Chunk, 10 Vanilla for a Change, 3 tubs of NSA Vanilla Choc-Swirl, 6 Half Baked FY, 4 tubs of Vanilla FY, 6 tubs of Choc-Fudge Brownie FY, 4 tubs of Cherry Garcia FY, 4 Berry Berry Extraordinary Sorbet, 3 Jamaican Me Crazy, 6 tubs of Lemonade Stand, 2 tubs of Mango Lime Sorbet, 4 tubs of Strawberry Kiwi, 1 boxes of Cookie Dough Batter, 1 boxes of Brownie Batter, 2 pints of Cherry Garcia, 2 pints of Choc-Chip Cookie Dough, 2 pints of Choc-Fudge Brownie, 1 pints of Coffee Heat Bar Crunch, 1 pints of N.Y. Super Fudge Chunk (Total Shortages: 210),

09/18/06: 10 tubs (MP-003216) of BJ's Pumpkin Cheese Cake (Total Shortages: 10)

07/04/07: 1 tub of BJ's Choc-Fudge Brownie FY, 3 tubs of BJ's Choc-Fudge Brownies, 1 tubs of BJ's Half Bake FY, 1 tub of BJ's Black Raspberry FY (Total Shortages: 6),

07/13/07: 1 tub of BJ's Vanilla Heat Bar (Total Shortages: 1),

09/07/07: 2 tubs BJ's Strawberry Cheese Cake (total Shortages: 2),

10/12/07: 1 pints of BJ's Pistachio (Total Shortages: 1),

-13-

1    12/11/07:  1 tub of BJ's Strawberry Kiwi Sorbet (Total Shortages: 1),

2    03/04/08:  2 pints of BJ's Chubby Hobby (Total Shortages: 2),

3    04/04/08:  1 quarts of BJ's Cherry Garcia, 2 tubs of BJ's Banana's on the Rum, 1 tub of

4            Strawberry Kiwi Sorbet (Total Shortages: 4),

5    05/30/08:  2 tubs of BJ's Butter Pecan (Total Shortages: 2),

6    06/02/08:  2 tubs of BJ's Cake batter, 2 tubs of BJ's Mango Sorbet (Total Shortages: 4),

7    **TOTAL PERIOD PRODUCTS DELIVERED BY WONDER: 27 MONTHS**

8    **TOTAL ITEMS SHORTED AND OR NOT DELIVERED IN 27 MONTHS: 673**

9    **TOTAL PERIOD WONDER REFUSED DELIVERIES: 13 MONTHS**

10   b.  Wonder Ice Cream LLC.

11   c.  Dates including: 09/28/04, 09/06/04, 03/02/05, 01/05/05, 08/03/05, 08/17/05, 07/13/05,

12       06/22/05, 04/06/0504/13/05, 4/27/05, 03/30/05, 04/06/05, 04/13/05, 4/18/05, 4/27/05,

13       05/18/05, 05/25/05, 05/30/05, 06/01/05, 09/28/05, 10/19/05, 11/09/05, 09/07/05, 11/09/05,

14       12/14/05, 03/03/06, 03/28/06, 06/20/06, 04/24/06, 06/26/06, 07/18/06, 01/11/06, 08/22/06,

15       09/18/06, 07/04/07, 07/13/07, 09/07/07, 10/12/07, 12/11/07, 03/04/08, 04/04/08,

16       05/30/08, 06/02/08.

17   d.  Shorted items including: 10 tubs of BJ Half Bake Carb Karma, 4 pints of BJ Coffee Heat

18       Bar Crunch, 2 pints of BJ Phish Food FY, 2 pints of Half Bake FY, 2 pints BJ Phish Food

19       1 pints of BJ Pistachio, 4 tubs of BJ Dublin Mudslide, 5 tubs of BJ Triple Caramel Chunk,

20       2 tubs of BJ Primary Berry Graham, 2 pints of BJ Brownie Batter, 2 pints of BJ Pistachio,

21       2 pints of BJ Phish Food, 6 tubs of BJ Strawberry Kiwi, 6 tubs of BJ Giant Chocolate Chip

22       8 tubs of BJ Chocolate Therapy, 1 pint of BJ Phish Food, 2 tubs of BJ Triple Caramel

23       Chunk, 3 tubs of BJ Chocolate Therapy, 2 tubs of BJ Mango Lime Sorbets, 6 tubs of BJ

24       Chunky Monkey, 2 tubs of BJ Lemon Lime Sorbet, 2 tubs of BJ Apply Ever After, 3 tubs

25       of BJ Chocolate Therapy, 2 tubs of BJ's Lemon Lime Sorbet, 3 tubs of BJ's Choc-Fudge

26       Brownie,  6 tubs of BJ's Lemon Lime Sorbet, 4 tubs of BJ's Butter Pecan,  2 boxes of BJ's

27       Brownie Batter, 4 tubs of BJ's In a Crunch, 2 tubs of BJ's Lemon Lime Sorbet, 2 tubs of

28       BJ's Lemon Lime Sorbet, 1 tub of BJ's Choc-Fudge Brownie, 4 tubs of BJ's Chocolate
                                            -14-

Therapy, 2 tubs of BJ's Lemon Lime Sorbet, 2 boxes of BJ's Brownie Batter, 6 tubs of BJ's Lemon Lime Sorbet, 1 tub of BJ's Butter Pecan, 2 Boxes of BJ's Brownie Batter, 8 tubs of BJ Half Bake Carb Karma, 1 box of BJ's Cherry Garcia Bars, 6 tubs of BJ's Lemon Lime Sorbet, 4 boxes of BJ's Brownie Batters, 1 pints of BJ's Pistachio, 6 tubs of BJ's Lemon Lime Sorbet, 2 tubs of BJ's NSA Blueberry, 2 boxes of BJ's Brownie Batters, 1 pints of BJ's Pistachio, 4 tubs of Chocolate Therapy, 1 tubs of BJ's Berry Berry Sorbet, 5 tubs of BJ's Lemon Lime Sorbets, 1 pints of BJ's Pistachio, 4 tubs of BJ's Lemon Lime Sorbets, 2 tubs of BJ's Cherry Vanilla, 2 pints BJ's Brownie Batter, 2 pints of BJ's Pistachio, 7 tubs of BJ's Wavy Gravy, 4 tubs of BJ's Half Bake FY, 10 tubs of BJ's Wavy Gravy, 3 pints of BJ's Pistachio, 12 tubs of Strawberry Kiwi Sorbets, 3 pints of BJ's Brownie Batter, 5 pints of BJ's Pistachio, 4 tubs of BJ's Baklava, 2 tubs of BJ's NSA Vanilla Choc Swirl, 2 tubs of BJ's NSA Vanilla Choc Swirl, 10 tubs of BJ's Wavy Gravy, 4 tubs of BJ's NSA Vanilla Choc Swirl, 1 tub of BJ's NSA Vanilla Choc Swirl, 1 tub of BJ's NSA Vanilla Choc Swirl, 6 tubs Butter Pecan, 10 tubs Cherry Garcia, 14 tubs Choc-Chip Cookie Dough, 10 tubs Choc-Fudge Brownie, 14 tubs choc, 6 tubs Chunky Monkey, 8 tubs of Coconut Almond Fudge Chip, 6 tubs of Coffee, 4 tubs of Coffee Coffee Buz Buz, 4 tubs of Dublin Mudslide, 14 tubs of Mint Choc-Chunk, 4 tubs of N.Y. Super Fudge Chunk, 4 tubs of Oatmeal Cookie Chunk, 4 tubs of Peanut Butter, 6 tubs of Phish Food, 5 tubs of Strawberry, 5 tubs of Strawberry Cheese Cake, 8 tubs of Sweet Cream & Cookies, 6 tubs of Triple Caramel Chunk, 10 Vanilla for a Change, 4 tubs of Vanilla, 4 tubs of NSA Vanilla Choc-Swirl, 4 Half Baked FY, 4 tubs Black Raspberry FY, 4 tubs of Vanilla, 6 tubs of Lemonade Stand, 8 tubs of Strawberry Kiwi, 2 boxes of Cookie Dough Batter, 4 boxes of Brownie Batter, 3 pints of Cherry Garcia, 3 pints of Choc-Chip Cookie Dough, 4 pints of Mint Choc-Chunk, 10 tubs Cherry Garcia, 14 tubs Choc-Chip Cookie Dough, 14 tubs Choc-Fudge Brownie, 12 tubs of chocolate, 8 tubs of Chocolate Therapy, 6 tubs Chunky Monkey, 6 tubs of Coconut Almond Fudge Chip, 6 tubs of Coffee, 6 tubs of Coffee Coffee Buz Buz, 6 tubs of Dublin Mudslide, 5 tubs of Key Lime Pie, 14 tubs of Mint Choc-Chunk, 5 tubs of N.Y. Super Fudge Chunk, 4 tubs of Peanut Butter, 8 tubs of

-15-

Phish Food, 8 tubs of Strawberry, 10 tubs of Sweet Cream & Cookies, 6 tubs of Triple Caramel Chunk, 10 Vanilla for a Change, 3 tubs of NSA Vanilla Choc-Swirl, 6 Half Baked FY, 4 tubs of Vanilla FY, 6 tubs of Choc-Fudge Brownie FY, 4 tubs of Cherry Garcia FY, 4 Berry Berry Extraordinary Sorbet, 3 Jamaican Me Crazy, 6 tubs of Lemonade Stand, 2 tubs of Mango Lime Sorbet, 4 tubs of Strawberry Kiwi, 1 boxes of Cookie Dough Batter, 1 boxes of Brownie Batter, 2 pints of Cherry Garcia, 2 pints of Choc-Chip Cookie Dough, 2 pints of Choc-Fudge Brownie, 1 pints of Coffee Heat Bar Crunch, 1 pints of N.Y. Super Fudge Chunk, 10 tubs (MP-003216) of BJ's Pumpkin Cheese Cake, 1 tub of BJ's Choc-Fudge Brownie FY, 3 tubs of BJ's Choc-Fudge Brownies, 1 tubs of BJ's Half Bake FY, 1 tub of BJ's Black Raspberry FY, 1 tub of BJ's Vanilla Heat Bar 2 tubs BJ's Strawberry Cheese Cake, 1 pints of BJ's Pistachio, 1 tub of BJ's Strawberry Kiwi Sorbet, 2 pints of BJ's Chubby Hobby, 1 quarts of BJ's Cherry Garcia, 2 tubs of BJ's Banana's on the Rum, 1 tub of Strawberry Kiwi Sorbet, 2 tubs of BJ's Butter Pecan, 2 tubs of BJ`s Cake batter, 2 tubs of BJ`s Mango Sorbet.

**Total Items shorted and not delivered: 673 in 27 Months.**

e. That Wonder Ice Cream was out of stock, or they did not get their shipment, or the delivery truck has not arrived yet, or that the warehouse was out of stock and later on by accusations of not being in compliance with the payment requirements.

f. Called Order desk at Wonder Ice Cream and called Plaintiffs RFM Steve Chertoff and inquired about the status of shortages and lack of deliveries. Corresponded with Plaintiffs'.

g. Jaime Miller at Wonder Ice Cream and Steve Chertoff RFM with Plaintiffs'

h. Documents submitted Bates-Numbered: MP004210 through MP004212, MP004213 through MP004215, MP004215 through MP004218, 2567 through 2581, MP004216 through MP004218, MP004113 through MP004215, MP004210 through MP004212, MP-003268, MP-003272, MP-003267, MP-003266, MP-003265, MP-003309, MP-003295, MP-003318, MP-003319, MP-003500, MP-003502, MP-003315, MP-003491, MP-003492, MP-003493, MP-003485, MP-003486, MP-003480, MP-003481, MP-003474, MP-003475, MP-003301, MP-003302, MP-003297, MP-003298, MP-001508, MP-

-16-

| | |
|---|---|
| 1 | 001507, MP-003454, MP-003455, MP-003543, MP-003544, MP-003558, MP-003539, |
| 2 | MP-003449, MP-003450, MP-003444, MP-003445, MP-003436, MP-003437, MP- |
| 3 | 003441, MP-003845 through MP-003928. |

## INTERROGATORY NO.10:

Identify each instance in which You contend that You were not provided limited time and seasonal flavors, and as to each instance, state:

a. the Product involved (and invoice number, if available);

b. the date;

c. the date You ordered it;

d. what You were told as to why You were not receiving it;

e. what action, if any, You took as a result;

f. whom, if anyone, You communicated with at Wonder or Plaintiffs concerning this; and

g. any documents relating to this instance.

## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

Subject to and without waiving its general and specific objections it has made Porghavami supplements his responses as follows:

a. Including but not limited to the tubs of ; 10 tubs of Pumpkin Cheese Cake MP-003211, 4 tubs of Baklava order number 577897, 7 tubs of Wavy Gravy order number 57553, 10 tubs of Wavy Gravy order number 574475, 10 tubs of Carb Karma Half Bake order number 565656, 4 tubs of Dublin Mudslide order number 564897, 5 tubs of Triple Caramel Chunk order number 567197, 2 tubs of Primary Berry Graham 573274, 8 tubs of Chocolate Therapy order number 572583, 3 tubs of Chocolate Therapy order number 569301, 4 tubs of Chocolate Therapy order number 569300, 4 tubs of Chocolate Therapy order number 570969, 4 tubs of In a Crunch order number 568938, 2 tubs of NSA Vanilla Choc-Swirl order number 578234, 2 tubs of Strawberry Cheese Cake, 2 tubs of PB Coconut, 2 tubs of PB Coconut, 2 tubs of PB Coconut, 2 tubs of Cake Batter, 1 tub Cake Batter.

-17-

b. Dates : 09/18/06, 03/03/06, 10/19/05, 11/09/05, 09/28/04, 090604, 01/05/05, 08/03/05, 4/13/05, 04/18/05, 5/30/05, 3/30/05, 3/28/06, 09/07/07, 05/30/08, 06/02/08, 06/13/08, 06/02/08, 06/13/08.

c. Dates of Order: 05/25/06, 03/02/06, 10/18/05, 11/08/05, 09/24/05, 08/31/04, 01/04/05, 08/01/05, 04/06/05, 04/06/05, 05/26/05, 03/23/05, 03/21/06, 09/05/07, 05/28/08, 05/30/08, 06/10/08, 05/30/08, 06/10/08

d. That Wonder Ice Cream was out of stock, or they did not get their shipment, or the delivery truck has not arrived yet, or that the warehouse was out of stock and etc. In the case of Pumpkin Cheese Cake that the account and payments are not up to date.

e. Called Order desk at Wonder Ice Cream and called Plaintiffs RFM Steve Chertoff and inquired the status and complained.

f. Often; Jaime Miller at Wonder Ice Cream and Steve Chertoff RFM with Plaintiffs', in the case of Pumpkin Cheese cake also communicated with Greg Tuttle (the New General Manager at Wonder)

g. MP-003576 through MP-003578, MP-001159, MP-002412, MP-002413, MP002411, MP-003340 through MP-003345, MP-002414 through MP-002419, MP003845, MP003846, MP003847, MP003848, MP003849, MP003850, MP003855, MP003895, MP003896, MP-003215, MP-003216, MP-003214, MP-003214, MP-003212, MP-003209, MP-003210, MP-003211, MP-003208, MP-003207, MP-003217,

## INTERROGATORY NO.15:

Separately for each of the problems listed below, identify each sales (by customer, amount, type of Product, date, etc.) that You claim You lost as a result of that problem:

a. underweighting;

b. shortages;

c. improperly marked or packed Product;

d. expired Product or Product not in Compliance with Ben & Jerry's own distribution criteria;

e. lack of delivery of Product;

f. delay in delivery of Product;

-18-

1    g.  not being provided limited time and seasonal flavors; and

2    h.  not receiving a pro rata distribution.

3    **SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

4    Porghavami in particular objects to this interrogatory on the ground that it is unduly burdensome

5    and oppressive and is overly broad, vague and ambiguous. Subject to and without waiving its

6    general and specific objections Porghavami has made 2nd supplements his responses as follows:

7        a.  Underweighting: It is unreasonable that plaintiffs' expects the record of every single sale

8            effected as the result of underweighted tubs of product throughout this period of 2004

9            through 2008. However, it is reasonable to assume that the less products delivered for the

10           same costs and often higher in most cases had only contributed to the shortages of

11           products, higher costs, higher inventory costs, diminished 2004 through 2008 sales and

12           loss of profitability, as a overall operations.

13       b.  Shortages: It is unreasonable that plaintiffs' expects the record of every single sale effected

14           as the result of shortages of product and in particular the popular, new and or featured

15           product throughout this period of 2004 through 2008. However, it is reasonable to assume

16           that shortages of most product often had only contributed to the lost sales, lost of special

17           events and business opportunity, customer dissatisfactions, lost of income, increase costs

18           leading to closure of shops and loss of investments.

19       c.  Improperly Marked or Packed Product: It is also unreasonable that plaintiffs' expects the

20           record of every single sale effected as the result of Improperly Marked or Packed product

21           throughout this period of 2004 through 2008. However, it is only reasonable to assume that

22           Improper Marked or Packed product delivered not being a normal practice of doing

23           business, had only contributed to the confusion, shortages of products, customer

24           dissatisfaction, wastage, higher costs, higher inventory costs, diminished 2004 through

25           2008 sales and loss of profitability, as a overall operations.

26       d.  It is also unreasonable that plaintiffs' expects the record of every single sale effected as the

27           result of expired product or product not in compliance with Ben & jerry's own distribution

28           criteria throughout this period 2004 through 2008. However, it is only reasonable to
                                                        -19-

1    assume that expired or soon to be expired products delivered for the same costs and higher

2    in most cases had only contributed to the shortages of products, customer complaints and

3    dissatisfaction, loss of sales, higher costs, higher inventory costs, diminished 2004 through

4    2008 sales and loss of profitability, as a overall operations.

5    e.   Lack of Delivery of Product- It is totally unreasonable that plaintiffs' expects the record of

6         every single sale affected as the result of the lack of delivery product throughout 2006 and

7         2007 period. Without product there would be no sales, no business to attend to! However,

8         it is only reasonable to assume that lack of delivery of product in 2006 had contributed to

9         the loss of revenue, closure of the Roseville and Sacramento shops in 2006 and lost of

10        investment.

11   f.   Delay in delivery of Product- It is unreasonable that plaintiffs' expects the record of every

12        single sale effected as the result of delays in delivery of product throughout this period of

13        2004 through 2008. However, it is only reasonable to assume that less products delivered

14        only contributed to the shortages of products, lost of customers, lost of revenue, higher

15        costs, higher inventory costs, diminished 2004 through 2008 sales and loss of profitability

16        of overall operations.

17   g.   It is again unreasonable that plaintiffs' expects the record of every single sale effected as

18        the result of not being provided limited time and seasonal flavors product throughout this

19        period of 2004 through 2008. It would only be reasonable to assume that lack of featured

20        and seasonal product had only contributed to the less customer appeal, lost of business, lost

21        of income, increase customer dissatisfaction, lost of brand appeal, diminished 2004

22        through 2008 sales and loss of profitability of overall operations.

23   h.   It is also unreasonable that plaintiff expects the record of every single sale effected as the

24        result of not receiving a pro-rata distribution of product throughout the period of 2004

25        through 2008. It is reasonable to assume that lack of proper new flavors selection

26        contributed to the lost of sales, lost of income, lost of customer appeal, increase customer

27        dissatisfactions, tarnished brand and added to the brand deteriorations resulting in

28        diminished 2004 through 2008 sales and loss of profitability, as a overall operations.
                                                    -20-

1         Documents related to the subject matter could be located in bates-numbered; MP004130,

2         MP004132 through MP004137, MP004138, MP004139 (2697), MP-001472, MP-001468,

3         MP-001467, MP-001466, MP-002931 through MP-003000, MP-003002 through MP-

4         003018.

5 **INTERROGATORY NO.16:**

6 Identify each distributor and supplier to whom You Claim Ben & Jerry's discredited You and, as

7 to each, state:

8     a.  what You understand Ben & Jerry's said to discredit You;

9     b.  when it was said;

10     c.  the Persons involved; and

11     d.  any documents relating to this issue.

12 **SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

13 Subject to and without waiting its general and specific objections it has made Porghavami

14 supplements his responses as follows:

15     a.  To watch out this account, that his shops was going out of business,

16     b.  During August 2006 and again in winter-spring 2007,

17     c.  Desk order personnel at Bunzl and Boelter

18     d.  Bates-numbered: MP-001021, MP-001022, MP-001018, MP-001017, MP-001014, MP-

19        001028, MP-001019, MP-001020, MP-001015, MP-001016, MP-003579, MP-001463,

20        MP-001434, MP-001435, MP-001436, MP-001458, MP-001459, MP-001454, MP-

21        001453, MP-001439, MP-001438, MP-001437, MP-001447, MP-001432, MP-001431,

22        MP-001427, MP-001428, MP-001429.

23 **INTERROGATORY NO.19:**

24 Separately with respect to each alleged "source" of damages You claim to have suffered or will

25 suffer in the future as a result of the actions of the Defendants (including, but not limited to, the

26 following "sources": (1) failure to receive Ben & Jerry's Products; (2) delays in receiving Ben &

27 Jerry's Products; (3) underweighted tubs; (4) improperly marked or packed Ben & Jerry's

28 Products; (5) delivery of Ben & Jerry's Products that had expired or were to expired within 90

-21-

1 days of Your receipt of Products (or otherwise was not in compliance with Ben & Jerry's own
2 distribution criteria); (6) shortages of Ben & Jerry's Products; (7) allegedly false and misleading
3 financial projections provided in connection with Your purchase of shops; (8) alleged lack of
4 assistance in connection with efforts to sell any of the Shops; (9) alleged failure to approve
5 prospective buyers for any of the Shops; (10) alleged refusal to renew the Roseville Franchise
6 Agreement; (11) alleged discrediting of Defendants to supplier and distributors; (12) omission of
7 the Concord Shop from marketing campaign; and (13) alleged deteriorating quality of the Ben &
8 Jerry's Products):

9      a. describe precisely how You intend to prove the fact and amount of damage from such
10        sources (e.g., before-and-after, yardstick), including each step by which the amount of
11        damage will be established and computed and each arithmetical or mathematical formula
12        used;

13     b. state in detail all of the facts upon which You intend to rely on to prove or measure the
14        amount of damage from such sources; and

15     c. identify all documents relating to the damage from each sources, including those You
16        intend to use in attempting to prove such damage.

17 ## SUBLEMENTAL RESPONSE TO INTERROGATORY NO. 19:

18 Subject to and without waiting its general and specific objections it has made Porghavami
19 supplements it response as follows: Porghavami in particular object to this interrogatory on the
20 ground that the interrogatory is compound, overly broad to the extent that requires the answer to
21 this interrogatory may be derived from records, and the burden of deriving the answer is
22 substantially the same for the requesting party as for the responding party. Accordingly,
23 Porghavami elects to respond to this interrogatory by specifying the following records (and all
24 other related documents) from which the answer may be derived or ascertained. Subject to and
25 without waiting its general and specific objections it has made Porghavami supplements his
26 responses as follows:

27 (1) Failure to receive Ben & Jerry's Products; loss of sales, revenue and investments in 2006,
28 2007, 2008 and in future, including bates numbered: 2853 through 2877, MP-003748, MP-
-22-

1 003749, MP-003720, MP-003721, MP-003722, MP-003747, MP-003712, MP003845 through
2 MP003928 .

3 (2) Delays in receiving Ben & Jerry's Products; loss of sales, revenue and investment in 2006,
4 2007 and thereafter, including bates numbered: MP004175 through 004177, MP004121 through
5 MP004129, MP004232, MP-002780, MP-002781, MP-002782, MP-003022, MP-003023, MP-
6 003094 through MP-003098, MP-003052 through MP-003057, MP-003105 through MP-003116,
7 MP-002758 through MP-002778, MP-002748, MP-002747, MP-002753, MP-002749 through
8 MP-002752, MP-003033, MP-001327, MP-001328, MP-002700 and MP003845 through
9 MP003928, MP-003432, MP-003571 through MP-003573, MP-003218.

10 (3) Underweighted tubs; lost of sales including bates numbered: 2844 through 2847, 2849 through
11 2850, 2606 through 2697, 2698 through 2771, 3260 through 3261, 2596, 2764 and 2771, MP-
12 00329, MP-003289, MP-003290, MP-003286, MP-003287, MP-001511, MP-003532, MP-
13 003531, MP-001520, MP-001521, MP-003527, MP-003352, MP-003353, MP-003354, MP-
14 003355, MP-003356, MP-003357, MP-003360, MP-003361, MP-003358, MP-003359, MP-
15 003362, MP-003363, MP-003422, MP-003423, MP-003419, MP-003381, MP-003372, MP-
16 003373, MP-003368, MP-003369, MP-003366, MP-003364, MP-003365, MP-001479, MP-
17 001488, MP-001489, and MPW-000102 through MPW-000166, MP003845 through MP003928.
18 (4) Improperly marked or packed Ben & Jerry's Products; Lost of sales and revenue, increase
19 costs, including bates numbered: 2603 through 2697, MP-001472, MP-001468, MP-001467, MP-
20 001466. Also refer to monthly sales reports of November 2002 through August 2008 numbers
21 including some indicated herein as bates-numbered MP-002931 through MP-003000, MP-003002
22 through MP-003018, MPW-0001711, 2448, MP-003267, MP-002177,

23 (5) Delivery of Ben & Jerry's Products that had expired or were to expired within 90 days of Your
24 receipt of the Products (or otherwise was not in compliance with Ben & Jerry's own distribution
25 criteria); lost of sales and increase customer complains, including bates numbered: MP-003352,
26 MP-003353, MP-003354, MP-003355, MP-003356, MP-003362, MP-003363, MP-003554, MP-
27 003352, MP-003353, MP-003354, MP-003355, MP-003356, MP-003267, MP-003358, MP-
28 003359, MP-003356, MP-003357, MP-003359.

-23-

(6) Shortages of Ben & Jerry's Products, including bates numbered: MP003845 through MP003981, MP-003432, MP-003573, MP-003354, MP-003355, MP-003368, MP-003369, MP-003419, MP-003424, MP-003422, MP-003423, MP-003403, MP003845 through MP003928, MP-003432, MP-003571 through MP-003573, MP-003403, MP-003364, MP-003365, MP-003218, MP-000800, MP-002823, MP-003227 through MP-003217.

(7) False and misleading financial projections provided in connection with Your purchase of Shops, including bates numbered: MP-002780, MP-002781, MP-002782, MP-003022, MP-003023, MP-003094 through MP-003098, MP-003052 through MP-003057, MP-003105 through MP-003116, MP-002758 through MP-002778, MP-002748, MP-002747, MP-002753, MP-002749 through MP-002752, MP-003033, MP-001327, MP-001328, MP-002700, MP004175 through 004177, MP004121 through MP004129, MP004232.

(8) Lack of assistance in connection with efforts to sell any of the Shops, including bates-numbered; 2853 through 2877, MP-003748, MP-003749, MP-003720, MP-003721, MP-003722, MP-003747, MP-003712.

(9) Failure to approve prospective buyers for any of the Shops, including bates-numbered: MP-001320, MP-001040, MP-001039, MP-001319, MP-001318, MP-001317, MP-002714, MP-002713, MP-002712, MP-002711, MP-002710, MP-002709, MP-002707, MP-002708, MP-002703, MP-002704, MP-002705, MP-002702, MP-002725, MP-002701, MP-002732, MP-002731, MP-002730, MP-002729, MP-003726, MP-003737, MP-003738, MP-003739, MP-003740, MP-003741, MP-002726, MP-002727, MP-002728, MP-002723, MP-003752, MP-003753, MP-003750, MP-003751, MP-002724, MP-002733, MP-002735, MP-002734, MP-002722, MP-002803, MP-002802, MP-003206 .

(10) Refusal to renew the Roseville Franchise Agreement, including bates-numbered MP-002804, MP004165 through MP004168, MP004169, MP004170.

(11) Discrediting of Defendants to suppliers and distributors, including bates-numbered MP-001021, MP-001022, MP-001018, MP-001017, MP-001014, MP-001028, MP-001019, MP-001020, MP-001015, MP-001016, MP-003579, MP-001463, MP-001434, MP-001435, MP-

-24-

1 | 001436, MP-001458, MP-001459, MP-001454, MP-001453, MP-001439, MP-001438, MP-

2 | 001437, MP-001447, MP-001432, MP-001431, MP-001427, MP-001428, MP-001429,

3 | (12) Omission of Concord Shop from marketing campaign, including bates-numbered; MP004169

4 | through MP004171

5 | (13) Deteriorating quality of the Ben & Jerry's Products: including bates-numbered; MP004243

6 | through MP004250, 2603 through 2697, MP-001472, MP-001468, MP-001467, MP-001466.

7 | Discovery is still ongoing and Porghavami reserves the right to supplement these

8 | responses.

9 | DATED: May 20, 2009

10

11

12

13 | By

MEHRDAD PORGHAVAMI, ET AL
Defendants & Cross-Complainant
14 | Appearing in Propria Persona
11140 Fair Oaks Blvd., Suite 300
15 | Fair Oaks, California 95628

16

17 | VERIFICATION

18

19 | I DECLARE UNDER THE PENALTY OF PERJURY THAT THESE RESPONSES ARE TURE

20 | AND CORRECT.

21

22

23 | Date: May 20,2009      Signed:

24 | MEHRAD PORGHAVAMI, In Pro se
Defendants & Cross-Complainant

25

26

27

28 | -25-

# PROOF OF SERVICE

I am a resident of the State of California, over age of eighteen years.

My business address is: 11140 Fair Oaks Blvd, Suite 300, Fair Oaks, California 95628. On this

May 20, 2009, I mailed within documents:

## "DEFENDANTS' MEHRDAD PORGHAVAMI AND MPA GROUP, INC.'S SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORY NUMBER 3, 5,6, 8, 9, 10, 15, 16 AND 19"

Case No. 2:07-CV-02599-JAM-KJM

To:     Barry M. Heller, Esq. / John J. Dwyer, Esq.
        Attorneys for Plaintiff BEN & JERRY'S, ET AL.
        DLA PIPER US LLP
        1775 Wiehle Avenue, Suite 400
        Reston, Virginia 20190-5159

Copy:   John F. Doyle, Esq.
        Attorney representing Cross- Defendant WONDER ICE CREAM LLC
        HOGE, FENTON, JONES & APPEL, INC.
        Sixty South Market Street, Suite 1400
        San Jose, CA 95113-2396

By placing the documents listed above in a sealed separate envelops for each

address named above with the name and address of person served shown on the envelop with

United States Postal Service delivery thereon fully prepaid, during the normal business hours in

Sacramento, California

I declare under penalty of perjury under the laws of the State of California that

the above is true and correct.

Executed on this May 20, 2009 at Sacramento, California

Mehrdad Porghavami

DEFENDANTS'
# Exhibit - "E"

Subj:    **Sacramento Ben & Jerry's Scoop Shop Purchase Agreement**
Date:    10/23/2006 3:45:26 P.M. Pacific Daylight Time
From:    Sacramentobj
To:      jmjnlawren
CC:      Rosevillebj

Hi Michael:

Please find attached herewith the Purchase Agreement, for your review. Should you be interested to proceed, we need to sign the Letter Agreement as soon as possible and you place your deposit. The purchase is subject to approval by the Ben & Jerry's Homemade, Inc. My goal is to complete the transfer by the end of the year. However, if we have to extend the transfer beyound December 29th, then sometimes in January would be the target date. I have the trainning course scheduale (Scoop you) date for December 4- 14th. There are no date for January course and I'm not sure at this time that there is going to be one. The other alternative is going to be the course that start November 6-16, but that seem impossible to make. There is a 30 days discovery date during which you have to conduct couple of interviews. Please let me know your thoughts. I propose to meet this week and finalize the Letter Agreement in person.

Sincerely,

Mehrdad


+++++++++++++++++

Mehrdad Porghavami
MP AGROUP, INC. DBA
BEN & JERRY'S
Roseville, Sacramento & Concord

October 22, 2006

Mr Michael Lawrence & Mrs. Jennifer Lawrence
3404 Raben Way
Cameron Park, CA 95682

Re. Purchase of Ben & Jerry's Sacramento

This letter will confirm our understanding regarding the transfer of our Roseville shop to you. We have agreed that you will acquire our "Ben & Jerry's Scoop Shop" located at 1735 Arden Way, Suite 222 Sacramento, CA 95815 (the "shop"), for a purchase price of $ 220,000.00 You are also responsible for the current transfer fees, training fee and expenses paid to Ben & Jerry's Homemade, Inc., and all inventories on hand. Additionally you are also responsible for paying the sales tax due on the transfer of the equipment. At closing we will transfer all right, title and interest in the personal property used in the operation of the shop, an assignment of our right under the lease for the shop, and the agreement with Ben & Jerry's Homemade, Inc., permitting you to operate the Shop as a Ben & Jerry's Scoop Shop on the same economic terms as our current arrangement. Closing to take place on or before December 29, 2006.

The Sale is subject to preparation and execution of final documents consistent with this letter, the approval of the landlord, and the approval of Ben & Jerry's Homemade, Inc. Because we have agreed not to offer the Shop to any other parties pending the closing, you have agreed to pay a $50,000., deposit when you sign and return this letter, which will be credited against the purchase price at closing.

If the transfer is not completed due to a refusal by the landlord or Ben & Jerry's Homemade, Inc., to consent to the transfer, we will return the deposit. In the event that the closing and consummation to the transaction do not occur for any reason other than the landlord refusing the assignment of lease or Ben & Jerry's Homemade refusing to consent to the transfer, Buyer and Seller agree that it would be impractical and extremely difficult to estimate the damages which Seller may suffer as a result thereof. Therefore, Buyer and Seller do hereby agree that a reasonable estimate of the total detriment that Seller would suffer in the event that Buyer fails to complete the purchase of business is and shall be, as Seller sole and exclusive remedy, and as full, agreed and liquidated damages for such breach, an amount equal to the deposit. The parties acknowledge that the payment of such liquidated damages is not intended as a forfeiture or penalty, but is intended to constitute liquidated damages to Seller. Additionally, Seller shall be released from selling business to buyer. If this accurately reflects your understanding of our agreement, please sign and return a copy of this letter.

Very Truly Yours,
MPA GROUP INC. DBA BEN & JERRY'S

_____
Mehrdad Porghavami

_____
Date

_____       _____
Michael Lawrence               Jennifer Lawrence

2587



**Personal Financial Statement as of:** 10/21/2006
(Date)

**Applicant's Name(s):** Michael & Jennifer Lawrence

**Home Address:** 3404 Raben Way
Cameron Park Ca, 95682

**Home Phone:** 530-676-8880

| Assets | In Even Dollars | | Liabilities and Net Worth | In Even Dollars | |
|---|---|---|---|---|---|
| Cash on hand and in Banks -- See Schedule A | $ | 8,000 | Notes Payable: This Bank -- See Schedule A | $ | 7,500 |
| U. S. Government Securities -- See Schedule B | $ | 30,000 | Notes Payable: Other Institutions -- See Schedule A | $ | 10,000 |
| Listed Securities -- See Schedule B | $ | 5,000 | Notes Payable -- Relatives | $ | - |
| Unlisted Securities -- See Schedule B | $ | - | Notes Payable -- Others | $ | - |
| Other Equity Interests -- See Schedule B | $ | 80,000 | Accounts and Bills Due | $ | - |
| Accounts and Notes Receivable | $ | - | Unpaid Taxes | $ | - |
| Real Estate Owned -- See Schedule C | $ | 625,000 | Real Estate Mortgages Payable -- See Schedule C or D | $ | 310,000 |
| Mortgages and Land Contracts Receivable -- See Schedule D | $ | - | Land Contracts Payable -- See Schedule C or D | $ | - |
| Cash Value Life Insurance -- See Schedule E | $ | - | Life Insurance Loans -- See Schedule E | $ | - |
| Other Assets: Itemize | $ | - | Other Liabilities: Itemize | $ | - |
| personal items ie vehicles, boat, personal effects | $ | 120,000 | | $ | - |
| | $ | - | | | |
| | $ | - | | $ | - |
| | $ | - | Total Liabilities | $ | 327,500 |
| | $ | - | Net Worth | $ | 540,500 |
| Total Assets | $ | 868,000 | Total Liabilities and Net Worth | $ | 868,000 |

| Sources of Income | In Even Dollars | | General Information |
|---|---|---|---|
| Salary | $ | 115,000 | Employer Self, CDI |
| Bonus and Commissions | $ | - | Position or Profession Owner, Manager   No. Years   11,16 |
| | | | Shingle Springs, CA 95682-- Cameron Park CA, 95682(San Jose, CA) |
| Dividends | $ | 2,000 | |
| Real Estate Income | $ | - | |
| *Other Income: Itemize | $ | - | Employer's Phone No.   530-676-0707 |
| | $ | - | Partner, officer or owner in any other venture? |
| Total | $ | 117,000 | |

*Alimony, child support or separate maintenance payments need not be disclosed unless relied upon as a basis for extension of credit.

no

Income taxes settled through (date)   current

| Contingent Liabilities | In Even Dollars | | General Information (continued) |
|---|---|---|---|
| | | | Are you a defendant in any suits or legal action? If so, explain:  No |
| As endorser, co-maker or guarantor | $ | - | |
| On leases | $ | - | |
| Legal claims | $ | - | |
| | | | Have you ever taken bankruptcy? |
| Provisions for federal income taxes | $ | - | |
| Other special debt, e.g., recourse or repurchase liability | $ | - | If so, explain:   No |
| | $ | - | Do you have a will? |
| | $ | - | If yes, with whom?   No |
| | $ | - | Do you have a trust? |
| | $ | - | If yes, with whom? |
| | $ | - | Number of Dependents:   2   Ages.   11,14 |
| TOTAL | $ | - | |

MP-003736

**Schedule A: Banks, Brokers, Savings & Loan Association, Finance Companies or Credit Unions.**

List here the names of all the institutions at which you maintain a deposit account and/or where you have obtained loans.

| Name of Institution | Name on Account | Balance on Deposit | | High Credit | Amount Owing | | Monthly Payment | Secured by What Assets |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Michael & Jennifer | | 5000 | | | 5000 | | Personal |
| Wells Fargo | Michael & Jennifer | $ - | | | | | | car 10,000 owed |
| | | $ - | | | $ - | | | |
| | | $ - | | | $ - | | | |
| | | $ - | | | $ - | | | |
| | **TOTAL** | $ - | | **TOTAL** | | | $ - | |

**Schedule B: U.S. Governments, Stocks (Listed & Unlisted), Bonds (Gov't & Comm.), and Partnership Interest (General & Ltd.)**

| Number of Shares, Face Value (Bonds), or % of Ownership | Indicate: Agency or name of company issuing security or name of partnership. | Type of investment or equity classification | Number of shares, bonds or % of ownership held. | Basis of valuation* | In Name of | * Market Value | Pledged | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No |
| Tbills | Us Treasury | Tbills | | | Michael & Jennifer | $ 30,000 | | X |
| stock accounts | | stocks | | | same | $ 5,000 | | X |
| Business | | business | | | same | $ 80,000 | | x |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | **TOTAL** | $ 116,000 | | |

*If unlisted security or partnership interest, provide current financial statements to support basis for valuation.

**Schedule C: Real Estate Owned (and related debt, if applicable)**

| Description of Property or Address | Title in Name of | Date Acquired | Cost + Improvements | Present Market Value | Mortgage or Land Contract Payable | | |
|---|---|---|---|---|---|---|---|
| | | | | | Bal. Owing | Mo. Pymt. | Holder |
| Home apprx val 625000 | Countrywide | 12/1/2006 | | | $ 310,000 | $ 1,935 | |
| | | | $ - | | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | **TOTAL** | $ - | $ - | $ 310,000 | $ 1,935 | |

**Schedule D: Real Estate: Mortgages & Land Contracts Receivable (and related debt, if applicable)**

| Description of Property or Address | Title in Name of | Date Acquired | Balance Receivable | Monthly Payment | Mortgage or Land Contract Payable | | |
|---|---|---|---|---|---|---|---|
| | | | | | Bal. Owing | Mo. Pymt. | Holder |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | | $ - | $ - | $ - | $ - | |
| | | **TOTAL** | $ - | $ - | $ - | $ - | |

**Schedule E: Life Insurance Carried**

| Name of Company | Face Amount | | Cash Surrender Value | | Loans | | Beneficiary |
|---|---|---|---|---|---|---|---|
| Farmers | $ 300,000 | $ 300,000 | $ - | | $ - | | Spouses |
| Farmers | $ - | $ 250,000 | $ - | | $ - | | |
| Misc | $ - | $ 50,000 | $ - | | $ - | | |
| Misc | $ - | $ 25,000 | $ - | | $ - | | . |
| | $ - | | $ - | | $ - | | |
| **TOTAL** | $ 925,000 | | $ - | | $ - | | |

The information contained in this statement is provided for the purpose of obtaining, or maintaining credit with you on behalf of the undersigned, or persons, firms or corporations in whose behalf the undersigned may either severally or jointly with others, execute a guaranty in your favor. Each undersigned understands that you are relying on the information provided herein (including the designation made as to ownership of the property) in deciding to grant or continue credit. Each undersigned represents and warrants that the information provided is true and complete and that you may consider this statement as continuing to be true and correct until a written notice of change is given to you by the undersigned. You are authorized to make all inquiries deemed necessary to verify the accuracy if the statement made herein, and to determine my/four creditworthiness. You are authorized to answer questions about your credit experience with me/us.

| Applicant's Signature | | Date Signed: | Social Security Number: | Date of Birth: |
|---|---|---|---|---|

| Spouse's or Co-Applicant's Signature | | Date Signed: | Social Security Number: | Date of Birth: |
|---|---|---|---|---|

MP-003737

# Ben & Jerry's

# Franchise Agreement Information

**PLEASE PRINT**

Please fill out the information requested below so that we may complete your franchise agreement.

## NOTICES, REPORTS AND PAYMENTS:

All written notices, reports and payments permitted or required to be delivered to the Franchisee by the provisions of the Franchise Agreement should be addressed and delivered to:

Michael & Jennifer Lawrence
Name

Corporate Name
3404 Raben Way
Street Address
Cameron Park CA 95682
City, State, Zip Code
530 676 8880
Phone

Fax

Email

## THE FORM OF FRANCHISE WILL BE:

Based on the format you will be operating your franchise under, you only need to fill out one of the corresponding sections.

_____ INDIVIDUAL - Complete section A.

_____ CORPORATION or JOINT VENTURE - Complete section B.

_____ GENERAL PARTNERSHIP - Complete section C.

_____ LIMITED PARTNERSHIP - Complete section C.

_____ TRUST - Complete section D.

## A.    **INDIVIDUAL (Sole Proprietorship):**

The Managing Owner of the Franchise is Michael & Jennifer Lawrence

The owner(s) of Franchise (is) (are) as follows:

Michael & Jennifer Lawrence
Print Name                                    Print Name

Street Address                                    Street Address
3404 Raben Way  Cameron Park, CA 95682
City, State, Zip Code                             City, State, Zip Code
530 676 8880
Telephone Number                                  Telephone Number

**B.**   **CORPORATION OR JOINT VENTURE** (CIRCLE ONE):

**ATTACH A COPY OF THE ARTICLES OR CERTIFICATE OF INCORPORATION, BY-LAWS OR JOINT VENTURE AGREEMENTS TO THIS FORM.**

List the name of the corporation or joint venture and the name(s) of the individual shareholder(s).

_____                    OR              _____
Name of Corporation                        Name of Joint Venture

The Managing Owner of the Franchise is_____
        (The Managing Owner must own not less than a one-third interest
        in the Franchise and has the authority of a chief executive officer).

Franchisee was incorporated/formed on _____, 20_____, under the laws of the
State of _____.        It has not conducted business under any name other than its
corporate name/joint venture name and _____. The following is a list of
Franchisee's directors and officers as of the effective date shown above:

Name & Address of Each Director/Officer   Position(s) Held   % of Ownership

_____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

C. **PARTNERSHIP:**

**ATTACH A COPY OF THE PARTNERSHIP AGREEMENT TO THIS FORM.**

List the name of the partnership and the name(s) of the individual partner(s):

_____
Name of Partnership

The Managing Owner is _____

(The sole Managing Partner, if any, is a Managing Owner, who has full
authority to bind Franchisee and act as its chief executive officer).

Franchisee is a [general] [limited] partnership formed and operating under the laws of the State of
_____ on or about _____ , 20_____. If a limited partnership, Franchisee has filed a certificate of
limited partnership or other appropriate documentation as required under the laws of the State of
_____ . It has not conducted business under any name other than its partnership name
(which is _____) and _____.

Name & Address of Each Partner        Position(s) Held  % of Ownership

_____                               _____           _____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____                               _____           _____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____                               _____           _____
Print Name

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

D.   TRUST:

ATTACH A COPY OF THE TRUST DOCUMENTS TO THIS FORM.

The Managing Owner of the Franchise is_____

   (The Managing Owner must be the trustee of the trust).

Franchisee is a revocable trust formed under the laws of the State _____on _____, 20_____. The grantor, trustee and primary income beneficiary of Franchisee is_____, a resident of the State of _____. The governing trust instrument of FRANCHISEE consists of a trust agreement dated _____, _____ and the following amendments, if any:

The governing trust instrument of Franchisee consists of a trust agreement dated _____, 20_____ and the following amendments, if any:

The trustee has full power and authority to bind the trust estate and to execute, deliver and perform, or cause the execution, delivery and performance, of all of Franchisee's obligations. In the event of the trustee's resignation, death or inability to act, the following are named to act as successor trustee, in this order:

   (a)_____
   (b)_____
   (c)_____

Please include current and contingent beneficiaries under the trust, and their respective interests therein:

   Current beneficiaries:

   (a)_____
   (b)
   (c)_____

   Contingent beneficiaries:

   (a)_____
   (b)_____
   (c)_____

ADDITIONAL INFORMATION

Please list any pertinent information that may be necessary to inform the ASC staff when sending out the signing email:

DEFENDANTS'
# Exhibit - "F"

Subj:    **Roseville Ben & Jerry's Scoop Shop**
Date:    10/23/2006 3:55:12 P.M. Pacific Daylight Time
From:    Sacramentobj
To:      halldg@cwnet.com
CC:      Rosevillebj

Hi Dale:

Please find attached herewith the Purchase Agreement, for your review. Should you be interested to proceed, we need to sign the Letter Agreement by Friday October 27th and you place your deposit. The purchase is subject to approval by the Ben & Jerry's Homemade, Inc· My goal is to complete the transfer by the end of the year. I have the trainning course scheduale (Scoop you) date for December 4- 14th. There are no date for January course and I'm not sure at this time that there is going to be one. The other alternative is going to be the course that start November 6-16, but that seem impossible to make. There is a 30 days discovery date during which you have to conduct couple of interviews. Please let me know your thoughts. I propose to meet this week and finalize the Letter Agreement in person.

Sincerely,

Mehrdad

++++++++++++++++++

Mehrdad Porghavami
MP AGROUP, INC. DBA
BEN & JERRY'S
Roseville, Sacramento & Concord

2592

October , 2006

Mr. Dale Hall
..............................
..............................

Re. Purchase of Ben & Jerry's Roseville

This letter will confirm our understanding regarding the transfer of our Roseville shop to you. We have agreed that you will acquire our "Ben & Jerry's Scoop Shop" located at 2030 Douglas Blvd., Suite 18 Roseville, CA (the "shop"), for a purchase price of $ 130,000.00  You are also responsible for the current transfer fees, training fee and expenses paid to Ben & Jerry's Homemade, Inc., and all inventories on hand. Additionally you are also responsible for paying the sales tax due on the transfer of the equipment. At closing we will transfer all right, title and interest in the personal property used in the operation of the shop, an assignment of our right under the lease for the shop, and the agreement with Ben & Jerry's Homemade, Inc., permitting you to operate the Shop as a Ben & Jerry's Scoop Shop on the same economic terms as our current arrangement.  Closing to take place on or before December 29, 2006.

The Sale is subject to preparation and execution of final documents consistent with this letter, the approval of the landlord, and the approval of Ben & Jerry's Homemade, Inc. Because we have agreed not to offer the Shop to any other parties pending the closing, you have agreed to pay a $50,000., deposit when you sign and return this letter, which will be credited against the purchase price at closing.

If the transfer is not completed due to a refusal by the landlord or Ben & Jerry's Homemade, Inc., to consent to the transfer, we will return the deposit. In the event that the closing and consummation to the transaction do not occur for any reason other than the landlord refusing the assignment of lease or Ben & Jerry's Homemade refusing to consent to the transfer, Buyer and Seller agree that it would be impractical and extremely difficult to estimate the damages which Seller may suffer as a result thereof. Therefore, Buyer and Seller do hereby agree that a reasonable estimate of the total detriment that Seller would suffer in the event that Buyer fails to complete the purchase of business is and shall be, as Seller sole and exclusive remedy, and as full, agreed and liquidated damages for such breach, an amount equal to the deposit. The parties acknowledge that the payment of such liquidated damages is not intended as a forfeiture or penalty, but is intended to constitute liquidated damages to Seller. Additionally, Seller shall be released from selling business to buyer. If this accurately reflects your understanding of our agreement, please sign and return a copy of this letter.

Very Truly Yours,
MPA GROUP INC. DBA BEN & JERRY'S

_____
Mehrdad Porghavami

_____
Date

_____
Dale Hall

2591

DEFENDANTS'

# Exhibit - "G"

# How to Claim Expenses

Ben & Jerry's has always supported its franchisees in the scooping of over 1 million free cones a year by reimbursing them for the cost of the ice cream they scoop. (And cheering you along the entire way!) In exchange, franchisees provide the staffing, the local marketing, the community relationships — and the heart and scooping muscles - to pull it off!

Either completing a bulk tub inventory or tracking cones through the point of sale system determines reimbursement for ice cream scooped. The value for each 4 oz. portion is $0.44.

**PLEASE NOTE: Operators must be in full compliance through March 2006 at time of submittal in order to receive a reimbursement check. If an operator is out of compliance, a credit in the amount of the reimbursement claim will be applied to open account balance.**

As you may recall, last year processing payments took much longer then expected due to the AP transition. This year we have allocated internal resources to expedite the reimbursement process. You can help us by mailing/faxing your claims ASAP. (Please include a valid email address on your reimbursement sheet so we can confirm receipt of your submittal)

**If we receive your claim by 5/25/06, it will be processed & submitted to our offsite AP vendor within 24 hours.** Check run times from our offsite AP vendor (receipt of claim from Ben & Jerry's until the check is in your hands) can range from 3-4 weeks. Reimbursement claims received after 5/25/06 may be delayed. All claims must be received no later than 8/15/06.

The amount spent on marketing locally, organizing and paying for entertainment, scooper labor and paper costs are all claimable as part of a shop's local marketing obligation on the 2006 Reporting Form.

**To receive reimbursement for the cost of the Ice Cream, Frozen Yogurt, and Sorbet served free on Free Cone Day:**

1. Fill out **one** of the attached Ice Cream Reimbursement Sheets. (The bulk method is the preferred method).

2. Complete the Marketing Questionnaire at the bottom of the sheet. This questionnaire must be completed in order for the sheet to be processed. We will expedite payment processing through May.

3. Mail and/or fax tally sheets ASAP, but no later than AUGUST 15th, 2006. Any reimbursement request postmarked after August 15th **will not** be paid.

Please note that last year, the average number of cones submitted was 4,090. We think that is great! At times, we have franchisees who do such an incredible job of promoting the event, they exceed the system average- we think that is awesome! However, we do randomly audit some stores after receiving their free cone day reports. Please, don't get upset if you get audited! Simply be prepared to share pre & post free cone day orders, labor efforts, marketing efforts, etc. We appreciate your cooperation in case of an audit, and more importantly can't wait to share what you did so well with others!

MP-003661

**To claim the cost of Paper Goods, Local Marketing, Entertainment and Labor used to serve free cones on Free Cone Day:**

1. Complete the Donations & Sampling Events section of the monthly New Reporting Form.

2. List the items, quantities and costs.
   Paper Goods = $0.06 per scoop (average of cone and cup costs)
   Marketing = Lump sum paid for print or media advertising
   Entertainment = Lump sum paid
   Labor = Lump sum paid for non-volunteer staff

Ben & Jerry's reserves the right to audit Free Cone Day reimbursement requests.
**Operators must be in full compliance at time of submittal (through March 2006) in order to receive a check reimbursement.**

MP-003662

# 2006 Free Cone Day Reimbursement Form

| |
|---|
| **For shops calculating the number of cones scooped through a bulk inventory.** |

Complete a comprehensive bulk tub inventory before the start of Free Cone Day. Full bulks count as 1.0, partial bulks should be accounted for as a decimal (0.25, 0.5, 0.75, etc.). At the completion of Free Cone Day, complete a second bulk inventory. The difference between the starting count and the ending count is the number of bulk tubs that were scooped.

Shop Location: _____

Shop ID#: _____

Corporation Name: _____

| |
|---|
| Number of Bulks Scooped (A): _____ <br><br> Multiply by Cost of Bulk (A) x $26.40 = _____ **(Total Reimbursement)** |

Each bulk tub yields an average of 60 small cones. Please tell us ho many scoops of ice cream were given away on Free Cone Day:

| |
|---|
| Multiply # of Bulk Scooped (A) x 60 = _____ **(Total Cones Scooped)** |

Now tell us about your day! This information is required – incomplete forms will not be processed for reimbursement.

What were your hours for Free Cone Day?

Did you receive press?                    More than '05_____ Less than '05____

What community organization(s) were represented at your shop?

If there was fundraising involved, how much did you raise?

If you had celebrity scoopers, who were they?

What were your top two flavors scooped?

**All forms must be postmarked/faxed ASAP, but no later than August 15th, 2006. Operators must be in full compliance at time of submittal to receive a reimbursement check. Otherwise, a credit in the amount of the reimbursement claim will be applied to the open account balance.**

Fax to: 802-846-1538, Attn: Amy Murphy (x7696)
Mail to: Retail Ops - Ben & Jerry's, 30 Community Drive, South Burlington, VT 05403

DEFENDANTS'

# Exhibit - "H"

Subj:     **Re: Price Survey**
Date:     5/15/2006 3:24:48 P.M. Pacific Daylight Time
From:     Rosevillebj
To:       Steve.Chertoff@benjerry.com

Steve:

Please find attached herewith our pricing for all 3 shop for your records.

Sincerely,

Mehrdad Porghavami
MPA GROUP, INC DBA
BEN & JERRY'S
Roseville, Sacramento & Concord
Tel # 916 781 7879 / 925 363 4648
Fax # 916 781 8119 / 925 363 4666

MP-002285

| 2008 SCOOP SHOP PRICE SURVEY | Please fill in your pre-tax prices for each of your stores | | | | | | |
|---|---|---|---|---|---|---|---|
| Corporate | | | | | | | |
| California | | | | | | | |
| SITE TYPE: (for example, Interior Mall) | | | | | | | |
| **Department: Cones** | | | | | | | |
| SMALL CONE | $3.00 | | | | | | |
| REGULAR CONE | $3.50 | | | | | | |
| LARGE CONE | $4.00 | | | | | | |
| BABY CONE | $3.00 | | | | | | |
| WAFFLE CONE | $1.00 | | | | | | |
| CHOCOLATE DIPPED WAFFLE CONE | $1.50 | | | | | | |
| CHOCOLATE DIPPED SUGAR CONE | $0.85 | | | | | | |
| **Department: Sundaes** | | | | | | | |
| HOT FUDGE SUNDAE | $5.00 | | | | | | |
| COOKIE COOKIE SUNDAE | $5.50 | | | | | | |
| BROWNIE SPECIAL | $5.50 | | | | | | |
| CORE CONCOCTION SUNDAE | $5.00 | | | | | | |
| WAFFLE CONE SUNDAE | $5.50 | | | | | | |
| BANANA FUDGE ROYAL | $5.50 | | | | | | |
| BANANA SPLIT | $6.39 | | | | | | |
| VERMONSTER | $48.99 | | | | | | |
| **Department: IC Drinks** | | | | | | | |
| REGULAR MILK SHAKE | $4.39 | | | | | | |
| LARGE MILK SHAKE | $4.89 | | | | | | |
| CAPPACHILLO COOLER | $4.49 | | | | | | |
| SMOOTHIE | $5.00 | | | | | | |
| LARGE SORBET SPLASH | $4.59 | | | | | | |
| ICE CREAM SODA/FLOAT | $4.49 | | | | | | |
| **Department: Hand packed** | | | | | | | |
| HAND PACK PINT | $4.99 | | | | | | |
| HAND PACK QUART | $8.99 | | | | | | |
| **Department: Ice Cream Cakes** | | | | | | | |
| SMALL ROUND CAKE | $16.95 | | | | | | |
| MEDIUM ROUND CAKE | $21.95 | | | | | | |
| LARGE ROUND CAKE | $35.95 | | | | | | |
| SHEET CAKE | $56.95 | | | | | | |
| **Department: Baked Goods** | | | | | | | |

| | |
|---|---|
| CHOCOLATE CHIP COOKIES | $1.25 |
| FUDGE BROWNIE | $3.50 |
| | |
| REGULAR SOFT SERVE | n/a |
| LARGE SOFT SERVE | n/a |
| REGULAR SOFT SERVE SHAKE | n/a |
| LARGE SOFT SERVE SHAKE | n/a |
| DIG IT SOFT SERVE SUNDAE | n/a |
| TRADITIONAL SOFT SERVE SUNDAE | n/a |
| | |
| PINTS | $4.39 |
| BEN & JERRY'S ICE CREAM BARS | $3.50 |
| | |
| LEMONADE/LIMEADE | n/a |
| BOTTLED WATER | $1.65 |
| | |
| Do you post your prices with or without tax? | no tax |
| What is your current tax rate? | 8.25% |
| | |